**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.00-6309-CR-DIMITROULEAS(s)(s)**

UNITED STATES OF AMERICA,
                    Plaintiff,
        v.

JOSEPH SILVESTRI,
                    Defendant

_____/



## GOVERNMENT'S TRIAL MEMORANDUM REGARDING ADMISSIBILITY OF 404(B) EVIDENCE

The United States of America, by its undersigned counsel, respectfully submits this memorandum which outlines evidence of criminal conduct that the Government seeks to introduce pursuant to Rule 404(b) of the Federal Rules of Evidence.

## I. **FACTUAL BACKGROUND**

### A.  **Charged Offenses**

As set forth in the Indictment, the instant matter concerns criminal activity involving defendant Joseph Silvestri and his coconspirators who were involved in numerous fraudulent schemes. Specifically, beginning in or about November 1998, and continuing through January 2000, the defendant's coconspirators Virgil and Charlotte Womack and several other individuals operated a business in Seneca, South Carolina to facilitate the marketing and sale of fraudulent guaranteed high-yield investment opportunities. Their business was known by several "trust" names, such as "Alliance

1



Trust" and "Chemical Trust" (collectively known as the "Chemical Trust") created to lend an appearance of legitimacy and to defraud investors. In connection with the operation of the business, Womack opened a number of bank accounts under these various trust names for the purpose of depositing investor checks and transferring funds.

After creating the Chemical Trust and opening bank accounts, Womack solicited insurance agents and other investment brokers to convince their investor clients to purchase these investments. Womack and his coconspirators created manuals for the investment salesmen, and made certain misrepresentation in the manuals related to their experience and to the nature of the investments. Womack promised high rates of return that were guaranteed. All of these representations were false.

Womack also falsely represented that the Chemical Trust investments were completely secured by a multi-billion dollar corporation, U.S. Guarantee of Scottsdale, Arizona, which, in reality, was a complete sham. Defendant Silvestri introduced Womack to the principals of U.S. Guarantee, and assisted Womack in opening Florida bank accounts in the name of Chemical and Alliance Trust in order to deposit investor checks. After an investor's check was forwarded by the agent to Womack's office in South Carolina, Womack would issue a laminated "bond" issued by U.S. Guarantee which was forwarded to the unsuspecting investor.

Defendant Silvestri received "commissions" from U.S. Guarantee, which were nothing more than original investor funds, in return for his facilitating the transfer of investor funds to U.S. Guarantee's accounts in Arizona. Defendant Silvestri deposited these commission in his own Florida bank accounts and accounts at "Americas International Bank Corp., Ltd."(AIBC) bank in the Bahamas.

Over several months in late 1999 and early 2000, the Womacks and other coconspirators defrauded over 1200 victims, many of whom were elderly, and took in over $50 million in fraud proceeds. In August 1999, Womack began to transfer millions of Chemical Trust fraud proceeds to his coconspirators Fred and David Morgenstern. Initially, $2.8 million in Chemical Trust fraud proceeds was transferred from Womack's Alliance Trust account at Admiralty Bank in Florida. Thereafter, Womack began to courier daily bundles of Chemical Trust investor checks to defendant Fred Morgenstern's office in Florida, where Fred Morgenstern would deposit them into local Florida bank accounts, including those in the name of "Gold Coast Check Cashing," "Americas Resource Corp." and the Bahamian bank of "Americas International Bank Corp., Ltd." at which Morgenstern maintained accounts. From these Florida and Bahamian bank accounts, Fred and David Morgenstern made further transfers of Chemical Trust funds and used millions of dollars of such funds to pay settlements in litigation initiated by investors in other fraud

schemes, pay personal expenses and transfer funds to overseas bank accounts in their control.  Fred Morgenstern also assisted Virgil Womack in opening various bank accounts in the name of "Prestige Accounting Services" out of which Womack would make purported "interest" payments and pay agent commissions and operating expenses.

**B.    Rule 404(b) Evidence**

1.    <u>Kenton Capital Ltd., et al., Relating to Fraudulent Practices of Defendant Joseph Silvestri Through the Use of Guarantee Bonds</u>

In May 1995, the Securities and Exchange Commission (SEC) brought suit against Kenton Capital Ltd. and Atlantic Pacific Guarantee Corporation based on allegations of fraudulent schemes concerning the offering of securities in violation of anti-fraud, securities registration, broker-dealer and investment advisor registration provisions of federal securities laws.  Defendants Kenton Capital ("Kenton") and Atlantic Pacific Guarantee Corporation ("Atlantic") were charged with luring investors throughout the United States with guarantees and projections of unobtainable profits to invest at least $900,000 in a purported program that uses pooled investor funds for vaguely described hypothecation with foreign banks with "leased" debt securities and subsequent trading in so-called "bank instruments."  Prospective investors pledged to invest at least $17 million dollars in Kenton

4

and Atlantic's fraudulent trading schemes.  Kenton and Atlantic projected preposterous annual profits ranging from 34,200% to 1,242, 639.4%.  The complaint filed in this matter is attached to this filing as Exhibit 1.

