UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.00-6309-CR-DIMITROULEAS(s)(s)

UNITED STATES OF AMERICA,
            Plaintiff,

v.

JOSEPH SILVESTRI,
            Defendant.
_____/



GOVERNMENT'S TRIAL MEMORANDUM IN SUPPORT
OF ADMISSIBILITY OF INTERCEPTED CONVERSATIONS

The United States of America, through its undersigned attorneys, respectfully files this trial memorandum in support of the admissibility of conversations intercepted pursuant to Title 18, United States Code, Section 2518.

I.

A.    Basis of Admissibility of Wiretap interceptions

It is the government's position that the tape recorded conversations that are being offered in evidence, which are between defendant Silvestri and coconspirator Fred Morgenstern and a conversation between coconspirators Fred and David Morgenstern are admissible pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence as a "statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Furthermore, all telephone conversations between defendant Silvestri and Fred Morgenstern are ultimately admissible pursuant to Rule 801(d)(2)(A)



as the "the parties own statement in either an individual or representative capacity..." as a party-admission.

B. <u>Summary of the Evidence Prior to January 7, 2000</u>

As set forth in the Indictment, the instant matter concerns criminal activity involving defendant Joseph Silvestri and his coconspirators who were involved in the Chemical Trust fraudulent investment scheme. Specifically, beginning in or about July 1999, and continuing through in or about November 2000, the defendant's coconspirators Virgil and Charlotte Womack and several other individuals operated a business in Seneca, South Carolina to facilitate the marketing and sale of fraudulent guaranteed high-yield investment opportunities. Their business was known by several "trust" names, such as "Alliance Trust" and "Chemical Trust" (collectively known as the "Chemical Trust") created to lend an appearance of legitimacy and to defraud investors. In connection with the operation of the business, Womack opened a number of bank accounts under these various trust names for the purpose of depositing investor/victims checks and transferring funds.

After creating Chemical Trust and opening bank accounts, Womack solicited insurance agents and other investment brokers to convince their investor clients to purchase these investments. Womack and his coconspirators created manuals for the investment salesmen, and made certain misrepresentation in the manuals related

to their experience and to the nature of the investments.  Womack promised high rates of return that were guaranteed.  All of these representations were false.

Womack also falsely represented that the Chemical Trust investments were completely secured by a multi-billion dollar corporation, U.S. Guarantee of Scottsdale, Arizona, which, in reality, was a complete sham.  Defendant Silvestri introduced Womack to the principals of U.S. Guarantee and assisted in creating bogus bonds that would be used to defraud investors.

From the inception of the fraud, defendant Silvestri was aware that U.S. Guarantee was an insolvent company that was not able to honor any claim by investor/victims of the Chemical Trust fraud. Defendant Silvestri collected approximately $1,600,000 in commissions for issuing the bogus bonds.

After an investor's check was forwarded by the agent to Womack's office in South Carolina, Womack issued a laminated "bond" issued by U.S. Guarantee which was forwarded to the unsuspecting investor.  The "commissions" received by defendant Silvestri were nothing more than original investor funds. Defendant Silvestri deposited these commissions in his own Florida bank accounts and accounts at "Americas International Bank Corp., Ltd." (AIBC) bank in the Bahamas.

In summer 1999, defendant Silvestri again furthered Womack's fraudulent activity by assisting Womack in opening a bank account

at Admiralty Bank in south Florida.  Silvestri was aware that fraud
proceeds would be transferred through that account to bank accounts
in the Bahamas and elsewhere.