Defendant Joseph Silvestri was alleged to have participated in the fraud scheme described above in civil pleadings filed in United States District Court, District of Columbia, which involved the use of Atlantic as a guarantor in security transactions.  On July 18, 1996, the Honorable Gladys Kessler, United States District Court, District of Columbia, entered a final judgment of permanent injunction and other relief against defendant Joseph Silvestri as a result of his participation in this fraud.  Defendant Silvestri consented to the entry of this order and was permanently enjoined from participating in any fraudulent practices pursuant to this order.  A copy of this order is attached to this filing as Exhibit 2.

      2.   GFI Financial Inc. and Keyes Insurance Relating to Fraudulent Sale of Promissory Notes by Defendant Silvestri and Others

Beginning in or about November 1996, and continuing until about June 1997, defendant Silvestri and his co-conspirators Virgil Womack and others, participated in a mail/wire fraud scheme that involved an attempt to defraud numerous investors of approximately $7 million through the supposed sale of promissory notes.  In this scheme, Womack used insurance agents to procure victims who were

convinced to invest substantial amounts of money in the purchase of promissory notes with the assurance that an approximately 10% rate of return would be earned and that the investments would be guaranteed by Keyes Insurance. Throughout the course of the fraud, victims were presented financial statements that falsely stated that the assets of Keyes Insurance were worth approximately $2 billion. In fact, Keyes Insurance possessed no real assets and would not be able to honor any claims. Instead, Keyes' assets were misrepresented to the victims to fraudulently induce investments. As in the instant matter, defendant Silvestri introduced Womack to Keyes Insurance and received a "commission" for every promissory note that was sold. Investor/victims, who were solicited by insurance agents, were promised that the money invested would be used for humanitarian purposes throughout the world. Like the financial statements described above, these representations were also false.[1]

---

[1] On May 16, 2000, defendant Silvestri along with his co-conspirator Virgil Womack and seven others were indicted in the Middle District of Georgia for their involvement in this fraud scheme. Defendant Silvestri's trial in this matter is pending. Coconspirator Womack entered a guilty plea. All other defendants, with the exception of defendant Silvestri, pled guilty to the offense or were convicted at trial. Virgil Womack is available to testify about the scope and participants of the fraud scheme. Specifically, Womack would testify that Keyes Insurance had no assets and that defendant Silvestri was the middle-man who introduced Womack to the principals of Keyes Insurance.

II.  **APPLICABLE AUTHORITY**

Rule 404(b), Fed.R.Evid., requires the government to provide notice to each defendant of its intention to offer extrinsic evidence of other crimes, wrongs or acts for the purpose of proving matters such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  This list of purposes contained within the Rule is illustrative rather than exhaustive.  United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988), cert. denied, 409 U.S. 1070 (1989).[2]  The Eleventh Circuit has held that "[t]he government must only provide notice of the 'general nature' of the extrinsic act evidence." United States v. Lampley, 68 F.3d 1296, 1300 (11th Cir. 1995) (citing United States v. Barnes, 49 F.3d 1144, 1148-49 (6th Cir. 1995) ("[T]he government's notice must characterize the prior conduct to a degree that fairly apprises the defendant of its general nature")). See also, 1991 Advisory Comm. Note to Rule 404(b) (notice should disclose the "general nature" of Rule 404(b) evidence).  Thus, the United States is not required to set forth in its notice the dates,

_____

[2] In Lampley, 68 F.3d 1296, 1299-1300 (11th Cir. 1995) (holding that differences in number of kilograms and dates between notice and testimony not reversible; only general notice required; the 10 year limitations on introducing prior convictions does not apply to prior bad acts under United States v. Beechum,582 F.2d 898, 911 (5th Cir. 1978), cert. denied, 440 U.S. 920 (1979), FRE 403 or 404, citing United States v. Pollock, 926 F.2d 1044, 1048 (11th Cir.) ("courts have upheld admission of 404(b) evidence that 'occurred ten and thirteen years earlier that the charged offense.'"), cert denied, 502 U.S. 985 (1991).

times, places and persons involved in the specific acts, documents

that pertain to the acts, or the means or methods through which the

acts will be proven.  See, United States v. Rusin, 889 F.Supp. 1036

(N.D.Ill. 1995) and United States v. Jackson, 850 F.Supp. 1481

(D.Kan. 1994), and cases cited therein.  When measured against the

aforesaid standards, the government's notice is clearly sufficient

notice as it was given via letter months ago.[3]

In applying Rule 404(b), the Eleventh Circuit has expanded

upon the two-part test of the leading case United States v.