In summer 1999, the defendant convinced Womack to begin
laundering the Chemical Trust fraud proceeds through David and Fred
Morgenstern.  In August 1999, Womack began to transfer millions of
Chemical Trust fraud proceeds to his coconspirators Fred and David
Morgenstern.    Initially, $2.8 million in Chemical Trust fraud
proceeds was transferred from Womack's Alliance Trust account at
Admiralty Bank in Florida.  Thereafter, Womack began to courier
daily bundles of Chemical Trust investor checks to defendant Fred
Morgenstern's office in Florida, where Fred Morgenstern deposited
them into local Florida bank accounts, including those in the name
of "Gold Coast Check Cashing," "Americas Resource Corp." and the
Bahamian bank of "Americas International Bank Corp., Ltd." at which
Morgenstern maintained accounts.  From these Florida and Bahamian
bank accounts, Fred and David Morgenstern made further transfers of
Chemical Trust funds and used millions of dollars of such funds to
pay settlements in litigation initiated by investors in other fraud
schemes, pay personal expenses and transfer funds to overseas bank
accounts in their control.  Fred Morgenstern also assisted Virgil
Womack in opening various bank accounts in the name of "Prestige
Accounting Services" out of which Womack would make purported

"interest" payments and pay agent commissions and operating expenses.

Again, in fall 1999, when Fred Morgenstern had difficulties locating a bank in South Florida to make deposits of the Chemical Trust fraud proceeds, defendant Silvestri, assisted by vouching for Morgenstern and other coconspirators associated with Gold Coast Check Cashing. As a result of the efforts of the defendant, new accounts were opened and the money laundering continued. The defendant was well aware that the check cashing store was being used as a facility to launder the fraud proceeds.

As a result of this scheme, over the next several months, the Womacks and the other coconspirators defrauded over 1200 victims, many of whom were elderly, and took in over $50 million in fraud proceeds.

C.    Evidence after January 7, 2000

On January 7, 2000, the FBI executed search warrants at the Chemical Trust offices in Seneca, South Carolina; the U.S. Guarantee offices in Phoenix, Arizona; and, at Gold Coast Check Cashing in Margate, Florida. At the same time, Virgil Womack, his wife and other coconspirators were arrested in South Carolina on fraud charges. All of the aforementioned defendants were taken into custody where Virgil Womack remained until he entered into a plea agreement with the government; thereafter, he was released on bail.

Also, on January 7, 2000, the Miami Division of the FBI initiated electronic surveillance on a cellular telephone used by coconspirator Fred Morgenstern pursuant to Court Order. For the next sixty days, conversations between Fred Morgenstern and other coconspirators were intercepted, including those of defendant Joseph Silvestri and Morgenstern's twin brother, David.

At the time of Womack's arrest and the execution of the search warrants, Fred Morgenstern had substantial funds belonging to Chemical Trust victims on deposit in his various bank accounts located in South Florida. Additionally, David Morgenstern had millions of dollars of Chemical Trust fraud proceeds on deposit in off-shore and foreign bank accounts located in the Bahamas, the United Kingdom and Switzerland. Defendant Silvestri also had hundreds of thousands of dollars of illegal proceeds from the fraud on deposit in off-shore bank accounts in the Bahamas and at other unidentified locations.

D.    Summary of Wiretap Conversations

Within three hours of the search of Gold Coast Check Cashing in Margate, Florida, Fred Morgenstern had a telephone conversation with his brother, David. During that conversation, Fred Morgenstern indicated that he was attempting to reach defendant Silvestri but was unsuccessful. Fred Morgenstern indicated that the FBI's searches could disrupt a lot of other things and that "there was a lot of tentacles that this thing touches." Fred

Morgenstern also recalled to his brother a recent conversation with defendant Silvestri about a problem with the Chemical Trust account at Admiralty Bank. The Morgensterns were concerned that the problem at the bank and the searches were related. The Morgensterns agreed that defendant Silvestri should be directed to make contact with Admiralty Bank and be "more aggressive" in questioning his contacts at the bank about what was occurring. The Morgensterns were also very concerned about the extent of the FBI's knowledge of their activity.