Beechum, 582 F.2d 898, 911 (5th Cir.) cert. denied, 440 U.S. 920

(1978).  The en banc court stated that the Beechum test has evolved

into a three-part test for evaluating the admissibility of Rule

404(b) evidence as follows:

> First, the evidence must be relevant to an issue other
> than the defendant's character.  Second, as part of the
> relevance analysis, there must be sufficient proof so
> that a jury could find that the defendant committed the
> extrinsic act.   Third,  the  evidence  must  possess
> probative value that is not substantially outweighed by
> its undue prejudice, and the evidence must meet the other
> requirements of Rule 403.

---

[3] The applicable rules mandate mere notice, and the trial court
must oftentimes rule on the admissibility of such evidence as the
trial progresses.  United States v. Connelly, 874 F.2d 412, 416
(7th Cir. 1989); United States v. Giampa, 904 F.Supp. 235, 284
(D.N.J. 1995); United States v. Messina, 882 F.Supp. 728,733
(N.D.Ill. 1995); United States v. Gonzalez, 1994 WL 689065
(S.D.N.Y. 1994).  In fact, the government's Notice herein
exceeded all of the aforesaid requirements by setting forth a
detailed description of the facts and providing the available
documentation in support thereof.

<u>United States v. Miller</u>, 959 F.2d 1535, 1538 (11th Cir. 1992)(en banc)(internal citations omitted).    <u>Accord</u> <u>United States v. Delgado</u>, 56 F.3d 1357, 1365 (11th Cir. 1995); <u>United States v. Clemmons</u>, 32 F.3d 1504, 1508 (11th Cir. 1994); <u>United States v. Diaz-Lizaraza</u>, 981 F.2d 1216, 1224 (11th Cir. 1993).

In applying the first part of this test, the Court should compare the similarity of the extrinsic evidence to the offense charged.  See <u>United States v. Kopituk</u>, 690 F.2d 1289, 1334 (11th Cir. 1982).  Where the extrinsic evidence goes to the issue of intent, "relevancy is determined by comparing the state of mind of the defendant in perpetrating the respective offenses."  <u>Id.</u> at 1334.  The Eleventh Circuit has also stated:

> [I]f the extrinsic acts are similar to the charged offense in that they require the same type of intent and if the extrinsic acts are fairly proximate in time to the charged offenses, then the extrinsic act evidence is highly probative on the issue of intent.

<u>United States v. Hewes</u>, 729 F.2d 1302, 1314 (11th Cir. 1984).

The defendants' not guilty pleas in the instant case renders their respective intents as material issues.  <u>Delgado</u>, 56 F.3d at 1365 (internal citations omitted).  Therefore, the government may introduce Rule 404(b) evidence to prove intent if the defendant does not "affirmatively take the question of intent out of contention by stipulating . . . [to] the requisite intent."  <u>Diaz-Lizaraza</u>, 981 F.3d at 1224 (internal citations omitted).

Evidence concerning the SEC and GFI matters described above

shows that the defendant was more likely to have knowledge of the charged crimes and that his acts were done intentionally and not through mistake or accident.   In addition, this evidence is admissible to demonstrate that he possessed the intent to join a conspiracy, not merely the mental state to commit single substantive acts.

As demonstrated above, the first part of the test is satisfied because the above-described evidence is relevant to the intent, knowledge, and the absence of mistake or accident.  See, e.g., United States v. Taylor, 17 F.3d 333, 339 (11th Cir. 1994). The next prong of the test indicates that similar act evidence is only relevant if the jury can reasonably conclude that the act occurred and the defendant was the actor.  Beechum, 582 F.2d at 912-913. In the SEC matter concerning the court order,  the defendant was specifically instructed not to engage in any  schemes involving mail or wire fraud or make any other misrepresentations in relation to the sale of securities.  He had been so advised since July 1996. In the GFI matter, prospective government witnesses will testify that the defendant committed the prior acts described above even after the restraining order was entered in the SEC matter in Washington, DC.  Based upon this evidence the jury will certainly be able to conclude the acts occurred and that the defendants committed them.  Thus, the evidence is relevant.

The third prong of the test involves a weighing of the

10

probative value of the evidence against its potential for undue

prejudice under Federal Rule of Evidence 403. In weighing these

factors:

> The judge should be mindful that the test under Rule 403
> is whether the probative value of the evidence is
> <u>substantially</u> outweighed by its unfair prejudice. As one
> commentator has put it, "the discretionary policy against
> exclusion only in those instances where the trial judge
> believes that there is a genuine risk that the emotions
> of the jury is a genuine risk that the emotions of the
> jury will be excited to irrational behavior and that this
> risk is disproportionate to the probative value of the
> offered evidence."

<u>Beechum</u>, 582 F.2d at 915 n. 20 (emphasis in original).