On January 8, 2000, at 12:15 a.m., within hours of the execution of the search warrants, Fred Morgenstern and defendant Silvestri had a conversation concerning the search warrant at Gold Coast Check Cashing. Morgenstern read the contents of the warrant to Silvestri and told Silvestri that they should go on the offensive concerning the case. Silvestri indicated that he had not been able to reach Womack by telephone concerning the FBI investigation. Silvestri then stated that the search warrants may have been occasioned because of the "marked up checks" that were presented to Admiralty Bank.[1] Silvestri further stated that Admiralty Bank apparently thought there was "some sort of money

_____

[1]    In fall 1999, Morgenstern and Silvestri presented for deposit at Admiralty Bank several checks from victims of the Chemical Trust fraud. Morgenstern had previously presented these checks for payment in the Bahamas. The checks were returned from the Bahamas marked "voided." Morgenstern whited out the markings on the checks and then attempted to negotiate them at Admiralty Bank and other places.

laundering bit." He then questioned how the FBI had known about all of Womacks trusts listed in the search warrant. Later, in the conversation, Silvestri confirmed that he and Womack had transferred some of the proceeds into a company called "ACC." In fact, Silvestri confirmed that Womack had transferred two million dollars into ACC.

On January 11, 2000, in another intercepted conversation, Silvestri inquired as to whether Morgenstern was able to launder an additional $400,000 in fraud proceeds for the purpose of assisting Womack. Silvestri also explained to Morgenstern that Womack had spoken to Silvestri's wife who was told that Womack needed $300,000 in traveler's checks that was to be used to post bail for Womack's wife who was also in custody. Defendant Silvestri also confirmed that he had spoken with Virgil Womack's attorney who had advised him that the funds would be deposited into the attorney's trust account.

On January 11, in a later conversation, Silvestri indicated to Morgenstern that it was extremely important to assist Womack by securing his release from jail. Silvestri specifically stated that "God forbid it takes another million to get this guy out of jail, that's what to do, but ah, but the guys got to tell you to do it."[2]

---

[2]     According to documents provided by Citibank, Morgenstern transferred approximately $417,000 of Chemical Trust fraud proceeds to the account of attorney Steve Sadow in Atlanta, Georgia. Additionally, another $500,000 of Chemical Trust fraud proceeds was transferred from an account in the Bahamas to the

Silvestri further stated that he was concerned that he would be charged with fraud because of his part in the bogus bond company, U.S. Guarantee.

On January 13, 2000, Silvestri confirmed that David Morgenstern knew where proceeds from the Chemical Trust fraud were located but that David Morgenstern would not immediately inform Womack's attorneys of it.

Again, on January 13, defendant Silvestri confirmed with Fred Morgenstern that the coconspirators had already sent $50,000 in Chemical Trust fraud proceeds to Charlotte Womack's attorney. He also confirmed with Morgenstern that Womack is being detained pending posting of a $15,000,000 bond. Moreover, Silvestri stated that he had been speaking guardedly over the telephone just in case the conversation was being recorded. Defendant Silvestri also spoke of his concern that Womack had been threatening to cooperate if other coconspirators did not assist him in securing his release from jail. Defendant Silvestri also stated that he was attempting to assist Womack's wife who was also in jail. Silvestri again confirmed that he had spoken to Womack's attorney who had requested that the funds be remitted in the form of traveler's checks.

---

account of attorney Bruce Harvey in Atlanta, Georgia. At that time, Harvey was representing Charlotte Womack and Sadow was representing Virgil Womack. Silvestri participated in several wire taped conversations with Fred Morgenstern concerning methods to either pay the attorneys or to secure the release of the Womacks on bail through the use of Chemical Trust fraud proceeds.

9

On January 14, 2000, Silvestri informed Morgenstern that he recently had a telephone conversation with Womack from jail. Silvestri said that he told Womack to keep his mouth shut, read a book and "act like an Italian." During this recorded conversation, Silvestri recommended to Fred Morgenstern a further money laundering transaction because there was problem obtaining funds for the Womacks' defense attorneys from other sources. Silvestri suggested that they create false documentation reflecting a loan for the proceeds justifying the transfer of funds for the benefit of the Womacks.