Additionally, when assessing whether the probative value

outweighs the threat of unfair prejudice,

> the court should consider such factors as the differences
> between the charged and extrinsic offenses, their
> temporal remoteness and the government's need for the
> evidence to prove intent.

<u>United States v. Green</u>, 40 F.3d 1167, 1174 (11th Cir. 1994)(internal

citations omitted). Indeed, "[t]he greater the government's need

for the evidence of intent, the more likely that the probative

value will outweigh any possible prejudice." <u>Delgado</u>, 56 F.3d at

1366 (internal citations and quotations omitted).

In the present case, the uncharged acts are similar to the

charged acts, close in time and probative as to the defendant's

state of mind. In particular, defendant Silvestri's conduct in the

SEC matter demonstrates that Silvestri was on absolute notice that

he was prohibited from engaging in fraudulent securities transactions and providing false guarantees. Moreover, the GFI matter completely mirrors his conduct as charged in the indictment in the instant matter. The defendant was instrumental in providing a bogus guarantor to his co-conspirator Virgil Womack for the purpose of fraudulently inducing investor/victims to produce worthless securities. The government needs the evidence to meet the "heavy burden of proving [the defendants'] intent." Green, 40 f.3d at 1175. There is no risk that the "jury will be excited to irrational behavior." Furthermore, any possible prejudice could be mitigated by a limiting instruction. Diaz-Lizaraza, 981 F.2d at 1225. Thus, the third part of the test is also satisfied.

WHEREFORE, the United States respectfully requests that this Court admit the above-described evidence of inextricably intertwined criminal activity during the trial of the above-captioned matter.

Respectfully submitted,
GUY A. LEWIS
UNITED STATES ATTORNEY

By: _____
J. BRIAN McCORMICK
ASSISTANT UNITED STATES ATTORNEY
Court I.D. #A5500084
500 East Broward Blvd., Suite 700
Fort Lauderdale, FL 33394
Telephone: (954) 356-7392
Fax: (954) 356-7230


By: _____
DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY
Court I.D. #A5500017

By: _____
JAMES R. PAVLOCK
SENIOR TRIAL ATTORNEY
DOJ/CRIMINAL DIVISION
Court I.D. #A5500657

13

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served by hand delivery to the following on May 23, 2002:


Richard Sharpstein, Esquire
777 Brickell Avenue
Suite 500
Miami, FL 33131
(Counsel for Joseph Silvestri)


J. BRIAN MCCORMICK
ASSISTANT UNITED STATES ATTORNEY

14



# Exhibit 1

# UNITED STATES DISTRICT COURT
## for the
### DISTRICT OF COLUMBIA

---

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

    v.

KENTON CAPITAL, LTD.; DONALD C. WALLACE;
JEFFREY E. CARTER; DELTAUR PARTNERS;
HARRY WATSON; TRACY L. FRENCH; AND
TERRY PLACK,

        Defendants,

and

AMERICAN PACIFIC GUARANTEE CORPORATION
AND CHARLES SMITH,

        Relief Defendants.

Civ. No. 95-

CASE NUMBER: 1:95CV00812

JUDGE: Gladys Kessler

DECK TYPE: TRO Preliminary Injunction

DATE STAMP: 05/01/95

United States District Court
For the District of Columbia
A TRUE COPY
NANCY MAYER WHITTINGTON, Clerk
5/22/02

---

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

1. This case involves an ongoing fraudulent scheme in which the defendants are offering securities in violation of the antifraud, securities registration, and broker-dealer and investment adviser registration provisions of the federal securities laws. The defendants have lured investors throughout the United States, with guarantees and projections of unobtainable profits, to invest at least $900,000 in a purported program that uses pooled investor funds for vaguely-described hypothecation with foreign banks of "leased" debt securities and

subsequent trading in so-called "bank instruments." Prospective investors have pledged to invest at least $17,000,000 in the defendants' fraudulent trading schemes. The defendants have projected preposterous annual profits ranging from 34,200 percent to 1,242,639.4 percent.

2.    Defendants Kenton Capital, Ltd. ("KCL"), Donald C. Wallace ("Wallace"), Jeffrey E. Carter ("Carter"), Deltaur Partners ("Deltaur"), Harry Watson ("Watson"), Tracy L. French ("French"), and Terry Plack ("Plack") are engaged in a fraudulent scheme to offer and sell unregistered securities to investors throughout the United States.

3.    To entice investors to participate in their scheme, the defendants have contacted, and are continuing to contact, prospective investors directly, as well as through paid intermediaries or finders who receive a fee for each investor whom they recruit into one of KCL's investment programs. In addition, the defendants have delivered, and continue to deliver, to investors promotional, offering, and solicitation materials containing materially false and misleading statements regarding KCL's investment programs and, in particular, the risks and rates of return or profit available to investors in those programs.