Later, in the conversation, Silvestri indicated that the funds continued to come in from the Chemical Trust fraud at U.S. Guarantee. He stated that "we can't even turn this thing off. The faucets open, it won't quit pouring."

On January 17, 2000, Silvestri admitted to Morgenstern that U.S. Guarantee had been the subject of a cease and desist order about two months before the searches. Morgenstern recounted a recent conversation he had with Crystal Wilkinson about the January 7, arrests of the coconspirators in South Carolina. The defendant and Morgenstern stated that they were suspicious of Wilkinson because of the nature of the call.[3]  Also, defendant Silvestri

---

[3]    On January 7, 2000, Wilkinson was arrested by the FBI on fraud charges with Virgil Womack. At the time of the call, Wilkinson was consensually recording the conversation with Fred Morgenstern on behalf of the FBI.

confirmed that in November 1999, he met with attorneys representing U.S. Guarantee in relation to an action by the state of Arizona against the company. He confirmed that the attorney representing the bonding company thought Womack's Chemical Trust company was a Ponzi scheme, but Silvestri was relieved that the state had closed the case.

On January 19, 2000, Silvestri had another telephone conversation with Morgenstern concerning the ongoing conspiracy. Silvestri read to Morgenstern a "form letter" that apparently had been sent to victims of the Chemical Trust fraud by the court-appointed receiver. The defendant and Morgenstern were cynical about the contents of the letter. During this conversation, Silvestri acknowledged to Morgenstern that he was aware of the location of millions of dollars from the victims of the Chemical Trust fraud. Silvestri indicated that "...if they haven't contacted the right people then they're never gonna find it anyhow, are they?" These funds were, at that time, being transferred by coconspirators for such things, as paying attorney and bail fees for the Womacks and paying personal expenses charged on credit cards.

II.

LEGAL ARGUMENT

A. The statements are admissible under Rule 801 (d((2)(E),
   As coconspirator statements in furtherance of the
   conspiracy

11

Count 14 of the Second Superseding Indictment charges defendant with conspiracy to violate both Title 18 United States Code, Section 1956 and 1957. The count charges that the conspiracy began in or about July 1999, and continued to in or about November 2000, in the Southern District of Florida and elsewhere. The defendant was not charged in the mail and wire fraud and money laundering case relating to Chemical Trust in the District of South Carolina. It is clear from the above-described recitation of the facts that the money laundering conspiracy was ongoing even after the arrest of the leader of the Chemical Trust fraud. Coconspirators continued to launder substantial sums of illegal proceeds even after Womack's operation was closed down in Seneca, South Carolina.

For example, after the January 7, arrest of Womack, defendants Silvestri and the Morgensterns were planning further money laundering transactions to assist the Womacks who were incarcerated. Furthermore, the Morgensterns continued laundering Chemical Trust fraud funds when they paid off substantial credit card balances, long after the arrest of Womack. Furthermore, long after the Womack arrests, defendant Silvestri negotiated checks through his off-shore accounts in the Bahamas.

It is well-settled that a conspiracy need not end with the arrest of one of the coconspirator so long as the coconspirators are still capable of and perpetuating the ongoing conspiracy.

<u>United States v. Jones</u>, 913 F.2d 1552, 1563 (11th Cir.1990); <u>United States v. Casamayor</u>, 837 F.2d 1509, 1513 (11th Cir. 1988). Moreover, in this case, Womack's arrest that caused the cessation of the scheme and artifice to defraud in relation to the Chemical Trust is completely unrelated to the continuation of the money laundering conspiracy charged in Count 14 of the superseding indictment. The only correlation is that the mail/wire fraud committed in South Carolina forms the basis for the specified unlawful activity for Count 14. Consequently, the only evidentiary value of Womack's arrest is that it forms the basis of further criminal conduct on the part of defendant Silvestri and Fred Morgenstern in furtherance of the conspiracy.