4.    Defendants KCL, Wallace, Carter, Deltaur, Watson, French, and Plack, directly or indirectly, have engaged, are engaged and are about to engage in transactions, acts, practices, and courses of business which constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities

2

Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]; Sections 10(b)
and 15(a) of the Securities Exchange Act of 1934 ("Exchange Act")
[15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 [17 C.F.R. §§
240.10b-5] thereunder; and Section 203 of the Investment Advisers
Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-3].

5.    Defendants KCL, Wallace, Carter, Deltaur, Watson,
French, and Plack will, unless restrained and enjoined, continue
to engage in the acts, practices, and courses of business alleged
herein, and in acts, practices and courses of business of similar
object and purpose.

6.    The Relief Defendants, Atlantic Pacific Guarantee
Corporation ("APGC") and Charles Smith ("Smith"), have received
investor funds that had unlawfully been raised by the other
defendants, and hold these funds in a constructive trust for the
benefit of investors.

## JURISDICTION

7.    This Court has jurisdiction over this action pursuant
to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e)
and 78aa], Section 22(a) of the Securities Act [15 U.S.C.
§ 77v(a)], and Section 214 of the Advisers Act [15 U.S.C.
§ 80b-14].

## THE DEFENDANTS

8.    Kenton Capital, Ltd. is an entity whose principal
office is located in Georgetown, Grand Cayman, British West
Indies.  KCL's investor solicitation efforts are being directed
by defendants Wallace and Carter from Little Rock, Arkansas,

where KCL's office is located in a room of a Holiday Inn hotel. Defendant Carter, assisted by a secretary from a temporary employment service, administers KCL's business operations from the Little Rock location, communicating with investors by telephone and facsimile transmission.

9.    Donald C. Wallace is the president of KCL and makes all strategic decisions for KCL.  Wallace communicates with current and prospective investors by telephone and correspondence sent by facsimile transmission, and signs investment agreements with investors on behalf of KCL.

10.    Jeffrey E. Carter ostensibly is a business consultant to KCL, and is responsible for managing KCL's office at the Holiday Inn in Little Rock and maintaining investor documentation.  Carter has actively marketed KCL's investment schemes to investors and has sent and caused to be sent to investors documents describing KCL's investment programs.

11.    Harry Watson is responsible for locating the trading programs in which KCL purportedly invests the funds that it has collected from investors.  Watson receives ten percent of each investment as a fee.  Watson also has solicited prospective investors for KCL.

12.    Tracy L. French promotes KCL's investment programs to prospective investors and drafted the documents describing KCL's investment programs that KCL sends to investors.  French has claimed that he represents investors who are prepared to invest $1 million in KCL's investment programs.

4

13.  Deltaur Partners is an entity controlled by defendants Watson and French, through which they have solicited investors for KCL's investment programs.  Documents produced by KCL indicate that Deltaur, Watson, and French have been paid at least $90,000 in commissions or fees by KCL for procuring investors.

14.  Terry Plack is a broker who has solicited investors for KCL in cooperation with defendant French.  Plack is a defendant in SEC v. Bankers Alliance Corp., et al., Civil Action No. 95-0428 (Friedman, J.) (D.D.C. 1995), and is subject to the preliminary injunction that was issued against him by consent in that case, enjoining him from violations of the antifraud and registration provisions of the federal securities laws.  Plack solicited investors for KCL's investment programs even after the entry of the preliminary injunction against him.

### THE RELIEF DEFENDANTS

15.  Atlantic Pacific Guarantee Corporation is a Nevada corporation with its principal office located in Santa Monica, California.  APGC purportedly provides, among other things, "corporate guarantees" and "performance bonds."  APGC is the seller of so-called "Guarantee Bonds" that KCL purportedly purchases with investor funds to guarantee the repayment of the principal amount of each investment.  APGC and its president, relief defendant Smith, have received as fees a total of at least $65,000 in investor funds.

16.  Charles Smith is the president of APGC.  Smith also is the co-signatory, together with KCL founder Marshall, on the KCL



bank account at the Cayman Islands branch of Barclay's Bank.

## THE FRAUDULENT SCHEME

17.  Beginning in the middle of March 1995 and continuing through the present, the defendants have solicited investors to invest in several investment programs, all of which purportedly involve renting securities and then hypothecating the rented securities to a major financial institution to produce "liquidity."  This "liquidity" is then purportedly used to trade bank instruments or fixed income securities, thereby generating the huge profits KCL claims it can return to investors.  All of KCL's programs have a $100,000 minimum investment and the principal amounts of investor funds supposedly are bonded or guaranteed by an entity managed by associates of defendants Wallace and Carter.

18.  With regard to one of the programs being offered by the defendants, in which investors are required to contribute a minimum of $425,000 each, the defendants claim that "a minimum guaranteed value of $720,000,000. . ." would be realized at the end of 366 days.  This program allegedly involves leasing $300,000,000 in U.S. Treasury securities from a company based in England and using the leased securities to create "liquidity" that would be used to trade other financial instruments, such as bank debentures.  The trading was to be conducted by another entity, with which KCL claimed that it had a contract.  Although in documents offering this program to investors, KCL claimed that it already had an agreement to lease the U.S. Treasury

securities, as well as a contract with the entity that was to carry out the trading, no such agreement or lease existed and KCL did not have a contract with the trading entity.

19.  The defendants also have offered another program, which they call the "Financial Guarantee Investment Program."  This program purports to provide three investment "structures" with annual returns ranging from 34,200 percent to 1,242,639.4 percent on investments ranging from $27,500 to $100,000.  In the offering materials for this program, KCL claimed that it could "leverage" the investor funds by obtaining either a "Letter of Guarantee" or "Letter of Credit" from one of three banks, including Credit Suisse and Credit Lyonnais, which it would, in turn, use to "rent" $100,000,000 of U.S. Treasury securities.  According to KCL's offering documents, the U.S. Treasury securities then would be hypothecated to another bank, which would lend KCL up to $85.5 million.  KCL claimed that it could use the $85.5 million to trade "10 year instruments," that would return profits of "at least 10% per week."  Under each of the three structures in this program, KCL claimed that it could generate annual returns of $342,000,000 regardless of the size of the investment.

20.  KCL also currently is offering to investors another investment program termed the "Asset Leveraging Opportunity." Defendant Carter testified under oath that this program could close on Wednesday, May 3, if KCL is able to collect a pool of $2 million from its investors.  The minimum investment per investor is $100,000.  As described in the material that Carter is sending

7

to investors, KCL, through a "Trading Program Manager," will "lease" $100,000,000 in U.S. Treasury securities at a cost of 2% per month, and will place those securities in an account "at a major brokerage house in New York." Thereafter, the leased U.S. Treasury securities "will be hypothecated in one day with a minimum hypothecation of 90% of face value." The proceeds of the hypothecation then are remitted to the "Trader" who uses them for a program of trading in "bank instruments." According to the offering materials that are being disseminated to investors, each investor in the Asset Leveraging Opportunity will receive $110,000 or more in weekly earnings on an investment of $100,000.

21. An "Investment Agreement" with an investor, that was executed on behalf of KCL by defendant Wallace on April 5, 1995, and which contemplates an investment of $100,000, states that "Kenton Capital has verified with the Trading Partners that the profits to Investor will be approximately 3,750% (three thousand seven hundred fifty percent) weekly. . . for a Trading Year of 40 weeks."

22. In both the Investment Agreement and the offering materials for both the Asset Leveraging Opportunity and the Financial Guarantee Investment Program, KCL claims that it will procure, with investor funds, a "Financial Guarantee" or "Guarantee Bond" from, variously, "a $300 MILLION+ Surety Company" or APGC. KCL has paid at least $65,000 in investor funds as fees to relief defendants APGC and Smith, ostensibly for providing the Financial Guarantees and Guarantee Bonds.

8

23. Defendant Carter has testified under oath that, as of April 28, 1995, KCL had received approximately $900,000 in investor funds, which have been wire transferred to the KCL account at Barclays Bank in the Cayman Islands. Defendant Carter further testified that approximately $400,000 of additional investor funds had been misdirected because of incorrect wire transfer instructions, and that KCL was in the process of obtaining those funds as well. According to Carter's sworn testimony, KCL was continuing to actively market the investment program in an effort to raise the funds needed to meet the $2 million that purportedly are required to lease U.S. Treasury securities in a transaction that is scheduled to close on May 3, 1995.

## FIRST CLAIM FOR RELIEF

**Defendants Are Violating Section 10(b)
of the Exchange Act [15 U.S.C. § 78j(b)]
and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

24. Defendants, and each of them, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase and sale of securities:

    a.    have employed, are employing, and are about to employ devices, schemes, or artifices to defraud;

    b.    have made, are making and are about to make untrue statements of material fact, or have omitted, are omitting and are about to omit to state material facts necessary in order to make the statements

9

made, in light of the circumstances under which they were made, not misleading; and

c.    have engaged in acts, practices or courses of business which have operated, are operating and will operate as a fraud or deceit upon other persons, including purchasers and sellers of such securities.

25.    By reason of the foregoing, defendants, and each of them, have violated and are violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Defendants Are Violating
### Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

26.    Defendants, and each of them, directly or indirectly, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails:

a.    have employed, are employing, or are about to employ devices, schemes or artifices to defraud;

b.    have obtained, are obtaining or are about to obtain money or property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    have engaged, are engaged, or are about to engage

10

> in transactions, acts, practices and courses of
> business which operated or would operate as a
> fraud upon purchasers of securities.

27.   By reason of the foregoing, defendants and each of them, have violated and are violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### THIRD CLAIM FOR RELIEF

**Defendants Are Violating Sections 5(a) and 5(c)
of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]**

28.   The investments described herein constitute "investment contracts" or otherwise are "securities" within the meaning of Section 2(1) of the Securities Act [15 U.S.C. § 77b(1)], Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)], and Section 202(a)(18) of the Advisers Act [15 U.S.C. § 80b-2(a)(18)].

29.   The securities being offered and sold by defendants are not registered in accordance with the provisions of the Securities Act and no exemption from such registration is available.

30.   Defendants, and each of them, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer and sell securities when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was available.

31.   By reason of the foregoing, defendants, and each of them, have violated and are violating Sections 5(a) and 5(c) of

the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## FOURTH CLAIM FOR RELIEF

### Defendants Are Violating Section 15(a)
### of the Exchange Act [15 U.S.C. § 77o(a)]

32. By engaging in the business of selling the investment contracts described above, the defendants each have acted as a broker or dealer, and each have made use of the mails or other means or instruments of interstate commerce to effect transactions in, or induce the purchase of, these investment contracts.

33. The defendants are not registered with the Commission as brokers or dealers.

34. By reason of the foregoing, the defendants, and each of them, have violated and are violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## FIFTH CLAIM FOR RELIEF

### Defendants Are Violating Section 203(a)
### of the Advisers Act [15 U.S.C. § 80b-3(a)]

35. By engaging, for compensation, in the business of advising their clients regarding the advisability of investing in, purchasing, or selling investments in the investment and trading programs operated by KCL and its associates, and having made use of the mails or other means or instruments of interstate commerce in connection with such business, the defendants each have acted as an investment adviser.

36. The defendants are not registered with the Commission as investment advisers.

12

37.  By reason of the foregoing, the defendants and each of them, have violated and are violating Section 203(a) of the Advisers Act [15 U.S.C. § 80b-3(a)].

## SIXTH CLAIM FOR RELIEF

### For a Constructive Trust
### Against Relief Defendants APGC and Smith

38.  APGC and Smith have received at least $65,000 of investor funds that were raised as a result of the unlawful conduct of the named defendants alleged above.  Investors have not received value from APGC or Smith in return for the use of their funds.  Accordingly, APGC and Smith hold theese investor funds in a constructive trust for the benefit of investors.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Grant as to the defendants, and each of them, a Permanent Injunction, restraining and enjoining them, and each of them, and their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them who receive actual notice by personal service or otherwise, from violating Sections 10(b) and 15(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78o(a)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)]; and Section 203(a) of the Advisers Act [15 U.S.C. § 80b-3(a)].

13

II.

Grant orders directing the defendants, and each of them, and their officers, agents, servants, employees, and attorneys, to disgorge all illegal gains, together with prejudgment interest.

III.

Grant orders directing the relief defendants to disgorge the funds they hold in constructive trust for investors;

IV.

Grant orders directing the defendants, and each of them, to pay civil money penalties, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

V.

Grant such other relief as this Court may deem just and proper.

Respectfully submitted,

Larry P. Ellsworth #165043
Yuri B. Zelinsky
Julie K. Lutz
Yolanda L. Ross
James M. McNamara

Attorneys for Plaintiff
Securities and Exchange Commission
450 Fifth Street, N.W., Stop 4-2
Washington, D.C. 20549
(202) 942-4596

Dated:    May 3, 1995

14



**Exhibit 2**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

    v.

KENTON CAPITAL, LTD.; DONALD C. WALLACE;
JEFFREY E. CARTER; HARRY WATSON,
TRACY FRENCH; DELTAUR PARTNERS; and
TERRY PLACK; and JOSEPH SILVESTRI,

    Defendants,

ATLANTIC PACIFIC GUARANTEE
CORPORATION and CHARLES SMITH,

    Relief Defendants.

Civ. No. 95-0829 (GK)

**FILED**

JUL 19 1996
Clerk, U.S. District Court
District of Columbia

*Calista P. Crangil*
5/22/02

## FINAL JUDGMENT OF PERMANENT INJUNCTION AND OTHER RELIEF AGAINST JOSEPH SILVESTRI

Plaintiff Securities and Exchange Commission ("Commission") having commenced this action, and Defendant Joseph Silvestri, in his Consent filed simultaneously with this Final Judgment of Permanent Injunction ("Final Judgment") and incorporated herein by reference, having entered a general appearance; admitted the jurisdiction of this Court over him and the subject matter of this action; waived the entry of findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure; and, without admitting or denying the allegations of the Complaint, except as to jurisdiction, which he admits, consented to the entry of this Final Judgment; and it appearing that this Court has jurisdiction over Defendants and Relief Defendants and the subject matter hereof, and the Court being

82

fully advised in the premises:

I.

IT IS HEREBY ORDERED that Defendant Joseph Silvestri, his agents, servants, employees, attorneys, successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, be and hereby are permanently enjoined from violating Sections 5(a) and 5(c) of the Securities Act of 1933 [15 U.S.C. §§ 77e(a) and (c)] by, directly or indirectly, in the absence of any applicable exemption:

a.    making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell the securities of any issuer, through the use or medium of any prospectus or otherwise, unless and until a registration statement is in effect as to such securities;

b.    carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale, the securities of any issuer, unless and until a registration statement is in effect as to such securities; or

c.    making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise the securities of

2

any issuer, unless and until a registration statement has
been filed with the Commission as to such securities, or
while a registration statement as to such securities is the
subject of a refusal order or stop order or (prior to the
effective date of the registration statement) any public
proceeding of examination under Section 8 of the Securities
Act [15 U.S.C. § 77h].

II.

IT IS FURTHER ORDERED that Defendant Joseph Silvestri, his
agents, servants, employees, attorneys, successors-in-interest,
and those persons in active concert or participation with them
who receive actual notice of this Judgment by personal service or
otherwise, and each of them, be and hereby are permanently
enjoined from violating Section 17(a) of the Securities Act [15
U.S.C. § 77q(a)], by, directly or indirectly, in the offer or
sale of any securities by the use of any means or instruments of
transportation or communication in interstate commerce or by the
use of the mails,

(1)  employing any device, scheme, or artifice to defraud;

(2)  obtaining money or property by means of any untrue
statement of a material fact or omission to state a material
fact necessary in order to make the statements made, in the
light of the circumstances under which they were made, not
misleading; or

(3)  engaging in any transaction, practice, or course of
business which operates or would operate as a fraud or

3

deceit upon a purchaser.

### III.

IT IS FURTHER ORDERED that Defendant Joseph Silvestri, his agents, servants, employees, attorneys, successors-in-interest, and those persons in active concert or participation with them who receive actual notice of this Judgment by personal service or otherwise, and each of them, be and hereby are permanently enjoined from violating Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder, by, directly or indirectly, through the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

    a.   employing any device, scheme, or artifice to defraud;

    b.   making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.   engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

### IV.

IT IS FURTHER ORDERED that Defendant Joseph Silvestri is jointly and severally liable with Defendants Kenton Capital, Ltd., and Donald C. Wallace, and with Relief Defendants Atlantic

4

Pacific Guarantee Corp. and Charles Smith to disgorge $40,970.51.
Defendant Joseph Silvestri is also liable for prejudgment
interest on these disgorgement amounts at the rate of interest
used by the Internal Revenue Service for the underpayment of
taxes as set forth at 26 U.S.C. § 6621(a)(2), which is a
reasonable approximation of the additional unjust enrichment
defendants could have earned on the moneys to be disgorged.
Accordingly, Defendant Joseph Silvestri is jointly and severally
liable for $3,193.19 in interest, for a total disgorgement amount
of $44,163.70.   Defendant Joseph Silvestri further admits that
he is liable for a civil penalty of at least $40,000.

V.

IT IS FURTHER ORDERED that, based upon Defendant Silvestri's
representations to the Commission concerning his financial
condition, the Commission has agreed, and the Court orders, that
the disgorgement, including prejudgment interest, and any civil
penalty are waived.  The determination to waive payment of
disgorgement and a civil penalty is contingent upon the accuracy
and completeness of Defendant's representations concerning his
financial condition.  If at any time following the entry of this
Judgment the Commission obtains information indicating that
Defendant's representations to the Commission concerning his
financial condition were materially inaccurate or incomplete at
the time such representations were made or at the time of the
entry of this Judgment, the Commission may, at its sole
discretion and without prior notice to Silvestri, petition this

5

Court for an order requiring Silvestri to pay disgorgement and a civil penalty in an amount no less than those set forth above, provided that the Commission may seek, and the Court may in its discretion order, a greater penalty.  In connection with any such petition, the only issues shall be whether the financial information provided by or on behalf of Silvestri was fraudulent, misleading, inaccurate or incomplete in any material respect as of the time such representations were made, and the amount of civil penalty to be imposed.  In its petition, the Commission may move this Court to consider all available remedies, including, but not limited to, ordering Silvestri to pay funds or assets, directing the forfeiture of any assets, or sanction for contempt of this Final Judgment, and the Commission may also request additional discovery.  Silvestri may not, by way of defense to such petition, challenge the validity of this Final Judgment, contest the allegations in the Complaint filed by the Commission, the amount of disgorgement and interest, or assert that disgorgement or the payment of a civil penalty should not be ordered.

VI.

There being no cause for delay, the Clerk of the Court is directed, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, to enter this Final Judgment forthwith.

So ordered.

Washington, D.C.,
18th day of July, 1996

Gladys Kessler
United States District Judge

6