Thereafter, the only issue to be resolved after concluding that the conspiracy did not end with the arrest of Womack is whether the statements were made in the course of and in furtherance of the conspiracy. Again, the evidence in this case clearly demonstrates that each intercepted call described above should be admissible as a statement made in furtherance of the conspiracy.[4]

On numerous occasions during the monitoring of the cell telephone, defendant Silvestri and Morgenstern discussed the status of the criminal case against Womack, who was the original provider

---

[4]    As will be addressed below, the admissions and statements of defendant Silvestri are independently admissible under Rule 801(d)(2)(A).

13

of the illegal proceeds. They were extremely concerned about the impact of Womack's arrest on the ongoing conspiracy. In that regard, they were concerned that Womack could elect to cooperate with the authorities.    In that regard, the defendant and Morgenstern discussed methods of laundering fraud proceeds to defense attorneys for the benefit of Womack and his wife to ensure that they would not cooperate.    During these conversations, the coconspirators also discussed further money laundering activity relating to illegal proceeds previously obtained from the Chemical Trust fraud.

Clearly, these types of conversations are in furtherance of the conspiracy charged in count 14 and easily qualify under the liberal standards adopted by the Circuit. In fact, these conversations would qualify no matter how strict the standard. United States v. Miles, ___ F.3d ____ (11th Cir. 2002)(the statement need not be necessary to the conspiracy, but must only further the interests of the conspiracy in some way); United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir.1988)("boasts and other conversations may be in furtherance of a conspiracy if such statements are used to obtain the confidence or to allay the suspicions of a coconspirator").

14

      B.  The Statements of the Defendant are admissible under
          Rule 801(d)(2)(A) as a Party-admission

In any event, all of defendant Silvestri's statements that are being offered into evidence from the wiretap are admissible as a party-admissions pursuant to rule 801(d)(2)(A). The objection to the admissibility of Fred Morgensterns statements is not well-founded and contrary to the weight of authority.

Any statements by Morgenstern are admissible not for the truth of the matter asserted, but rather to place in "context" the admissions of defendant Silvestri. <u>United States v. Smith</u>, 918 F.2d 1551, 1559 (11th Cir. 1990)("This Court has recognized that an informant's statements are admissible not for the truth of the matter asserted, but for the purpose of placing a conspirator's comments in context for the jury."); <u>United States v. Price</u>, 792 F.2d 994, 997(11th Cir.1986)("The single purpose for admitting the Carbone statements was to make understandable to the jury the statements made by Price himself."); <u>United States v. Gutierrez-Chavez</u>, 843 F.2d 77, 81 (5th Cir. 1988)(even though coconspirator had been arrested, recorded statements of the coconspirator are admissible in order to put defendant's responses in context). Accordingly, the recorded conversations are also admissible on this independent ground.

## CONCLUSION

Wherefore, the government respectfully urges the Court to permit the admission into evidence of the aforementioned wiretap conversations pursuant to Rule 801 (d)(2)(A) and (E) of the Federal Rules of Evidence.

Respectfully submitted,
GUY A. LEWIS
UNITED STATES ATTORNEY


By:    _____
DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY
Court I.D. #A5500017
500 East Broward Blvd., Suite 700
Fort Lauderdale, FL 33394
Telephone: (954) 356-7392
Fax: (954) 356-7230


By:    _____
JAMES R. PAVLOCK
SENIOR TRIAL ATTORNEY
DOJ/CRIMINAL DIVISION
Court I.D. #A5500657


16

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by hand delivery to the following on May 28, 2002:

Richard Sharpstein, Esquire
777 Brickell Avenue
Suite 500
Miami, FL 33131
(Counsel for Joseph Silvestri)

DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY