# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,       CASE NO. 00-6309-CR-Dimitrouleas
         Plaintiff,

v.

JOSEPH SILVESTRI
         Defendant.
_____ /



## DEFENDANT SILVESTRI'S EXPANDED
## MOTION FOR DOWNWARD DEPARTURE
## AND INCORPORATED MEMORANDUM OF LAW

Defendant Joseph Silvestri, through undersigned counsel, moves this Court for a downward

departure based upon his elderly age and infirmity due to his complex of serious medical conditions,

in combination with other mitigating factors and circumstances -- including his prior good works,

the exceptional family circumstance that his frail and elderly wife is at heightened risk of suicide,

the over-representation of his prior criminal history, and the "unique combination" of the totality of

these factors.[1]  In support of this Motion, undersigned counsel attaches and references exhibits

described below and represents as follows:

---

[1] Silvestri's original Notice of Motion for Downward Departure identified as departure grounds: age and infirmity (pursuant to USSG §5H1.1 and §5H1.4), prior good works (pursuant to USSG §5H1.11), and the combination of these factors (*see* §5K2.0).  This Expanded Motion adds Silvestri's:  family circumstance involving his wife's suicidal condition (*see* §5KH1.6) and the over-representation of his prior criminal history (§4A1.3).  Undersigned counsel informed both the Probation Officer and counsel for the government of this expansion in advance of filing the Motion.

1



**I. Request Based on Elderly Age and Infirmity Due to Serious Medical Conditions**

While a defendant's age and physical condition are "not ordinarily relevant" in determining whether a sentence should be outside the applicable guideline range, the Guidelines explicitly recognize that these factors <u>may</u> warrant a downward departure "when the defendant is elderly <u>and</u> infirm." USSG §5H1.1 (emphasis added), referencing §5H1.4.[2]  Concomitantly, §5H1.4 provides that "an extraordinary physical impairment may be a reason to impose a sentence below the applicable guideline range."  Under the express terms of both of these provisions, in appropriate cases, the sentencing court may find that home confinement may be as "efficient as, and less costly than, imprisonment."  Alternatively, these provisions permit a downward departure to a shorter term of imprisonment. *See United States v. Slater*, 971 F.2d 626, 635 (10th Cir. 1992) (proper procedure is to decide whether defendant suffers from a sufficient physical impairment, and, if so, to then "consider whether that condition warrants a shorter term of imprisonment or an alternative to confinement."). *Accord, United States v. Hilton*, 946 F.2d 957, 958 (1st Cir. 1991); *United States v. Ghannam,* 899 F.2d 327, 329 (8th Cir. 1992).  Silvestri respectfully submits that under the facts and circumstances of this case, his age, in combination with his poor health, warrants a downward departure in his sentence.

Silvestri is 71 ½ years old.[3]  He suffers from a wide array of serious medical problems which are described and discussed in three letters from Dr. Victor Molina, the private physician who cared for Silvestri for approximately seven the years prior to his incarceration, attached hereto as Exhibit

---

[2]§5H1.1 states that "[p]hysical condition, which may be related to age , is addressed at §5H1.4."

[3]Undersigned counsel has been informed that for the very old, as with the very young, "half birthdays" count.

A 1-3, and in a letter from Dr. Martin S. Bilsker, a cardiologist in the University of Miami School of Medicine, who has recently reviewed Silvestri's medical history, attached hereto as Exhibit B.[4] Explaining that Silvestri "has a fairly complicated past medical history with multiple medical problems requiring many medications and close attention to detail," Dr. Molina's letter dated November 11, 2002, (Exhibit A-2), provides a detailed list of Silvestri's ailments along with recommended care, the most prominent of which may be summarized as follows:

| Disease | Recommended Care |
| --- | --- |
| Long term atherosclerotic cardiovascular disease, with extensive areas of scar and ischemia in left ventricle, total occlusion of right coronary artery with collaterals perfusing beyond total occlusion, and diffuse plaques throughout coronary tree. | Needs aggressive dietary manipulation and medications, requiring close monitoring with blood tests to assess potential liver and muscle toxicity; 2 months in first year, every 3-4 months in second year, and every 6 months thereafter. |
| Thrombosis of deep venous system of right leg, with recurrent pulmonary embolism. | Chronic anticoagulation with Coumadin (warfarin) for life, with at least monthly monitoring of prothrombin time/INR. |
| Hypertension and hyperlipidemia. | Dietary treatment, medications, medical examinations and blood tests at monthly intervals. |

---

[4]In addition to these letters, Silvestri's medical problems are also documented in his medical records from the following sources: Dr. Molina's office (1995-2002); Palm Beach Gardens Hospital (1995 evaluation); Broward General Hospital (June 2002 evaluation); Columbia Cedars Hospital (November 20002 evaluation, and December 2002 surgery); and the Federal Detention Center (June-December 2002). Because of their bulk, undersigned counsel has not attached copies of these records as exhibits to this motion but has provided copies to the Probation Officer and counsel for the government. Undersigned counsel expects to receive additional medical records from FDC and will similarly provide copies of those upon receipt. Undersigned counsel will also have a full set of all of Silvestri medical records in court at sentencing for the Court to review if desired.

3

| Osteoarthritis in lumbosacral spine and both knees. | Total Surgically replaced right knee |
|---|---|
| Calcified pleural plaques in thoracic cavity (asbestosis). | X-rays yearly and/or CAT scan of the thorax for further delineation. |
| Gastroesophageal reflux disease causing considerable heartburn. | Antacid and other medications. |
| Basal Cell Carcinoma | Dermatologist exam every six months. |
| Renal cysts, hematuria and benign prostatic hypertrophy. | Urologic evaluation and test for prostatic specific antigen needed once a year or as clinically indicated. |
| Hypoglycemia. | Must avoid concentrated sweets and eat frequent small meals. |
| Because of Coumadin treatment, blood may not clot properly. | Must avoid situations that expose him to any type of injury, especially head, and aspirin and similar medications. |

As this Court is aware, Silvestri began to experience troubling symptoms indicative of congestive heart failure in early November, 2002 (*see* Exhibit A-1), and as result of this Court's Order dated November 13, 2002, was transferred from FDC to Columbia Cedars Hospital, Miami for a full cardiology examination which took place between November 26 and December 2, 2002.[5] As a result of that examination, which revealed that Silvestri's cardiac health had deteriorated to the point where he needed "surgical myocardial vascularization (open heart surgery with bypass of the blocked arteries)...as soon as possible," *see* Dr. Molina's letter, dated December 9, 2002 (Exhibit A-

---

[5]Several days prior to the Court's Order, in response to a series of requests by undersigned counsel that Silvestri be examined by a cardiologist because of his congestive heart-failure symptoms, Silvestri had been transferred to Jackson Memorial Hospital, Miami. However, the only examination he received at that time was for his severe arthritic condition. *See* letter Dr. Edwin Lopez, dated November 15, 2002, attached to Government's Supplemental Response in Opposition to Defendant's Motion for Downward Departure.

4

3), Silvestri underwent such surgery on December 10, 2002.[6]

Of Mr. Silvestri's various conditions, his cardiovascular problems are the ones that would appear to pose the most serious problem *vis a vis* prison. Dr. Bilsker's letter (Exhibit 5)explains the "effect on [Silvestri's] life" caused by his two major areas of cardiovascular disease:

1)    ...Because [Silvestri] has had recurrence of deep vein thrombosis...with pulmonary embolism....he must remain on the drug coumadin (warfarin) indefinitely....to prevent further episodes of clotting...with possible embolism to his lungs.  Pulmonary embolism is a potentially life-threatening medical problem. Related to this chronic problem, the effect of the coumadin on his blood clotting needs to be monitored carefully....at a minimum of once a month.  If [the blood tests] deviate from the normal range, which is typically very frequent in patients on anticoagulation therapy, the tests may need to be done more frequently, even at times daily until stabilized.  If the effect is too great, there is a significant risk for severe bleeding which could cause disability or even death.  If the effect is too small, there is a risk for recurrent deep vein thrombosis...and possible pulmonary embolism.

2)    ...As with any patient with significant coronary disease, [Silvestri] is at risk for rupture of a coronary artery plaque which could cause an acute coronary event, including an acute myocardial infarction.  Survival from such an event is closely correlated to the time to treatment by trained personnel in a qualified acute care facility....[Appropriate therapy] must be [administered] within a period of minutes to less than several hours to have maximum positive outcome.  In addition, good medical care related to his coronary disease is extremely important in slowing the progression and helping prevent recurrence of acute events.  This would include, at the least,...[appropriate medications] with monitoring every 3-6 months, and high quality overall medical care to prevent or control other illnesses which might further put his cardiac status at risk.

The medical regime which Silvestri needs to control his cardiovascular disease is a strict and complex one, requiring close medical and laboratory supervision.  The importance of scrupulous adherence to the monitoring and adjustment of his blood-thinning medication cannot be

---

[6]Dr. Bilsker explains in his January 29, 2003 letter (Exhibit B) that the surgery entailed a "three vessel coronary artery bypass grafting," which was needed because Silvestri "had a partial obstruction of the left coronary artery" and "a total obstruction of his right coronary artery which was receiving blood supply from collaterals of the partially obstructed left system."

overemphasized: if a mistake is made -- if not properly monitored or if the dosage is not adjusted correctly or quickly enough -- Silvestri faces the risk, on the one hand, of "severe bleeding which could cause disability or even death," and, on the other hand, of "recurrent deep vein thrombosis...and possible pulmonary embolism," which is a "potentially life-threatening medical problem."  Furthermore, as Dr. Molina's November 11, 2002 letter (Exhibit A-2) points out, Silvestri's vast array of ailments is matched by an equally vast array of other required monitoring and examinations, which must also be maintained in order to prevent Silvestri from suffering unnecessary medical reverses.

On these facts, the downward departure Silvestri requests for "age and infirmity" is amply justified.  As for the "age" prong, there can be no dispute that Silvestri, whom the government concedes "is older than many" in the prison system, Government's Response in Opposition to Defendant's Motion for Downward Departure, qualifies as elderly for purposes of such a departure. Indeed, departures under §5H1.1 have been granted for defendants far younger than Silvestri.  *See, e.g.*, *United States v. Whitmore*, 2002 WL 460391 (9th Cir. 2002) (downward departure for age and infirmity where defendant was 67); *United States v. Collins*, 122 F.3d 1297 (10th Cir.1997) (same where defendant was 64); *United States v. Libutti*, 1994 WL 774647 (D. N.J. 1994) (same where defendant was 62).

Moreover, Silvestri has grown quite elderly in fact: Whatever his physical condition may have been prior to his incarceration eight months ago, and for whatever reason -- whether as a result of his deteriorating health or as a result of the stressful impact of prison on the elderly, discussed below -- Silvestri has now lost any physical agility or strength.  He walks with a cane and experiences difficulty in all of his movements.  As one of his daughter's, Suzanne Giovinazzo, notes

in her letter, her father has "age[d] severely" in detention. Notice of Submission of Letters for Consideration at Sentencing, letter # 6. *Cf. United States v. Tocco*, 200 F.3d 401, 434 (6th Cir. 2000) (departure based on §5H1.1 not warranted in part because defendant, although 72 years old, still "remain[ed] active" in community affairs and "carr[ied] on...a number of business interests").

The issue of whether Silvestri qualifies as sufficiently infirm for an "age and infirmity" departure must be resolved similarly. "Extraordinary physical impairment" is not defined in the guidelines. However, courts have recognized that the heart of the issue is the interplay between the defendant's condition and the prison environment. As explained by *United States v. Rabins*, 63 F.3d 721 (8th Cir. 1995), in accordance with the "the manifest purpose" of § 5H1.4, the following critical questions must be answered:

> Is the particular defendant's physical condition such that he or she would find imprisonment more than the normal hardship? Would imprisonment subject him or her to more than the normal inconvenience or danger? Does the physical condition have any substantial present effect on the defendant's ability to function?

*Id.* at 729 (emphasis added). *See also United States v. Hilton*, 946 F.2d at 959 (recognizing that "the central inquiry" in assessing whether a medical condition constitutes an "extraordinary physical impairment" "involves the degree to which imprisonment unduly imperils a defendant's physical health"); *United States v. Long,* 977 F.2d 1264, 1277 (8th Cir. 1992) (recognizing as extraordinary a physical impairment that renders defendant particularly vulnerable to harm in the prison environment). The answers to these questions leave no doubt that Silvestri's infirmity, in combination with his age, warrants a downward departure.

It is well recognized that older, infirm prisoners have comparatively greater difficulty than younger, healthier prisoners in the often hostile and highly stressful atmosphere of prison; and that

"the elderly person's ordeal [in prison]...is exacerbated by the impairments of old age.....," especially those involving "heart or respiratory problems...." *See, e.g.*, Lyle B. Brown, THE JOINT EFFORT TO SUPERVISE AND TREAT ELDERLY OFFENDERS: A NEW SOLUTION TO A CURRENT CORRECTIONS PROBLEM, 59 Ohio St. L. J. 259, 260 n.4, 272 (1998); Patricia S. Corwin, SENIORITIS: WHY ELDERLY FEDERAL INMATES ARE LITERALLY DYING TO GET OUT OF PRISON, 17 J. Contemp. Health L., & Pol'y 687, 697-698 (2001).[7] Moreover, because of his particular ailments, prison is fraught with special dangers for Silvestri -- in particular, dangers from circumstances that could place him at risk of an uncontrollable bleeding reaction, either because of mismanagement of his medications, which both Dr. Molina and Dr. Bilsker worry about, or because of trauma, especially to Silvestri's head, which Dr. Molina focuses upon. This latter risk is particularly great because Silvestri's osteoarthritic problems, affecting his knees and his hips, impair his ability to walk and maintain his balance, thereby increasing his risk of falling, which could trigger a major medical emergency, potentially endangering his life. In short, the potential impact of the stressful prison environment on Silvestri, with his particular cardiovascular disease and osteoarthritic conditions, could be fatal.

However, even if Silvestri does not succumb to an acute fatal episode, "incarceration is likely to be detrimental to this defendant's health,[8] resulting in a lessening of his life expectancy." *See United States v. Blarek*, 7 F. Supp.2d 192, 212 (E.D. N.Y.1998). Were he healthy, Silvestri's normal life-expectancy as a white male would be, at best, less than 13 years. *See* NATIONAL VITAL STATISTICS

---

[7]As Corwin notes, elderly prisoners experience "an inability to cope effectively with the fast pace and noise of a regular prison facility and a fear of vulnerability to attack by younger inmates....The structure of the prison itself can also be burdensome to the elderly...[who] may have difficulty negotiating stairs or making the long walk to the cafeteria." *Id.* at 697-698.

[8]Certainly, Silvestri's condition deteriorated rapidly over the eight months he has been confined since his trial.

REPORT. National Center for Health Statistics, Vol. 50, No. 6 at 2 (March 21, 2002), Table A. Given

his physical ailments, Silvestri's life-expectancy is necessarily underlined reduced from that norm. This is

especially so since heart disease is ranked as the number-one killer and men -- like Silvestri -- who

suffer from some form of heart disease and are over 70 years of age face a particularly high rate of

death annually. *Id.* at Vol. 49, No. 8 at 6 (September 21, 2001), Table C. With the high stresses of

prison, Silvestri's life-expectancy will be shortened even more.

Given these factors, prison clearly presents "more than the normal hardship" for Silvestri,

"subject[s] him...to more than the normal inconvenience or danger" and is an environment in which

his medical problems will have "a substantial present effect on his ability [ -- or inability -- ] to

function." Given these factors, it is clear that as a result of Silvestri's age and infirmity, he will

suffer a greater punishment than others -- a basis, in and of itself, for departing downward. *See*

*Whitmore, supra,* 2002 WL 460391 at 10 (approving district court's decision to depart downward

on the basis that the guidelines sentence, if imposed on an elderly, infirm defendant, "is far more

punitive than that same sentence would be on a person of middle age").

As discussed in Silvestri's original Notice of Motion for Downward Departure, courts have

granted downward departures to defendants with far fewer health problems than Silvestri. *See, e.g.,*

*Whitmore, supra,* 2002 WL 460391, 10 (67 year old defendant with "a number of infirmities,

including HIV, coronary artery disease and vulnerability to...infections"); *United States v. Collins,*

122 F.3d 1297, 1307 (10th Cir.1997) (defendant, seven years younger than Silvestri, suffered from

"heart disease, high blood pressure, ulcers, arthritis and prostatitis" and faced "prospect of intrusive

surgery to address his prostatitis"); *Moy, supra,* 1995 WL 311441a t 29 (78 year-old defendant

"suffer[ed] from severe depression and from a serious coronary artery disease"); *United States v.*

9

*Libutti*, 1994 WL 774647, 10 (D. N.J. 1994) (62 year old defendant with claustrophobia and coronary artery disease). *See also United States v. Rioux*, 97 F.3d 648, 663 (2nd Cir. 1996) (defendant had "kidney transplant over 20 years [before]" and maintenance of stable kidney function required "regular blood tests and prescription medicines") and *United States v. Paradies*, 14 F.Supp.2d 1315, 1320 (N. D. Ga. 1998) (defendant, 76 years of age, "suffer[ed] from osteoarthritis, a torn rotator cuff, an enlarged prostate and chest pains") -- two cases in which the defendant's physical impairments were <u>part</u> of the basis on downward departure was premised.

In opposing Silvestri's request for a downward departure, the government takes three tacks, none of which withstand scrutiny. First, the government downplays the significance of Silvestri's ailments. *See* Government Response in Opposition to Defendant's Motion for Downward Departure ("GR") at pages 2-4 and the letter from Dr. Edwin Lopez, dated November 15, 2002, attached to the Government's Supplemental Response ("GSR"). However, as events have unfolded, it is clear that the Silvestri was far more seriously at risk of heart failure than the government or Dr. Lopez believed prior to his open-heart surgery. And he is far more seriously at risk now of potentially life-threatening episodes resulting from his severe cardiovascular disease than the government or Dr. Lopez wish to admit.

Second, the government cites to a string of cases in which "courts have considered requests for downward departure based on age, health and other factors and have denied them." GR 4-7. But each one of these cases is distinguishable on its facts or merely stands for the proposition -- with which Silvestri agrees -- that before departing, the district court must make "specific findings as to whether defendant has an 'extraordinary physical impairment,' or combination of impairments, worthy of departure." *See, e.g., Tocco, supra*, 200 F.3d at 434.

10

Third, the government, relying on a letter from Chief Physician Michael B. Nelson, BOP

Health Services, Washington, D.C., asserts that "BOP would be more than capable of handling and

treating" Silvestri, especially at one of its Medical Referral Centers. However, a report prepared by

the United States General Accounting Office, entitled "Bureau of Prisons Health Care--Inmates

Access to Health Care is Limited by Lack of Clinical Staff," GAO/HEHS 94-36, 1994 WL 833229

(F.D.C.H.) (hereafter "the GAO report"), a copy of which is attached hereto as Exhibit C, calls any

such claim into very serious question. The GAO report recounts the results of an in-depth

investigation of the quality of care provided to federal inmates at BOP's medical centers.[9] Its

disturbing findings are, *inter alia*, that:

> Inmates with special needs, including...patients with chronic illnesses, were <u>not
> receiving all of the health care they needed</u>....This situation was occurring because
> there were insufficient numbers of physician and nursing staff to perform required
> clinical and other related tasks. For example, physicians did not always have enough
> time to supervise physician assistants who provided the bulk of the primary care
> given to inmates....<u>As a result, some patients' conditions were not improving and
> others were at risk of serious deterioration.</u>

Exhibit C at 3 (emphasis added).

> Many physician assistants in BOP lack generally required education and certification
> and are not receiving adequate supervision from physicians....BOP's policy does not
> require physician assistants to be certified by the National Commission on
> Certification of Physician Assistants or to have graduated from a program approved
> by the [AMA]. This policy is in contrast to the community's, Department of Veterans
> Affairs', and military services' requirements that physician assistants have approved
> education or certification before they can be hired.

> Further, physicians at the[ ] centers [visited] told us that they lack the time to
> adequately supervise physician assistants. This situation occurred because [BOP]
> either did not have sufficient medical physicians or did not assign a sufficient number

---

[9]Although the GAO investigative team visited only three of BOP's seven medical centers,
it reviewed extensive documentation pertaining to all the centers. *See* Exhibit C at 22-23
(Appendix I). Hence, its findings are generally applicable throughout the BOP medical system.

of these physicians to supervise their physician assistants.  <u>As a result, inmate patients were at risk of not receiving quality medical care.</u>

BOP's Medical Director agreed that physician assistants should have approved education or certification. But he believes that adopting more stringent hiring criteria for BOP's physician assistants would limit BOP's ability to hire such personnel because its current salary structure is significantly lower than what certified personnel can obtain in the private sector.

Exhibit C at 10 (emphasis added).  The GAO report took special note of the inadequate care

provided those with chronic conditions:[10]

Patients with chronic conditions that cannot be stabilized often require frequent observation and monitoring by a nurse in a chronic care unit.  However,...most inmates with <u>chronic care conditions</u>, such as high blood pressure, diabetes, and <u>cardiac conditions</u>, were housed in units that <u>did not have frequent monitoring by nurses</u>.

Exhibit C at 8.  The GAO report concluded:

Currently, BOP does not have the capacity to provide appropriate medical and psychiatric care to inmates at the...centers we visited because it has been unable to recruit and retain qualified health care staff.  Further, <u>staffing shortages at these medical referral centers are chronic and show no signs of improving.</u>  This, in turn, adversely affects quality assurance programs, which rely on staff support for effective implementation.  In addition, <u>physician assistants, who are relied upon to provide a significant amount of primary care to patients, are not as well trained or supervised as they should be.  As a result of these problems, patients are and will continue to be at risk of receiving poor care.</u>

Exhibit C at 18 (emphasis added).

Nor has the government demonstrated that the "risk of receiving poor care" documented in

the GAO report has abated.  A summary of four actions taken by the BOP in response to the GAO

report, provided to undersigned counsel as recently as November 2002, attached as Exhibit D-1,

---

[10]The GAO report defines chronic conditions as conditions which "are permanent or long-term health care needs that do not require constant and extensive medical monitoring by a physician."  Exhibit C at 3, n.4.

certainly suggests the opposite. While euphemistically called "corrective actions," the first and fourth such action appear to do nothing more than create a paper trail of concern about "quality of care," and the second and third focus expressly on <u>cutting costs</u>.[11]

Furthermore, Chief Physician Nelson's letter, ostensibly submitted by the government to assure the Court that Silvestri will receive adequate care, does not even assert that such care <u>will</u> be given; it merely states that BOP "<u>believe[s</u> it] will be <u>able</u> to continue to provide appropriately for Mr. Silvestri's health case and prescriptive needs...." (Emphasis added). Given how inadequately BOP has fulfilled that role up until now -- not even providing Silvestri with a cardiac examination until this Court ordered it to do so -- Nelson's letter does little to inspire confidence that BOP will <u>do</u> what it "believe[s]" it is "<u>able</u>" to do. Certainly, a failure of BOP to actually provide proper medical care is not actionable under the Eight Amendment, absent proof of "deliberate indifference," which is practically impossible to develop. *See Estelle v. Gamble*, 429 U.S. 97 (1976); *Hill v. Dekalb*, 40 F.3d 1176, 1186 (11th Cir. 1994). Nor does the fact that all seven of BOPs Medical Referral Centers are now "accredited by the Joint Commission on Accreditation for Health care Organizations," *see* attachment to Nelson's letter, diminish Silvestri's "risk of receiving poor care" at these Centers. When the GAO report was prepared, five of the Centers were accredited (Exhibit C at 2), but none provided adequate care.

Silvestri submits that, given the findings of the GAO report, and the absence of any proof by the government that those findings no longer obtain, there can be <u>no</u> assurance that, incarcerated, he will realistically receive the close and aggressive medical follow-up he needs, administered by

---

[11]The Status of Open Recommendations, dated January 1996, attached as Exhibit D-2, provides further detail as to what BOP has <u>not</u> done in response to the GAO report.

trained medical providers who are competent to manage his particular medical problems. Accordingly, there can be no assurance that incarceration will not seriously jeopardize his health and, indeed, shorten his life.

Furthermore, precisely because his health has deteriorated so drastically, Silvestri submits that he is, now, effectively incapacitated, rendering a substantial reduction in his sentence, even to home confinement, eminently reasonable. As the court pointed out in *United States v. Jimenez*, 212 F. Supp. 2d 216 (S.D. N.Y. 2002):

> [T]he specific language of § 5H1.4 [and of §5H1.1, as well]...instructs that departure would be warranted because "in the case of a seriously infirm defendant, home confinement may be as efficient as, and less costly than, imprisonment."...This suggests a...penologically quite sound rational for departure [, namely that] <u>[w]here an extremely infirm defendant is so incapacitated that the ordinary purposes of incapacitation and deterrence of recidivism do not justify the expense of extended incarceration, some lesser degree of punishment is permissible, and indeed specifically authorized, by the Sentencing Commission.</u>

*Id.* at 217 (emphasis added).[12] Silvestri invokes this rationale in requesting a downward departure based upon his elderly status and upon "the combination of ailments" from which he suffers, *see Paradies, supra*, 14 F.Supp.2d at 1322, and which collectively constitute a serious, incapacitating infirmity. Indeed, because there can be no question that Silvestri suffers from a qualifying disability, at the very least a significantly shorter period of imprisonment is warranted.

---

[12]It should be noted that the cost to the prison system of caring for Silvestri -- assuming it could do so adequately -- would obviously be burdensome. According to BOP's Notice of Annual Determination of Average Cost of Incarceration, 67 Fed. Reg. 53 at 12586 (March 19, 2002), the average cost of incarceration per inmate is approximately $21,601000 per year, whereas the "[t]he average annual cost of confining an elderly prisoner is $69,000....[ -- ] more than three times the cost expended to incarcerate younger inmates, and more than twice the annual cost for a full service nursing home." Corwin, *supra*, at 688 & n.n.7, 8.

## II. Request Based on Prior Good Works

USSG §5H1.11 provides:

> Military, civic, charitable, or public service; employment related contributions; and similar prior good works are not <u>ordinarily</u> relevant in determining whether a sentence should be outside the applicable guideline range.

(Emphasis added). While under this provision "prior good works" are not "ordinarily" grounds for departure, Silvestri respectfully submits that the contributions he has made to society over the whole of his life-time are sufficiently exceptional to constitute just such a basis for departure, or at the very least, to contribute to a departure based upon a <u>combination</u> of factors.

Silvestri's contributions to society range from the extraordinary way in which, from his teen years on when his mother was institutionalized and his father began a pattern of abandoning his children, Silvestri cared for and supported his siblings and gave a home to his younger brothers and ensured their education; to his military service in which he served in the United States Army during the Korean War, rising to the rank of Staff Sargent, and then participating actively in the Reserves for seven years, including the Bay of Pigs operation; to his contributions to his community through service on various community boards and committees, securing federal money to finance low-income housing, actively leading community-efforts to acquire and preserve open spaces and parkland; to his extraordinary life-long commitment -- and fulfillment of this commitment -- to helping in monetary and other ways, not only his siblings and but also countless other persons less fortunate than he.[13]

---

[13]Some of these matters are touched upon in the PSI at ¶94-100 and 116. Others are the subject of the letters submitted with the Notice of Submission of Letters for Consideration at Sentencing. *See* especially the letters of Silvestri's brother, Richard C. Silvestri, letter # 3; half-sister, Margie Caparelli, letter # 4; business associate, Ashley Goodman, letter # 16; business

Silvestri submits that his life-time of good works is truly "different from the ordinary case where th[is] factor is present." *See Koon v. United States,* 116 S.Ct. 2035, 2045 (1996). As discussed in Silvestri's original Notice of Motion for Downward Departure, courts have found far more limited records of prior good works to be sufficient, in combination with other factors, to warrant a downward departure. *See, e.g., Rioux, supra,* 97 F.3d at 663 (defendant's "efforts to raise money for the Kidney Foundation," in combination with kidney problem and hip replacements, sufficient); *Paradies, supra,* 14 F. Supp.2d at 1321 (the fact that defendant "had been an officer in the Air Force during World War II and ha[d] given both his time and money to numerous charitable organizations," in combination with defendant's health problems, sufficient). Other cases have relied on even <u>lesser</u> records of prior good works to support combination downward departures. *See, e.g., United States v. Takai,* 930 F.2d 1427, 1430 (9th Cir. 1991) (downward departure granted and upheld in part on basis of <u>two</u> instances in which the defendant had "gone to great personal expense to assist victims of crime or earthquake"); *United States v. Acosta,* 846 F. Supp. 278, 279 (S.D. N.Y. 1994) (downward departure granted in part on basis of <u>one</u> instance in which the defendant "saved the life of another at the risk of his own"). "[B]y <u>comparison</u>" with these cases, *see Koon,* 116 S.Ct. at 2047 (emphasis added), a downward departure at least in part on the ground of "prior good works" is amply justified in this case.

---

associate, Donald A. Connor, letter # 17.

16

### III. Request Based on Exceptional Family Circumstance: -- heightened risk of suicide of frail elderly wife.

While a defendant's family circumstances are not ordinarily grounds for departure, *see* §5H1.6, Silvestri respectfully submits that the particular family circumstance at issue here -- the heightened risk of suicide by his frail, elderly wife -- is sufficiently extraordinary to constitute just such a basis for departure in his case, or, at the very least, to contribute to a departure based upon a combination of factors.

As noted in the PSI at ¶101, Silvestri and his wife, Dolores, who is also 71 ½ years of age, have been married for over 50 years, during which time they have both been steadfastly devoted to one another and to their marriage. It is understandable, therefore, that Delores Silvestri has been devastated by her husband's incarceration and the prospect that he will be in prison for the rest of his -- and presumably her -- life. The impact that her husband's situation has had on her psyche, however, is beyond the "ordinary."

As documented in the report by psychologist Dr. April Kassover, attached as Exhibit E,[14] Delores Silvestri is now "at heightened risk for a successful suicide." Dr. Kassover's report states:

> Ms. Silvestri is undergoing a major depressive disorder since her husband's conviction.....[She] is at heightened risk for a successful suicide due to the ideation, plan and intent, depression, anger, desire for retaliation, low self esteem and age (there is little to hope for since she realizes her husband may die in jail)....[D]ue to the severity of symptoms any legal mitigating facts to minimize her husband's sentence could in essence save her life.

Courts have considered the impact of a defendant's incarceration on family members in determining whether to grant a downward departure based on a defendant's extraordinary family

---

[14]Due to logistics, the copy of Dr. Kassover's report attached as Exhibit D is unsigned. A signed report will be substituted at or before the sentencing proceeding.

circumstances. In *United States v Rivera*, 994 F.2d 942, 948 (1st Cir. 1993), the First Circuit framed the issue this way: "[a]t some point the nature and magnitude" of the impact of a defendant's incarceration on his family "may transform the 'ordinary' case of such circumstances into a case that is not at all ordinary." So framed, courts have found such extraordinary circumstances to exist in many cases. *See, e.g., United States v Sclamo*, 997 F.2d 970 (1st Cir. 1993) (departure to probation upheld based on the defendant's unique relationship with the 12 year old son of woman with whom he lived, where the boy had serious psychological and behavioral problems which were ameliorated by the companionship and guidance of the defendant); *United States v Gaskill*, 991 F.2d 82 (3rd Cir. 1993) (departure upheld to permit sentence of home confinement or probation rather than incarceration where defendant was solely responsible for care of his wife who suffered from mental illness); *United States v Haverstat*, 22 F.3d, 790, 796-98 (8th Cir. 1994) (departure based on defendant's involvement in treating wife's psychiatric problems upheld, although reversed as to extent of departure). "[B]y comparison" with these cases, *see Koon*, 116 S.Ct. at 2047 (emphasis added), the extraordinarily devastating impact on Dolores Silvestri of her husband's incarceration is a factor of family circumstance which, at least in combination with other factors, justifies a downward departure in this case.

## IV. Request Based on Over-Representation of Prior Criminal History

As this Circuit has repeatedly recognized, USSG §4A1.3 permits the district court to depart along the horizontal axis of the Sentencing Table if it finds that the criminal history category assigned to the defendant overstates his criminal history. *See, e.g., United States v. Smith*, 289 F.3d 696, 710 (11th Cir. 2002); *United States v. Collins*, 915 F.2d 618, 620-621 (11th Cir. 1990). Thus, §4A1.3 states:

> There may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes...The court may conclude that the defendant's criminal history was significantly less serious than that of most defendants in the same criminal history category..., and therefore consider a downward departure from the guidelines.

Because §4A1.3 expressly identifies overstatement of a defendant's criminal history as a circumstance that may warrant a departure, a departure under that provision is considered an "encouraged" departure, see Koon v. United States, supra, 116 S.Ct at 2045 -- a departure based upon an "approved ground." Collins, supra, 122 F.3d at 1304. As the Tenth Circuit in Collins explained:

> The Commission's commentary to section 4A1.3 makes clear that 'the criminal history score is unlikely to take into account all the variations in the seriousness of criminal history that may occur.' U.S.S.G §4A1.3, comment. (backg'd.). Because section 4A1.3 provides an encouraged basis for departure not already taken into account by the Commission, over-representation of a defendant's criminal history or likelihood for recidivism always will be an approved ground for departure. [Emphasis added].

However, even as an "approved ground," this Circuit limits the application of §4A1.3 to "the pattern or timing of prior convictions." See, e.g., United States v. Rucker, 171 F.3d 1359 (11th Cir. 1999), which states:

> [O]ur cases addressing §4A1.3 appear to have applied it to a pattern of criminal conduct, not to an individual crime...[Sectioin 4A1.3] is concerned with the pattern or timing of prior convictions, not with doubts about their validity.

Id. at 1363 (emphasis added).

Silvestri respectfully submits that an "encouraged" departure is warranted here precisely because of "the timing" of the single prior conviction that results in his assignment to Criminal History Category II. See PSI ¶¶ 85, 86 (assigning Silvestri 3 criminal history points for his

19

conviction, on December 21, 1982, for bribery). Under §4A1.1(a) and its Application Note, Silvestri's 1982 bribery conviction, described in PSI ¶85, is "counted" on the basis that "the defendant's incarceration extended into th[e] fifteen year period" between the conclusion of that sentence and "the defendant's commencement of the instant offense" (emphasis added), which, according to the PSI was June of 1999. *See* PSI ¶ 22. However, Silvestri submits that several aspects of this "timing" are flukes, resulting in the overstatement of the temporal proximity of this single "counted" offense.

First, although Silvestri was convicted of bribery on December 21, 1982, he was, at that time, released on bond initially pending his sentencing on January 28, 1983, and then pending completion of his appeal. As a result, Silvestri did not actually commence serving his sentence for this conviction until March 5, 1984.[15] Had that not occurred -- had Silvestri commenced to serve his sentence immediately upon conviction, or, at the very least, immediately upon his sentencing -- he would have completed the entirety of this single counted sentence for bribery by the end of December 1984, or at the very latest, the end of January 1985.[16]

Second, although Silvestri's sentence for this single "counted" offense was 24 months, *see* note 16, he served only 18 months of that sentence confined in a correctional facility, at which time he was released to a half-way house.[17] However, under the methodology used by the Probation

---

[15]Although the date that Silvestri surrendered and commenced to serve his sentence is not reflected in the PSI, it was confirmed to undersigned counsel by the Probation Officer.

[16]Although Silvestri's formal sentence for this offense was "3 years imprisonment," he was released from this sentence at the end of 24 months -- another fact not specifically reflected in the PSI but confirmed to undersigned counsel by the Probation Officer.

[17]This fact, although, again, not reflected in the PSI, is not disputed by the Probation Officer.

Officer in "counting" this offense, the full 24 months of Silvestri's sentence is treated as the period of "the defendant's incarceration." Silvestri disputes this methodology. In a case dealing with a similar downward-departure request, *United States v. Baltas*, 236 F.3d 27, 39 (1st Cir. 2001), the district court rejected the defendant's argument that his "prior sentence...barely qualified as...such under §4A1.1(a)..." "because it found that [the defendant] was in prison within the guideline's 15-year period." (Emphasis added). Here, Silvestri was not "in prison" from at least October 1985 on; and, furthermore, had he commenced to serve his sentence immediately upon conviction, or, at the very least, immediately upon his sentencing, he would not have been in prison beyond the end of June 1984 or, at the very latest, July 1984.

To be sure, even treating Silvestri's "incarceration" for his single "counted" offense as terminating by the end of June or July 1984, that "incarceration" "extended into th[e] fifteen year period." However, just barely so. It is because this extension into the 15-year period is virtually *de minimus* that Silvestri requests the Court to exercise its discretion and not "count" his bribery conviction for purposes of calculating his Criminal History Category.

In short, Silvestri requests that this Court find that his placement in Criminal History Category II over-represents the seriousness of his criminal history because that history consists of a single "counted" offense which occurred, at worst, at the cusp of the 15-year period, and which was not, by any definition, a recent offense. Thus, based on "the timing" of that offense, Silvestri requests that this Court depart downward to place him in Criminal History Category I, where he properly belongs.

21

**V.      Request Based on Unique Combination of Totality of Factors**

Even if each of the factors discussed in §§ I -IV taken alone were not sufficient to justify a downward departure in this case, those factors, <u>taken collectively and viewed in their totality</u>, warrant such a departure. Numerous cases support this principle. *See, e.g., United States v. Coleman,* 188 F.3d 354, 361-362 (10th Cir. 1999) (because the "aggregation of factors may warrant a downward departure under *Koon*,....the district court is required to consider the particular factors of the case as a whole, and any combination thereof, in determining whether there [are] sufficient extraordinary factors to take [the] case out of the 'heartland'"); *United States v. Cook,* 938 F.2d 149, 153 (9th Cir. 1991) ("a unique combination of factors may constitute the "circumstance" that mitigates," thus justifying a downward departure); *United States v. Lara,* 905 F.2d 599, 602-3 (2nd Cir 1990) (proper to consider whether factors that are "are not ordinarily [individually] relevant," when taken as a whole, "present an extraordinary situation"); *United States v. Agu,* 763 F.Supp. 703 (E.D.N.Y. 1991) (defendant who served part of his sentence, spent time in the armed forces, and failed to get permanent citizenship despite military service, merited a downward departure based on totality of circumstances).

In *United States v. Morris,* 781 F.Supp. 428 (E.D. Va. 1991), *vacated on other grounds,* 988 F.2d 1335 (4th Cir. 1993), the court confronted a medically less compelling case than this one. There, medical evaluations of the defendant revealed that although he suffered from a considerable history of serious illness, he "<u>[did] not suffer from any life-threatening illness, nor any condition which cannot be adequately monitored or treated in prison.</u>" *Id.* at 442 (emphasis added). The court also found that the defendant had performed a significant amount of community service during his lifetime, and that he had received a sentence out of proportion to that of his co-defendants.

22

Concluding, however, that these factors did not individually support a departure, the court nonetheless held that, "in combination," they "constitute[d] a factor not adequately considered by the Sentencing Commission and justify a downward departure in this unusual case." *Id.* at 444.[18]

The same result is required here. Like the defendant in *Morris*, Silvestri suffers from a history of serious health problems, and has contributed positively to society throughout his life. Yet, unlike the defendant in *Morris*, Silvestri's health problems are life threatening and there is no assurance they can be adequately monitored or treated in prison, and, moreover, the impact of his incarceration is already devastating to his wife and may become fatally so. The unique combination of all of these factors, viewed in its totality, is surely sufficiently extraordinary to warrant a downward departure. This is truly a situation in which "[n]either case nor conduct can be reduced to a single factor[; rather] [c]ase and conduct are a total pattern of behavior." *See Cook,* 938 F.2d at 153. As the court in *Cook, id.,* summarized the role of the sentencing judge:

> In making a decision in any particular [sentencing guideline] case, good judgment will often require the evaluation of a complex of factors. No single factor may be enough to point to the wise course of decision. But a wise person will not look on each particular factor abstractly and alone. Rather, it will be how the particular pieces fit together, converge, and influence each other that will lead to the correct decision.

## CONCLUSION

For all the foregoing reasons, defendant Joseph Silvestri respectfully requests that this Court grant his multi-faceted request for a downward departure based upon his elderly age and infirmity due to his complex of serious medical conditions, in combination with other mitigating factors and

---

[18]On remand, 837 F. Supp. 726, 729 ( E.D. Va. 1993), the district court imposed a more lenient sentence on the defendant, in which it "gave more weight...to [his] age and poor health than did the first [sentence]."

23

circumstances -- including his prior good works, the exceptional family circumstance that his frail

and elderly wife is at heightened risk of suicide, the over-representation of his prior criminal history,

and the "unique combination" of the totality of these factors.

Respectfully submitted,

**JEANNE BAKER**
ATTORNEY AT LAW, P.A.
Florida Bar No. 0880700
2937 Southwest 27th Avenue, Suite 202
Miami, Florida 33133-3703
(305) 443-1600
(305) 445-9666 (fax)
**COUNSEL for JOSEPH SILVESTRI**

By: _Jeanne Bak_

24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing instrument was hand-delivered this _3/ st_

day of January 2003, to the following:

        Assistant United States Attorneys
        Brian McCormick and Diana L.W. Fernandez
        United States Attorney's Office
        500 E. Broward Boulevard
        Ft. Lauderdale, Florida 33394
        (954) 356-7255
        (954) 356-7230 (fax)
        **Counsel for the United States**

         and
        United States Probation Officer
        Donald Jefferson
        299 E. Broward Boulevard
        Ft. Lauderdale, Florida 3301-1168
        (954) 769-5515
        (954) 769-5566 (fax)

                    JEANNE BAKER



# PALM BEACH MEDICAL GROUP

*Quality Health Care Through Teamwork*

SERVING THE COMMUNITY FOR 50 YEARS

November 5, 2002

*Via fax at 305-445-9666*

Ms. Jeanne Baker
Attorney At Law, P.A.
2937 SW 27 Avenue
Suite 202
Miami, FL 33133

Dear Ms. Baker:

As per our conversation earlier, I have spoken with Shannon Materio, the daughter of Mr. Silvestri, she spoke with him yesterday after Mr. Silvestri's evaluation by the prison health care professional. I am not sure if this was a doctor or a physician's assistant or a nurse practitioner. According to Shannon, the daughter, Mr. Silvestri told her that they found that his right leg was swollen but also a chest x-ray revealed a enlarged heart. Apparently Mr. Silvestri was also told that he probably had fluid around the heart and had fluid in the lung. Ms. Materio also tells me that Mr. Silvestri has described to her waking up in the middle of the night for the past ten days gagging and gasping for air and all that was given to him was an extra pillow to elevate his upper torso. Also there was no change in his medication except a bedside nitroglycerin to use on an as need basis. Based on the history clinically and clearly the patient is going into congestive heart failure, which is a life threatening condition and should be evaluated urgently in the emergency room and also should have an evaluation by a cardiologist. At the very least perhaps other tests like an echocardiogram with doppler should be performed to address the competency of his valves cardiac function and to rule out the possibility of a pericardial effusion, which was described previously as the fluid around the heart. His medication regimen should be evaluated and possibly some medications adjusted. He may even need intravenous medications to stabilize him and improve his symptoms. He may need serial cardiac enzymes to rule out the possibility of a heart attack as well as an electrocardiogram and a follow up chest x-ray to compare to the previous one done yesterday and evaluate for changes.

Page 2

Note also that this patient is on Coumadin (warfarin). There is a known drug-to-drug interaction between Coumadin and nonsteriodal anti-inflammatory agents. This interaction potentiates the effect of Coumadin possibly creating a life threatening condition by prolonging his prothrombin time/INR. This may cause a severe bleed either spontaneously or via trauma no matter how minor it may be. This I come to mention because the patient in his list of medications provided to me through you shows that he is on naproxen and Aleve, which are both nonsteriodal anti-inflammatory agents. Again, this family of medications including aspirin and the like should be totally avoided in patients taking Coumadin because of the potential for life threatening bleeds that may occur.

Sincerely,

Victor M. Molina, M.D.

# PALM BEACH MEDICAL GROUP

*Quality Health Care Through Teamwork*

SERVING THE COMMUNITY FOR 50 YEARS

November 11, 2002

Ms. Jeanne Baker
Attorney At Law, P.A.
2937 SW 27 Avenue
Suite 202
Miami, FL 33133

Re:    Joseph Silvestri

Dear Ms. Baker:

I have been Joseph Silvestri's primary care physician since September 5, 1995. He has a fairly complicated past medical history with multiple medical problems requiring many medications and close attention to detail.

Mr. Silvestri's medical history includes atheroschlerotic cardiovascular disease for many years. This was documented in his history by the abnormal cardiolyte stress test done in September 15, 1995. The test revealed rather extensive areas of scar and ischemia in the left ventricle, a reasonable aerobic performance for his age, and a hypertensive response. A cardiac catherization done in October 1995 revealed a total occlusion of the right coronary artery with collaterals from the proximal right coronary artery and left anterior descending circumflex system perfussing the area of the right heart beyond the total occlusion. The left coronary angiogram revealed diffused plaques throughout the coronary tree but no significant stenosis. His history also includes thrombosis of the deep venous system of the right leg with pulmonary embolism and recurrence, which has required for him to be treated with chronic anticoagulation with Coumadin (warfarin) for life. He also has a history of hypertension and hyperlipdemia, which needs to be aggressively treated not only with dietary manipulation but also with medications. These medications require close monitoring with blood tests to assess for potential liver and muscle toxicity. His obesity affects his health in general. He has a history of osteoarthritis in the lumbosacral spine and both knees, which required surgery replacing the right knee. He has a past history of sciatica syndrome and hematuria (blood in the urine). Fortunately the work up did not reveal tumors or cancers in the genitourinary tract. This condition requires urologic evaluation once a year and more often if clinically indicated.

Mr. Silvestri also suffers from gastroesophageal reflux disease, which causes considerable heartburn at times and has a history of skin cancers specifically basal cell carcinoma, which requires a visit to the dermatologist every six months. He has benign prostatic hypertrophy and also hypoglycemia for

Page 2

which he should avoid concentrated sweets and eat frequent small meals. He has a history of renal cysts and calcified pleural plaques in the thoracic cavity probably from previous asbestos exposure. This requires close monitoring with chest x-rays at least yearly and/or cat scan of the thorax if clinically indicated.

Mr. Silvestri will need monitoring monthly for his prothrombin time/INR and adjust the dose of Coumadin (warfarin), an anticoagulant, when clinically indicated. He should avoid the risk of situations that may expose him to any type of injury since his blood may not clot properly. Especially if trauma to the head is sustained, the patient can develop an intracraneal bleed that may go unnoticed for some time and may cause severe neurologic problems even death. I would recommend monitoring of his chemistry profile with the specific attention to the liver function test, cpk, and lipid panel every two months for the first year then every three to four months for the second year and if all remains stable every six months thereafter. This is to monitor for the potential liver and muscle toxicity from his cholesterol lowering medication Lovastatin. The chemistry panel would also help monitor for the potential effects of the electrolytes and kidney function that are seen with furosemide and lisinopril. The dosage of his cholesterol lowering medication should be adjusted to maximize lowering his LDL level and total cholesterol while minimizing its toxicity. Mr. Silvestri should be seen by a primary care physician (an internist or family physician) every three months for routine follow up visits and also for his yearly comprehensive evaluation for which he is due now. This should include a comprehensive chemistry panel, complete blood count, urine analysis, lipid profile, createnine phosphokinase, prostatic specific antigen, fecal occult blood on three samples, electrocardiogram, and a follow up chest x-ray. This x-ray should be compared to his previous ones monitoring for changes on the pleural plaques previously noticed. He may also need a cat scan of the thorax for further delineation. I also recommend a yearly influenza vaccine and a pneumonia vaccine every six years. The next pneumovax is due in the year 2005-2006. Dermatologically he is due for follow up for his skin cancers (basal cell carcinoma) and every six months thereafter. Note he is also due for a cardiologic evaluation now.

I am reviewing Mr. Silvestri's medication list provided to me by Ms. Baker and there are some differences from what he was being treated as an out patient in his last visit of April 18, 2002. As long as the patient's cardiovascular system, hypertension and his other medical problems are well controlled I see no major problems with the exception that Mr. Silvestri was on potassium supplement as an out patient and a potassium level should be monitored periodically and the dose adjusted when clinically indicated. Also, I would not recommend for him to take naproxen, Aleve, or any other nonsteriodal anti-inflammatory agents like aspirin or ibuprofen or the like because of its potential interaction with the Coumadin (warfarin) elevating its anticoagulant effect and run the risk of severe bleeding internal or external either from trauma or spontaneous. A situation like this could be detrimental to his health and if severe enough may lead to death.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Victor M. Molina, MD

# PALM BEACH MEDICAL GROUP

*Quality Health Care Through Teamwork*

SERVING THE COMMUNITY FOR 50 YEARS

December 9, 2002

*Via Fax and Certified Mail*

Ms. Jeanne Baker
Attorney At Law, P.A.
2937 SW 27 Avenue
Suite 202
Miami, FL 33133

Dear Ms. Baker:

Per our conversation earlier today, I am in receipt of a package with records from Columbia Cedars Medical Center in Miami, Florida containing records of Mr. Joseph R. Silvestri. I noted he has had an extensive cardiovascular evaluation and it is the recommendation of the cardiac surgeon Dr. Roy F. Williams that he should have surgical myocardial revascularization (open heart surgery with by pass of the blocked arteries). Mr. Silvestri declined this procedure at this time because he wanted to talk to you and to his family before making a decision. When he decides to go through with the surgery, it should be done as soon as possible to decrease the risk of myocardial infarction and myocardiac arrhythmia and even death.

I have also noted in his discharge summary dated 12/02/02 his list of medications does not include Coumadin, which he had been taking in the past for recurrent deep vein thrombosis of his lower extremities and pulmonary embolisms. Also cholesterol lowering drugs in the statin family are not being given. The reason for the omission of these two medications in his medical regiment is not clear to me from these records. The importance of these two medications have already been addressed in a previous letter to you.

I would also like to bring to your attention that in the discharge summary of 12/02/02 there is no mention of recommended activity ordered nor a dietary regiment. There is another sheet labeled "Discharge Instructions (general)", which only addresses the diet as regular. I would like to point out that a patient in Mr. Silvestri's condition should be on two grams of sodium/low cholesterol diet at the very least.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Victor M. Molina, M.D.



UNIVERSITY OF

# Miami

SCHOOL OF MEDICINE

January 29, 2003

Ms. Jeanne Baker
Attorney At Law, P.A.
2937 SW 27 Avenue
Suite 202
Miami, FL  33133

RE:  **Joseph Silvestri**

Dear Ms. Baker:

At your request, I have reviewed Joseph Silvestri's records related to his cardiac problems.  He has two major areas of cardiovascular disease which will have a significant effect on his life:

1.  He has a history of deep vein thrombosis of the deep venous system of the right leg with pulmonary embolism with recurrence.  Because he has had recurrence of deep vein thrombosis (clots in the veins in his leg) with pulmonary embolism (breakup of the clots from the legs with travel to the arteries in the lung), he must remain on the drug coumadin (warfarin) indefinitely.  This is to prevent further episodes of clotting in his leg with possible embolism to his lungs.  Pulmonary embolism is a potentially life-threatening medical problem.  Related to this chronic problem, the effect of the coumadin on his blood clotting needs to be monitored carefully.  If the blood tests are stable, they need to be monitored at a minimum of once a month.  If they deviate from the appropriate range, which is typically very frequent in patients on chronic anticoagulation therapy, the tests may need to be done more frequently, even at times daily until stabilized.  If the effect is too great, there is significant risk for severe bleeding which could cause disability or even death.  If the effect is too small, there is a risk for recurrent deep vein thrombosis of the leg and possible pulmonary embolism.

2.  Mr. Silvestri has severe coronary artery disease and in December, he underwent three vessel coronary artery bypass grafting.  He had a partial obstruction of the left main coronary artery.  In addition, he had a total obstruction of his right coronary artery which was receiving blood supply from collaterals of the partially obstructed left system.  Those lesions were all bypassed.  However, as with any patient with significant coronary disease, he is at risk for rupture of a coronary artery plaque which could cause an acute coronary event, including an acute myocardial infarction.

Division of Cardiology (D-39)
P.O. Box 016960
Miami, Florida 33101
305-585-5542
Fax: 305-585-5826

Survival from such an event is closely correlated to the time to treatment by trained personnel in a qualified acute care facility, which could include such therapy as thrombolytic drugs, acute catheterization with angioplasty, intravenous beta blockers, heparin, and other therapies.  This must be done within a period of minutes to less than several hours to have maximum positive outcome.  In addition, good medical care related to his coronary disease is extremely important in slowing the progression and helping prevent recurrence of acute events.  This would include, at the least, beta blocker medications, medical therapy, lipid-lowering drugs with monitoring every 3-6 months, and high quality overall medical care to prevent or control other illnesses which might further put his cardiac status at risk.

Martin S. Bilsker, MD, FACC
Associate Professor of Medicine
Director, Echo/Doppler Laboratory and
JMH Outpatient Cardiology Clinic

MSB/mrp

Citation                    Rank(R)                 Database              Mode
GAO/HEHS 94-36              R 1 OF 1                GAO-RPTS              Page
1994 WL 833229 (F.D.C.H.)

Federal Document Clearing House
Copyright (c) 1994 Federal Document Clearing House, Inc.

United States General Accounting Office
February 10, 1994

Chairman, Subcommittee on Intellectual Property and Judicial Administration,
Committee on the Judiciary, House of Representatives

BUREAU OF PRISONS HEALTH CARE--INMATES ACCESS TO HEALTH CARE IS LIMITED BY LACK
OF CLINICAL STAFF

United States
General Accounting Office
Washington, D.C. 20548

Health, Education, and
Human Services Division

February 10, 1994

The Honorable William J. Hughes
Chairman, Subcommittee on Intellectual Property
and Judicial Administration
Committee on the Judiciary
House of Representatives

Dear Mr. Chairman:

In March 1992, you requested that we evaluate the adequacy of the
Federal Bureau of Prison's (Bop) medical services and the
effectiveness of its medical Service's quality assurance program.  At
that time, allegations of patient neglect, unacceptable medical
practices, and incompetent physicians in BOP were receiving attention
in the national media.

As agreed with your office, we reviewed the following  four
issues:

-Are inmates with special medical needs-including women,
psychiatric patients, and inmates with chronic medical conditions-
receiving the care they need?

-Does BOP have quality assurance systems in place that detect
problems with health care, and is corrective action taken to prevent
similar problems?

-Are BOP physicians and other health care providers qualified to
Copr. (C) West 1996 No claim to orig. U.S. govt. works

perform the services they are assigned?

-IS BOP considering the most cost-effective alternatives to meet inmates' rising needs for medical services?

We also agreed to concentrate our review on three Of BOP'S seven medical referral centers-Butner, North Carolina, which serves only male psychiatric patients; Lexington, Kentucky, which provides medical services only to female inmates; and Springfield, Missouri, which serves only male inmates. [FN1]  We reviewed selected reports and correspondence from the other four centers.


    FN1  The other four medical centers are in Rochester, Minnesota; Terminal Island, California; Fort, Worth, Texas and Camile, Louisiana.

Background

BOP'S Health Services Division is responsible for providing health care services to approximately 78,000 inmates housed in 71 correctional facilities throughout the United States. This includes emergency and urgent care and care needed to prevent further deterioration of an inmate's condition.  At most correctional facilities, only basic care, such as a physical examination, is provided.  Inmates who require more intensive care or suffer from chronic conditions are either treated at one of seven BOP medical referral centers or are referred to community hospitals with which Bop contracts to provide the needed care.

BOP'S medical referral centers are staffed by physicians, dentists, physician assistants, nurses, and other health care staff. They provide care to inmates of various security levels, from minimum to high.  Five of the centers treat male patients only, one treats female patients only, and one provides care to patients of both sexes. The centers provide various types of services to patients, including medicine, surgery, radiology, psychiatry, and laboratory services. Inpatient services are available only at the centers.  None of the centers provides tertiary care. [FN2]  In addition, each of the centers houses nonpatient inmates who help maintain the centers.  The services provided by each of the three centers we visited are described in appendices II, III, and IV.

BOP has directed six of its seven medical referral centers to seek accreditation by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO). [FN3]  Each was surveyed in March 1993 for accreditation.  Five were fully accredited and one, the Terminal Island, California, center, was refused accreditation.

                         Copr. (C) West 1996 No claim to orig. U.S. govt. works

Inmates with special needs, including women, psychiatric patients, and patients with chronic illnesses, [FN4] were not receiving all of the health care they needed at the three medical referral centers we visited.  This situation was occurring because there were insufficient numbers of physician and nursing staff to perform required clinical and other related tasks.  For example, physicians did not always have enough time to supervise physician assistants who provided the bulk of the primary care given to inmates, and nurses did not have sufficient time to provide individual and group counseling to psychiatric patients.  As a result, some patients' conditions were not improving and others were at risk of serious deterioration.


    FN2  Tertiary care medical centers have the capability to provide all medical or surgical care, such as surgery that requires an intensive care unit for recovery.


    FN3  Carville is managed and operated by the Public Health Service (PHS), which provides medical care to BOP inmates under an interagency agreement.  PHS has not sought JCAHO accreditation for Carville.


    FN4  Chronic conditions are permanent or long-term health care needs that do not require constant and extensive medical monitoring by a physician.


While all three centers had quality assurance programs intended to identify problems with health care, two of the centers failed to correct identified quality assurance problems.  At Springfield, key staff, such as physicians, did not use adverse outcome data to help improve inmates' care, while Lexington was so understaffed its personnel could not act on any but the most severe problems identified.  As a result, quality-of-care problems recurred.

Physicians at each of the centers we visited were qualified to perform the work they were assigned.  However, many physician assistants did not meet the training and certification requirements of the medical community outside of BOP.

To reduce its reliance on community hospitals and the associated costs of providing health care to patients in a non-BOP setting,BOP is considering constructing six large acute tertiary care hospitals; acquiring several military facilities; or both.  But BOP has not yet developed the data with which to determine what kind of medical services are needed by its inmates or the type of services it can efficiently and effectively provide.  Absent such data, BOP has little basis for deciding the numbers and types of staff it would need to operate these hospitals.

                          Copr. (C) West 1996 No claim to orig. U.S. govt. works

BOP needs to determine its basic requirements and consider the costs and benefits of other alternatives for meeting its needs before proceeding with the construction or Acquisition of facilities.  For example, BOP can draw on the experience of several states that have had problems similar to BOP's in providing inmates access to adequate medical care.  These states have contracted out some or all of their inmate medical care and found that the medical care received under this process is better than it was when the prison system was providing the care directly, according to state officials.

   FN5  The cost to provide inmates with medical care at community hospitals increased by 27 percent from fiscal year 1991 to 1992, from $63.5 to $68.0 million.

BOP policy requires that female inmates receive a physical examination, which includes a pelvic examination and Pap test, when entering the prison system and, thereafter, on an annual basis.  The physical examinations are done to detect any health problems that might exist, and the pelvic examinations and Pap tests are designed to detect cancer at its early stages.  The examinations and Pap tests are especially important in identifying and treating sexually transmitted diseases, which many of these women contracted before entering the federal prison system.  If these diseases are left untreated, irreversible complications can occur.

But at the Lexington Medical Referral Center, which specializes in providing medical care to women, pelvic examinations and Pap tests were not done in a timely manner and in some cases may not have been done at all.  In fact, these tests were often only performed when the patient had a problem that brought her to sick call, according to the center's former Clinical Director.  As a result, patients were at risk of having an undetected, untreated cancer progress to a serious condition before it received attention.  This situation was occurring because medical staff at Lexington could not perform the pelvic examinations and Pap tests and also perform their required daffy duties.

In August 1992, the gynecology nurse at Lexington estimated that the center was 6 months behind in performing pelvic examinations and Pap tests.  At that time, the gynecology service had a full-time gynecologist, a full-time nurse practitioner, and a part-time physician assistant to perform these functions.  However, the staffing situation worsened in the ensuing months.  In January 1993, the only gynecologist at Lexington transferred to another facility for personal reasons.  In June 1993, the nurse practitioner for the gynecology clinic retired, leaving only a part-time physician assistant and a clinical nurse to provide gynecological examinations, tests, and

                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

treatment in the gynecology service.  The clinical nurse, a registered nurse, could not do pelvic examinations and Pap tests because she was not credentialed to do so. [FN6]  Thus, as of June 14, 1993, only a part-time physician assistant was providing care in the gynecology service for about 2,000 inmates.

   FN6  A registered nurse's (RN) scope of practice does not usually include performing pelvic examinations or Pap tests unless the RN is a specialist with advanced training in gynecology.


Staffing shortages were not the only reason pelvic examinations and Pap tests were delayed or not performed.  Lexington had no system to assure that all new entrants to the center were referred to a physician, nurse practitioner, or physician assistant who could perform the examination and test.  Upon entry to the center, inmates are seen by a physician assistant, who determines from their health care record whether they need a pelvic examination and Pap test. Those requiring such services are referred to the gynecology service. But Lexington's former gynecologist told us that if a physician assistant fails to make this referral to a physician, the patient will not be seen unless she requests the examination or develops a problem that requires the examination and test.  Because no one reviews the physician assistants' work to assure that inmates' needs for specialized tests are accurately recorded, a patient with a gynecological problem could enter the prison system and have the problem go undetected until it had advanced to a serious state.

Many psychiatric patients in the Springfield and Lexington Medical Referral Centers were not receiving regularly scheduled individual and group therapy that could improve their mental condition.  This situation was occurring because neither facility had a sufficient number of psychiatrists to perform this work.  In fact, the Chief of Psychiatry at Lexington told us that he could not provide the type of psychiatric care each patient needed and was lucky if he could "eyeball" each patient daily.  The staffing shortages in these centers were placing inmate patients at risk of receiving poor or untimely psychiatric assessments and inadequate monitoring of their mental conditions.

BOP'S Chief Psychiatrist told us that an ideal staffing pattern in a BOP psychiatric unit is one psychiatrist for each 20 to 25 patients.  Using the staffing pattern cited by the Chief Psychiatrist, Springfield would need a minimum of 12 psychiatrists to provide quality mental health care.  But Springfield has not met this standard.  In September 1989, Springfield was authorized seven psychiatric positions to serve approximately 300 acute and chronic care mental health patients.  But between January 1991 and August 1992, it never had more than four psychiatrists.  In April 1991, it had only one psychiatrist working in the center.  In 1992, Springfield

Copr. (C) West 1996 No claim to orig. U.S. govt. works

decreased the number of authorized psychiatrist positions to five, and by June 1993, four of these positions were filled.  But, this number of psychiatrists is insufficient to provide adequate treatment to the 294 acute and chronic care mental health patients the center serves.

The Lexington Medical Referral Center was also below its authorized number of psychiatrists.  At the time of our visit in July 1992, Lexington was authorized three psychiatrists but had only two for 237 acute and chronic care mental health patients.  In March 1993, BOP authorized Lexington to hire a fourth psychiatrist.  However, in July 1993, the center had only three psychiatrists on its staff.  To meet the Chief Psychiatrist's optimal staffing level, the center would need nine psychiatrists.

Of the centers we visited, Butner was the only facility whose authorized strength met optimal staffing requirements.  It was authorized nine psychiatrist positions to treat its 230 acute and chronic care mental health patients.  However, as of July 31, 1993, only seven of these positions had been failed.

Figure 1 shows the number of psychiatrists needed for ideal staffing, the number of authorized positions, and the number of positions filled at the three centers as of July 1993.


Figure 1: Psychiatrist Staffing at Three
BOP Centers (July 1993)
[deleted -- bar graph]

Nursing shortages were prevalent in the psychiatric units at each of the three centers we visited.  As a result, nurses at each location told us that their efforts were limited to addressing patients' immediate symptom's, such as disruptive behavior, and they had no time to seek long-term solutions to patients' psychiatric conditions.  For example, in Lexington, one nurse was usually assigned to 34 acute mental health patients on each shift.  In Springfield and Butner, the nurse-to-patient ratios were roughly the same-Springfield assigns four to seven nurses per shift for 177 acute mental health patients, and Butner assigns one to three nurses per shift for 75 acute mental health patients.

Although BOP has no staffing policies governing nurse-to-patient ratios, psychiatric nurses at all three centers told us that they could not adequately treat all their patients under the current staffing arrangements.  For example, Butner's Director of Nursing in a May 1993 memo to the Associate Warden for Health Services said that the nurses provide about 13 minutes of nursing care a day for each patient.  She added that no other  health care institution measures patients' nursing care time in minutes rather than hours.  Further, the Director of Nursing believes that the authorized staffing level of

Copr. (C) West 1996 No claim to orig. U.S. govt. works

15 nurses is dangerously low.  During its March 1993 accreditation survey, a JCAHO surveyor also stated that Butner needed more nurses. However, even if the central office approves an increase in nursing staff at Butner, the Director of Nursing is not sure she can fill positions with nurses from the community because its salaries are at least $7,000 below nursing salaries in the community.  Butner asked for an increase in nursing salaries in 1992, but central office refused the request, stating that the center did not have enough vacancies to justify the salary increase.

The situation was the same at the Lexington Medical Referral Center.  In March 1993, BOP'S central office approved 20 additional medical positions (10 nurse positions and 10 other positions such as physician assistant and occupational therapist) for Lexington.  At that time, BOP'S Medical Director told us that the center was in a crisis situation and needed the additional staff to provide adequate care to the patients.  However, as of June 1993, the center had not received funding for the positions and had not hired any nurses. Further, it was still unclear whether the center would be able to recruit the additional nurses because its salaries were about $3,000 per year below those found in the community.

The Director of Nursing at the Springfield Medical Referral Center told us that nurses were available in the Springfield area and that recruiting and retaining nurses were not problems.  But nurses at the center told us that the number of authorized nursing positions was too low to provide adequate care to both the mental health patients and the medical and surgical patients.  For example, from March to May 1993, some nurses on the mental health unit were asked to fill in on the medical and surgical units while nurses were on leave.  The Warden stopped this practice in May because it jeopardized the medical condition of the mental health patients in units from which the nurses were drawn.  In July 1993, despite receiving overtime from its nurses to staff the medical and surgical units, the center could not meet all its patients' needs.  For example, from July 11 to July 17, 1993, the center had 2,141 hours of nursing staff absences in surgical, medical, and mental health units, according to the Director of Nursing.  But only 40 of these hours were covered through overtime; the remaining hours were not covered.

The Springfield Medical Referral Center has not requested additional nursing positions from the central office because the nursing department has not accurately determined patients' nursing needs.  Rather than determining the amount of nursing time needed to fully address patients' needs, the nursing department schedules only the staff time it has available to provide care.  This action justifies the existing nurse staffing levels.  But according to the nursing staff, the medical and surgical patients admitted to the center during 1993 are more acutely ill than patients admitted in past years.  As a result, they stated that the patients need more hours of

Copr. (C) West 1996 No claim to orig. U.S. govt. work

care than they can provide within existing staff levels.  For example,
between December 1991 and June 1993 the number of end-stage acquired
immunodeficiency syndrome (AIDS) patients being treated at the
Springfield center increased from 10 to 31.  Therefore, more hours of
nursing time were needed to care for these patients than other, less
ill patients would need.

Some nurses at Lexington also told us that if BOP hired
psychiatric technicians, more of the psychiatrists' and nurses' time
could be spent in providing therapy to psychiatric patients.  BOP'S
Medical Director told us that he was considering the use of
psychiatric technicians at the medical centers but, as of March 1993,
he had not acted on this issue.

Some Inmates With Chronic Conditions Not Receiving Follow-Up Care

Patients with chronic conditions that cannot be stabilized often
require frequent observation and monitoring by a nurse in a chronic
care unit.  However, the Lexington Medical Referral Center closed its
chronic care unit in August 1990 because it did not have a sufficient
number of nurses to staff the unit.  As a result, most inmates with
chronic care conditions, such as high blood pressure, diabetes, and
cardiac conditions, were housed in units that did not have frequent
monitoring by nurses.  The center relied on inmates with chronic
conditions to appear at sick call or schedule a clinic appointment
themselves when they needed medical care.  The Clinical Director told
us that physicians try to periodically check when their chronic care
patients were last seen.  But with little time to see scheduled
patients, this check is not a priority and is not always made.

Relying on inmates with chronic health problems to appear at sick
call or schedule a clinic appointment for themselves is ineffective
because some chronically ill inmates may not recognize that their
conditions warrant medical treatment until the condition becomes
serious.  For example:

An inmate housed in a unit that did not have frequent nurse
monitoring at the Lexington Medical Referral Center had serious
chronic problems, including hypertension, diabetes, and renal
difficulties.  From January 1991 until her death in July 1992, the
patient was periodically admitted to the acute inpatient care unit at
the Lexington Medical Referral Center and to two community hospitals
for treatment of her eating conditions.  But her condition required
closer monitoring.  After each admission/treatment, she was returned
to a unit that did not have frequent monitoring by nurses and was told
to present herself to the clinic if further problems occurred.  The
inmate did not assure that her treatment for diabetes was closely
regulated, and she developed hypoglycemia. [FN7] The situation went
undetected until another inmate brought the patient to the medical
staff in a confused state.  The patient was transferred to a community
                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

hospital for treatment but eventually died.  The Clinical Director
told us that if the center had sufficient nursing staff to operate a
chronic care unit for this type of patient, the hypoglycemia might not
have gone undetected and treatment could have been started sooner,
possibly preventing the patient's death.

BOP policy requires that patients with AIDS be seen monthly.  But
this was not occurring at the Lexington Medical Referral Center
because the center did not have sufficient medical staff to perform
required work.  Rather than monthly visits, the 17 AIDS patients in
Lexington were scheduled to be seen by a physician every 6 months,
unless they had symptoms that required immediate treatment.
Springfield and Butner had sufficient staff to perform monthly
assessments of their 40 and 14 AIDS patients, respectively.


   FN7  Hypoglycemic reactions result when a patient omits a meal or eats less
food than prescribed, receives an overdose of insulin, has a nutritional and
fluid imbalance due to nausea and vomiting, or overexerts without compensating
with additional carbohydrates.


Medical centers are also required to have infection-control
programs in place to identify and control the spread of infectious
diseases.  All three centers we visited had an infection-control
program and a person assigned to conduct the program.  However, the
centers varied in their effectiveness in treating tuberculosis.
Tuberculosis is a major problem in correctional facilities because it
occurs three times more often than it occurs in the community.  To
illustrate, outbreaks of tuberculosis have recently occurred in some
state prison facilities, and some cases have surfaced in BOP
correctional facilities.  Inmates who have a positive tuberculosis
test and fail to complete the medication treatment risk developing
active tuberculosis disease, which can be transmitted to other inmates
and staff.  Lexington was the first medical referral center in the BOP
system to perform annual tuberculosis testing of all inmates and track
inmate patients' compliance with treatment.  Specifically, in the
summer of 1992, the center hired two Public Health Service (pHs)
pharmacy students to review all patient medical records to assure that
every inmate who had tested positive for tuberculosis was complying
with treatment.  They found that about 27 percent of the 135 inmates
who had tested positive for tuberculosis were not following their
prescribed medical regimen.  The center staff immediately initiated a
counseling program for these inmates to assure compliance.  The
compliance rate at the time of our visit 3 months later was close to
100 percent.

The Butner Medical Referral Center began annual tuberculosis
testing in March 1993 after an inmate with active tuberculosis went
                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

undiagnosed for about 1 month while housed at the center.  At Butner,
the nurses administer preventive medication to inmates with a positive
skin test, observe the inmate taking the medication, and document that
the patient took the medicine.  In contrast, Springfield tests every 2
years unless an inmate has symptoms of tuberculosis, such as coughing
and fever.  Further, the Springfield center relies on the patients to
take their prescribed preventive medications and does not rely on
direct observation by the staff.  Staff become aware of noncompliant
inmates when their prescriptions are not refilled at appropriate times
or during staff inspections of inmates' cells.


Many physician assistants in BOP lack generally required
education and certification and are not receiving adequate supervision
from physicians.  At the three centers we visited, 11 of 27 physician
assistants had neither graduated from a program approved by the
American Medical Association (AMA) nor obtained certification from the
National Commission on Certification of Physician Assistants. [FN8]
However, BOP'S policy does not require physician assistants to be
certified by the National Commission on Certification of Physician
Assistants or to have graduated from a program approved by the "A.
This policy is in contrast to the community's, Department of Veterans
Affairs', and military services' requirements that physician
assistants have approved education or certification before they can be
hired.


   FN8  Thirty-four of the 66 physician assistants working in BOP at its seven
medical referral centers hive not met either of these requirements.  Of these
individuals, 28 were foreign medical school graduates.  These providers are not
licensed to practice medicine in the United States, but current Office of
Personnel Management regulations permit them to work as physician assistants in
federal facilities.


Further, physicians at these centers told us that they lack the
time to adequately supervise physician assistants.  This situation
occurred because centers either did not have sufficient medical
physicians or did not assign a sufficient number of these physicians
to supervise their physician assistants.  As a result, inmate patients
were at risk of not receiving quality medical care.

BOP's Medical Director agreed that physician assistants should
have approved education or certification.  But he believes that
adopting more stringent hiring criteria for BOP's physician assistants
would limit BOP's ability to hire such personnel because its current
salary structure is significantly lower than what certified personnel
can obtain in the private sector.

                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

BOP's credentialing policy on its physician assistants was
formulated using a 1970 Office of Personnel Management (OPM)
qualification standard.  This standard requires only that a physician
assistant receive training from a nationally recognized professional
medical group, such as the "A, or by a panel of physicians established
by a federal agency for this purpose.  But the Chief of OPM's
Standards and Qualifications Branch told us that the Qualification
standards are minimal federal hiring standards.  The standard was
issued on an interim basis and was to be examined further as the
physician assistant occupation evolved.  On August 2, 1993, the Chief
of the Standards and Qualifications Branch at OPM told us that he
hoped a revised standard would be issued in 1993.  He explained that
OPM has been conducting an overall study of medical occupations and
that no changes will be made to the 1970 standard until BOP and the
military services submit comments.

In June 1991, a consultant [FN9] expressed concern to BOP that its
physician assistants lacked proper qualifications for the position and
that BOP physicians were not providing them with adequate supervision.
Specifically, he noted that uncertified physician assistants were
providing the bulk of health care to inmates and that the ratio of
attending physicians to physician assistants was sub-optimal.  The
consultant was also concerned that the training physician assistants
received was inconsistent and might even have been inappropriate for
the type of care and treatment they provided to inmates.  He
recommended that more physician positions be authorized to improve
overall quality of care.  But as of July 1993, BOP had not been able
to fill all the physician positions that were authorized in any of the
centers we visited.


   FN9  Dr.  Joseph A. Leiberman III, M.D. and M.P.H., Professor and Chairman,
Department of Family and Community Medicine, Medical Center of Delaware,
Wilmington, Delaware.


Figure 2: Physician Assistants (PA)
With and Without Credentials at Six
BOP Medical Centers
[deleted -- bar graph]

We corroborated the consultant's findings concerning both
credentials and supervision.  Figure 2 shows the number of physician
assistants at six centers and the number who lacked credentials.

Physicians at Lexington told us that they lacked sufficient time
to review charts for patients seen by physician assistants and as a
result, they had not reviewed any.  At Butner, physicians reviewed
some charts, but told us that physician assistants needed more
                         Copr. (C) West 1996 No claim to orig. U.S. govt. works

supervision.  As a result of our visit, Butner's Warden authorized an
additional physician to be hired to provide better supervision for
physician assistants.  But as of July 29, 1993, the position was not
filled.  BOP's Health Services Manual states that supervision of
physician assistants can be achieved through a daily physician review
of at least 10 charts of patients seen by physician assistants.
However, a medical records audit conducted by Springfield staff in
April 1992 found that over a 1-month period the physician responsible
for the outpatient department reviewed only 14 of 90 charts for
patients seen by physician assistants.

In addition to providing inadequate supervision to physician
assistants, physicians at the Springfield facility did not always
provide appropriate clinical support to these personnel.  According to
hospital policy, physicians are required to respond to physician
assistants' requests for consultations on patients' conditions within
1 0 days of receipt of the request.  In an August 1992 memorandum to
the center's Clinical Director, the Assistant Clinical Director stated
that physician assistants did not believe that they were receiving
timely responses to their requests for physician consultations.

Each of the three centers we visited had quality assurance
programs that were identifying actual and potential quality-of-care
problems.  But only the Butner Medical Referral Center has a program
in place that was addressing these problems.  At the Springfield
Medical Referral Center, neither the physicians nor the other health
care providers were accepting responsibility for the problems
identified by the quality assurance personnel.  And at Lexington,
insufficient numbers of clinical staff prevented the quality assurance
coordinator from taking corrective action on identified problems.  As
a result, quality-of-care problems continued to occur in both centers.

In May 1992, a consulting team visited Springfield and reported
that the Center's quality management process had resulted in little
evaluation, action, or followup for the data collected or problems
identified.  The team also found little interdisciplinary cooperation
or collaboration among nurses, the quality assurance staff, and the
physicians.  The consulting team concluded that until quality
improvement was considered everyone's responsibility, the system would
not function properly.

BOP's quality management process includes internal and external
reviews of mortality cases.  The effectiveness of these reviews is
limited because (1) medical center reviewers make few recommendations
and (2) the external reviewer's findings are seldom communicated in
writing to the centers for corrective action.  Our review of 44
mortality cases over the period October 1990 to September 1992 at
Springfield showed that the clinical staff who reviewed the mortality
cases limited their review to determining whether the death was
preventable or not.  They did not address whether the adverse outcomes
                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

that occurred were associated with quality-of-care problems and what
corrective action could be taken to prevent recurrence of the
problems.  We identified quality-of-care problems in 12 of these
cases.  We believe that in these cases, corrective actions should have
been implemented to improve future patient care.  The following
example is a case in point:

A 47-year-old patient was uncooperative upon admission to the
psychiatric unit at Springfield Medical Referral Center in May 1991,
malting it impossible for clinical staff to take his medical history
or perform a detailed physical examination.  Nursing notes indicated
that the patient was cooperative as of December 1991.  The patient saw
a physician assistant on April 14, 1992, with shortness of breath and
a high pulse rate.  An electrocardiogram test [FN10] of his heart showed
abnormalities and scar tissue, indicating a previous heart attack.  As
a result of these findings, the physician assistant referred the
patient to a physician for further follow-up care.  On April 16, 1992,
a general practice physician saw the patient but did not perform a
complete history and physical or cardiac workup, nor did he order
medications for the patient.

During the next few weeks, the patient's condition worsened, and
he was seen by a physician assistant on May 21, 1992.  The physician
assistant ordered a repeat electrocardiogram, a chest X-ray, and other
cardiac tests.  The chest X-ray showed that the patient's heart had
increased significantly in size and he had an increased amount of
fluid in his lungs.  The physician assistant performed a detailed
history and physical on the patient on May 22, 1992.  He believed the
patient could be in cardiac failure and notified the general practice
physician.  The physician saw the patient that day.  But despite his
worsened condition, the patient was not transferred from the
psychiatric unit to the medical acute care unit until May 28, 1992.
The patient died of cardiac complications on May 29, 1992.


   FN10  An electrocardiogram test is performed to diagnose cardiac disease and
abnormal cardiac rhythms.


The mortality review committee found that the patient had not
received a cardiac evaluation, but it had no recommendations on this
case.  Additionally, it did not comment on the 1-year delay in taking
a detailed patient history and conducting a physical examination.
These situations are in violation Of BOP Policy, which requires that
both be performed within 14 days of admission into a center.  Instead,
the history and physical examination were performed on May 22, 1992, 7
days before the patient died.  Further, the committee made no
recommendations about when a patient should be transferred to a
medical acute care unit.  The center should have (1) taken action to

                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

assure staff adherence to BOP policy concerning examining newly
admitted patients, (2) developed a standard operating procedure for
when to transfer patients to the medical acute care unit, and (3)
established protocols for closely monitoring patients with both
physical and mental health problems.

The failure of medical center staff to deal with identified
quality-of-care problems was also occurring in the area of clinical
privileging. [FN11]  Our review of the files of physicians currently
employed at the three centers we visited showed that the physicians
were qualified to perform the work they were assigned.  But at
Springfield, often no action was taken against physicians once
performance problems were identified.  For example, the patient care
practices of two physicians had been repeatedly challenged by nurses,
physician assistants, and the medical services quality assurance
committee from 1990 to 1992.  In one case, the medical staff quality
assurance committee recommended that (1) an entry be made in a
physician's file indicating that he had failed to consult with a
specialist to make a cancer patient's remaining days more
comfortable[12] and (2) the case be referred to the medical executive
committee for review.  The medical executive committee concluded that
the care provided by this individual was not "standard of care
normally practiced." The Joint Commission also had identified a lack
of effective pain management of patients as a problem during its
February 1993 accreditation survey of Springfield.

We found that one of the aforementioned physicians was involved
in three other incidents involving quality-of-care issues.  However,
no action was taken to prevent these problems from recurring or to
restrict the physician's privileges.  The physician was still employed
and in good standing at the center.


   FN11  Privileging is the process of evaluating physicians' clinical
experience, competence, ability, judgment, and health status when granting them
permission to treat certain illnesses and perform certain medical procedures.


   FN12  The cancer had spread throughout the patient's body, and he was unable
to move his extremities.  His primary pain medication was Motrin.


Butner and Lexington had not identified any performance problems
with their physicians.  Physicians employed at the three centers we
visited all had appropriate credentials and were educationally
qualified to perform the work they were assigned.  Further, we
examined the credential files of all physicians at each of these
centers and found that BOP personnel had verified all physicians'
credentials.

                         Copr. (C) West 1996 No claim to orig. U.S. govt. works

Lack of sufficient staff to perform quality assurance activities can inhibit the effectiveness of a quality assurance program.  The Lexington Medical Referral Center had one quality assurance coordinator who was also responsible for infection control and risk management.  In addition, she was the center's only anesthetist. These and other duties limited the time she could give to quality assurance issues.  As a result, the quality assurance programs at this center suffered.  For example, our review of patients' charts indicated that of 54 inmates who had abnormal mammograms, 26 left the medical referral center without being informed that they had an abnormal test result that required follow-up care and monitoring.  We discussed this situation with the quality assurance coordinator and although staffing was still a problem she immediately made this a priority and began sending letters to inmates with known addresses telling them of their abnormal test results.  However, when she performed this duty, work in other quality assurance areas had to be deferred.

In contrast to the Springfield and Lexington Medical Referral Centers, the Butner quality assurance program was identifying quality assurance problems and taking action to resolve them.  Quality assurance activities at this center were used to help center management evaluate the quality of care provided and identify areas needing improvement.  These activities included studying the effects of specific psychiatric medications, setting limits on lengths of stay and requiring justification when these limits were exceeded, and performing random peer reviews of individual cases and taking corrective action to prevent recurring problems.

Clinical and other staff, such as counselors and case managers, work together to serve as the quality assurance committee, evaluate clinical indicators, and determine acceptable thresholds for adverse patient outcomes.  Outcomes that exceed established thresholds are reviewed to identify preventable problems, and corrective action is taken to lessen the chance that they will recur.  In addition, adverse events that appear to be unpreventable are analyzed, and areas for improvement are identified and reported to staff in order to minimize future occurrence.  For example, when an inmate died in December 1991 from a cardiac condition, the Associate Warden for Health Services established a mortality review committee to investigate his case.  The committee found that the patient could have been evaluated more thoroughly when he first reported his symptoms.  The committee indicated that the staff should have continued close monitoring of the patient even after his condition responded to treatment.  The committee made several recommendations, including future staff training in identifying and treating impending heart attacks to prevent similar occurrences.

                          Copr. (C) West 1996 No claim to orig. U.S. govt. works

BOP recognizes that its health care costs are escalating.
Additionally, its capacity to provide necessary in-house care with
existing staff levels is at risk.  Because of recruitment and
retention problems, several of BOP's medical referral centers have
been unable to consistently provide care for patients' health needs.
Routine care is sporadic, emergency cases must be transported to
outside hospitals and providers, and each of the centers we visited
must contract out all work needed for most specialties.  To help cope
with this situation, BOP is planning a major hospital acquisition
program for each of its six regions.  Under this program, BOP plans to
either construct new hospitals or acquire closed military hospitals.
But BOP has not fully assessed whether inmates' medical needs justify
this acquisition program nor has it planned how to recruit and retain
the clinical staff necessary to operate these facilities.  Further,
BOP has not fully explored cost-effective alternatives to providing
necessary medical care to inmate patients.

In fiscal year 1992, BOP spent $68 million on care provided in
community facilities, including $12.7 million for correctional
officers to escort patients to and from outside medical appointments.
This represents an increase of $14.5 million over the amount paid in
fiscal year 1991 for outside care.  But BOP did not maintain
sufficiently detailed accounting records to inform management about
the extent and the types of care they were acquiring under contract.
In 1992, BOP's Medical Division proposed awarding a contract to a
private consultant to determine the extent of its outside medical
needs and costs.  This proposal was not approved because BOP's
Executive Committee determined that funds were not available.  As a
result, BOP cannot accurately plan for the future medical needs of its
inmate population.

BOP has not fully determined its medical needs.  In fact, in
1989, a consultant hired by BOP concluded that BOP did not have a
well-defined medical mission and had not measured inmates' needs for
clinical services.

Despite this lack of data, BOP is considering acquiring several
new hospitals to care for its patients.  One option being considered
is to build an acute tertiary care hospital in each Of BOP's six
regions.  Each hospital would have 500 beds and cost about $100
million to construct and equip.  Currently, BOP has received funding
for one new hospital in Butner, North Carolina, to replace the current
hospital there. [FN13] As an alternative to building the remaining five
acute tertiary care hospitals, BOP is trying to acquire selected
closed military hospitals and use them for its own health care needs.
BOP officials told us that they have acquired the hospital at Fort
Devens in Massachusetts and hope to obtain hospitals at Carswell Air
Force Base in Texas and at March Air Force Base in California.
However, it is unclear what services BOP Will provide at these
hospitals and how it will staff them.

                    Copr.  (C) West 1996 No claim to orig. U.S. govt. works

In our view, an alternative to hospital construction or acquisition that BOP could consider is to acquire medical services that it cannot provide from a source outside the prison system.  At least 15 states provide all or part of their health care to inmates through private contractors.  For example, in October 1992, the Missouri Department of Corrections entered a contract with a private contractor to provide health care for its 14,000 or more inmates. This approach was taken because the state could not recruit sufficient numbers of medical staff to provide necessary care within the prison system.  Missouri's Health Services Assistant Director told us that contract care assures the department that certain staffing levels will be consistently maintained and that physicians will provide inmates with needed treatment and periodic examinations.  Before this decision, Missouri was encountering staffing problems similar to that Of BOP's hospital in Springfield, Missouri.  In 1992, the contractor began providing all health care for about $1,336 a year per patient (about 14,000 inmates) or $18.7 million. [FN14]  In comparison, BOP spent about $2,500 a year for each inmate in 1992 or $198 million.  Another option that BOP could consider is telemedicine.  This consists of using electronic voice, video, and data transmission technology to allow consultant physicians to advise on-site clinicians on patient treatment.  For example, a cardiologist could review electrocardiogram results to determine whether a patient's cardiac condition warrants emergency treatment.  Using this technology, BOP could reduce consultant costs, increase available professional resources, and eliminate the need for escorting an inmate to an outside provider or health care facility.  BOP could also use this technology to link medical staff in its medical referral centers with clinical providers in its other correctional facilities.  This would provide timely assessments and treatment plans and reduce unnecessary transfers of inmates whose conditions are not serious to the medical referral centers or to outside hospitals.


   FN13  Butner's current medical beds will be used for chronic patients who require minimum care or those who no longer need medical care.


   FN14  If Missouri's number of inmates exceeds 14,000, the cost for each additional inmate is about half of the base cost.


Conclusions

To assure that it operates an efficient, effective medical program for its inmate population, BOP needs to determine (1) what the health care needs of its inmate population will be over the next 5-10 years, (2) what in-house services it should provide to its inmate
                              Copr. (C) West 1996 No claim to orig. U.S. govt. works

patients, and (3) how it will obtain the employed or contracted staff needed to provide medical services.  But BOP has not planned for the future medical needs of its patient population or fully evaluated all cost-effective alternatives for providing necessary medical care. Thus, in our view, BOP's current concentration on acquiring or constructing new hospitals needs to be reevaluated.

Currently, BOP does not have the capacity to provide appropriate medical and psychiatric care to inmates at the three centers we visited because it has been unable to recruit and retain qualified health care staff.  Further, staffing shortages at these medical referral centers are chronic and show no signs of improving.  This, in turn, adversely affects quality assurance programs, which rely on staff support for effective implementation.  In addition, physician assistants, who are relied upon to provide a significant amount of primary care to patients, are not as well trained or supervised as they should be.  As a result of these problems, patients are and will continue to be at risk of receiving poor care.

Recommendations

We recommend that the Attorney General require the Director Of BOP to do the following:

-Prepare a needs assessment of the medical services its inmate population requires and determine what medical services it can efficiently and effectively provide in-house.

-Determine the most cost-effective approaches to providing appropriate health care to current and future inmate populations.

-Revise BOP hiring standards for physician assistants to conform to current community standards of training and certification.

-Reemphasize to the wardens of medical referral centers the importance of taking corrective action on identified quality assurance problems.

Agency Comments and Our Evaluation

In a letter dated December 10, 1993, the Assistant Attorney General for Administration, Department of Justice, stated that BOP found our report to be informative and comprehensive.  However, he also stated that BOP strongly disagrees with our conclusion that BOP does not have the capacity to provide appropriate medical and psychiatric care to the inmate population at the three centers we visited.  BOP believes that while more staff and more resources to provide health care are desirable, it is providing quality care consistent with community standards with the staff it has at its disposal

                        Copr. (C) West 1996 No claim to orig. U.S. govt. works

Despite its objection to our conclusion about the care it is able
to provide to inmates in the facilities we visited, BOP agreed with
our specific findings.  Further, the Assistant Attorney General stated
that action will be taken on two of our four recommendations.  BOP
believes that the intent of our remaining two recommendations is being
dealt with through existing systems and plans. (See app.  V.)

BOP's disagreement with our conclusion is not justified by the
facts.  BOP acknowledges that it has not been able to recruit and
retain sufficient medical staff to adequately staff the three medical
referral centers we visited.  Further, it agrees with our findings
that there are (1) insufficient nursing staff at each of the centers
visited; (2) insufficient numbers of psychiatrists at the Springfield
and Lexington centers; and (3) female inmates in Lexington who were
not receiving timely pelvic examinations and Pap tests upon
incarceration because of staff vacancies in positions for a
gynecologist, physician assistants, and nurses.  In his response to
this report, the Assistant Attorney General further stated that BOP
has difficulty in recruiting all ranges of professional staff in the
Lexington area because of its inability to compete with salary ranges
offered by community-based organizations.  Each of these conditions
form the basis for our conclusion that BOP does not have the capacity
to provide appropriate medical and psychiatric care to the inmate
population at the three centers we visited.

In responding to our recommendation that BOP needs to prepare a
needs assessment of medical services that its inmate population
requires and determine what it can effectively provide in-house, the
Assistant Attorney General stated that BOP has developed a
comprehensive data collection and utilization management system to
plan for future medical referral center needs.  In his opinion, this
system is growing in sophistication and will give BOP the capability
to determine its health care needs.  Thus, in his opinion, our
recommendation has been satisfied.  We disagree.  BOP's system does
not provide the type of information needed to make decisions on what
services can be efficiently and effectively provided in-house.  Such
data would include information such as an inmate's condition and the
type and amount of medical care the patient needs.  Without this
information BOP cannot accurately determine appropriate staffing
needs, and such information is necessary to determine the extent to
which care can be provided in-house.

The Assistant Attorney General also stated that the intent of our
recommendation that BOP determine the most cost-effective approaches
to providing appropriate health care to current and future inmate
populations is being met through BOP's Long Range Medical Facilities
Plan.  This is partially true.  According to the facilities plan, the
medical referral centers will contract with outside services for as
many technologically advanced procedures as possible, consistent with

Copr. (C) West 1996 No claim to orig. U.S. govt. works

custody and cost considerations.  However, we also believe that BOP
should be considering contracting out when it cannot provide basic
services effectively.  In its long-range plan, BOP states that its
medical referral centers will, at a minimum, provide such basic
services as obstetrics, gynecology, and cardiology.  But we found that
BOP does not have sufficient staff to provide in-house the basic
services required by the facilities plan. hi its planning, BOP must
recognize that this problem exists and develop appropriate
alternatives.  Thus, we believe that our recommendation needs to be
given further consideration.

The Assistant Attorney General did address one aspect of the
contracting out issue.  Specifically, he cited a May 1990 study by Abt
Associates that concluded that privatization of medical referral
centers was not feasible from either a management or cost-
effectiveness perspective.  But privatization of medical referral
centers is only one aspect of the contracting option we are
recommending that BOP consider.  We believe that BOP should explore
the pros and cons of contracting out any element of medical care that
cannot be effectively provided within its medical referral centers.
In this respect, the ABT findings are similar to our findings.  Abt
concluded that contracting out of certain elements of medical care may
in fact help relieve a center's inability to achieve fun staffing
levels.  Abt also concluded that fully staffing the Lexington and
Springfield centers, by means of either contracted or government
employees, will probably enhance the treatment of medical/surgical
patients at these facilities.

The Assistant Attorney General agreed with our recommendations
that (1)  BOP's Wring standards for physician assistants be revised
and (2) corrective actions on identified quality assurance problems be
reemphasized to the wardens of medical referral centers.  In both
areas, BOP agreed to take corrective action to resolve the problems.

Unless you publicly announce its contents earlier, we plan no
further distribution of this report for 30 days.  At that time, we
will send copies to the Attorney General and the Director Of BOP and
interested congressional committees.  We also will make copies
available to others upon request. If you have any questions regarding
this report, please contact me at (202) 512-7101. Major contributors
to this report are listed in appendix VI.

Sincerely yours,


David P. Baine
Director, Federal Health Care
Delivery Issues


                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

## Contents

Letter  1

Appendix 1  26
Objectives, Scope,
and Methodology

Appendix II  28
Mission of Referral Center  28
Location and Condition of  Facility  28
Number of Inmates and Patients Served  28
Number and  Type  of  Medical  Beds  29
Number and type of Staff Positions Authorized and Filled  29
Staff Organization  29

Appendix III  31
Mission of Referral Center  31
Location and Condition of  Facility  31
Number of Inmates and Patients Served  31
Number and Type of Medical Beds  31
Number and Type of Staff Positions Authorized and Filled  31
Staff Organization  32

Appendix IV  33
Springfield Medical Mission of Referral Center  33
Location and Condition of  Facility  33
Number of Inmates and Patients Served  33
Number and Type of Medical  Beds  33
Number and Type of Staff Positions Authorized and Filled  33
Staff Organization  34

Appendix V  35
Comments From the
Director, Federal
Bureau of Prisons

Appendix VI  44
Major Contributors to
This Report

## Figures

Figure 1: Psychiatrist Staffing at Three BOP Centers          7
Figure 2: Physician Assistants With and Without Credentials at 13
    Six BOP Medical Centers

## Abbreviations

                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

AIDS          acquired immunodeficiency syndrome American Medical
Association
BOP          Bureau of Prisons
JCAHO        Joint Commission on Accreditation of Healthcare
Organizations
OPM   Office of Personnel Management
PA    physician assistant
PHS   U.S. Public Health Service
RN    registered nurse
VA    Department of Veterans Affairs


Appendix I
Objectives, Scope, and Methodology

In a letter dated March 23, 1992, the Chairman of the
Subcommittee on Intellectual Property and Judicial Administration,
House Committee on the Judiciary, requested that we investigate the
medical care provided to federal inmates to determine whether (1)
quality of care problems were widespread and (2) the Bureau of
Prison's medical delivery system, including its quality assurance
program, was functioning well.  After consulting with Subcommittee
staff, we agreed to focus our review on the following four issues:

-Are inmates with special medical needs-including women,
psychiatric patients, and inmates with chronic medical conditions-
receiving the care they need?

-Are BOP physicians and other health care providers qualified to
perform the services they are assigned?

-Does BOP have quality assurance systems in place that detect
problems with health care, and is corrective action taken to prevent
similar problems?

-Are alternative approaches available to meeting inmates' medical
needs?

To follow up on allegations of problems with BOP health care, we
reviewed files of correspondence sent to the Subcommittee from inmates
and their friends and relatives, reports and  other  documentation
prepared by the Joint Commission on the Accreditation of Healthcare
Organizations  and the American Correctional Institute, a transcript
of a 60 Minutes television program on BOP's medical care for inmates,
and inspection reports prepared by the Offices of Inspector General
for the Departments of Justice and Health and Human  Services  who
reviewed  BOP  facilities.  We also interviewed a reporter from  the
Dallas  Morning  News  who  wrote  a series of articles on the quality
of medical care provided by BOP.

Copr. (C) West 1996 No claim to orig. U.S. govt. works

To identify and evaluate BOP policies and procedures governing the medical care provided to inmates, we visited BOP's central office and its regional offices in Annapolis Junction, Maryland, and Kansas City, Missouri. At BOP's central office, we interviewed officials from the Medical Division, the Administrative Division, the Program Review Division, and the Office of General Counsel. We also reviewed documents related to health care budget and costs, consultant reports concerning current and future health care operations, and plans for constructing new BOP hospitals. At the regional offices, we interviewed regional health services administrators and reviewed reports submitted by medical referral centers as well as those prepared by regional staff on the results of their evaluations of medical referral centers.

To assess the quality of the health care delivered to patients with special needs, actions taken on identified problems, and the effectiveness of quality assurance programs, we met with the wardens-medical, surgical and psychiatric physicians; nurses; technicians; and other health care staff. We also met with correctional and administrative employees at medical referral centers in Butner, North Carolina; Lexington, Kentucky; and Springfield, Missouri. We reviewed documents related to budget and costs, staffing, quality assurance plans, pharmacy operations, laboratory operations, and inmate complaints. In addition, we reviewed minutes of meetings of the following center committees: medical executive, medical staff, quality assurance, infection control, nursing, utilization management, and pharmacy. We also reviewed selected documents from the other four medical referral centers.

To determine if the qualifications of medical staff to perform assigned work were being properly evaluated, we interviewed cognizant staff and reviewed the credentialing and privileging files of physicians and physician assistants. We determined whether the centers had verified physicians' and physician assistants' educational and professional credentials and whether quality assurance data were present in the providers' files at the time privileging decisions were made. We also reviewed any actions taken when problems were identified.

To evaluate care provided to inmates with special needs, such as chronic or psychiatric conditions, we reviewed selected patient files of inmates who died between October 1, 1990, and September 30, 1992. We also reviewed files of selected female inmates who had abnormal results on either their Pap tests or mammograms. We then discussed these cases with cognizant staff.

We performed our work between April 1992 and August 1993 in accordance with generally accepted government auditing standards.

Copr. (C) West 1996 No claim to orig. U.S. govt. works

Appendix II
Butner Medical Referral Center

Mission of Referral Center

The primary mission of the Bureau of Prison's medical referral
center at Butner, North Carolina, is to provide psychiatric diagnostic
and treatment services to male inmates with minimum to medium security
classifications.  The patients being treated have either been
convicted of a crime or are categorized as forensic.  Forensic
patients have been accused of crimes and were referred to Butner to
determine if they are mentally competent to be tried in a federal
court.

In addition to psychiatric care, the Butner staff and consultants
also provide inmates with outpatient medical care.  Inmates who
develop acute medical conditions that require inpatient care are
transferred to other BOP medical referral centers or to a community
hospital.

The Butner federal correctional institution opened in 1976 as a
psychiatric referral center.  The eight housing buildings are small,
open units, which are mostly unlocked during the day, allowing
considerable intermingling of patients, other inmates, and staff.

One of the buildings housing mental health patients contains a
seclusion admission area with an officers' station, 1 0 standard
individual cells, 6 double cells, and 4 observation cells.  These
latter cells have large windows that allow observers to continually
observe the occupant and are used mainly for patients considered to
have the potential to commit suicide.  Because these patients must be
watched 24 hours a day (with observation notes written and initialed
every 15 minutes), Butner uses inmate it companions' to observe the
potential suicide patients.  These companions are inmates who have
been screened and trained for this work, and a psychologist supervises
them.  The remaining three buildings contain open housing for
psychiatric patients, the outpatient clinic, and health care offices.

In July 1993, the Butner correctional facility housed
approximately 800 male inmates.  Of these inmates, 180 were mental
health inpatients, about 100 were in a substance abuse program, 24
were in the sex offender treatment program, 20 were in outpatient
therapy for sex offenses, and 50 were in outpatient psychiatric
treatment.  At that time, about 300 inmates, including some of the
mental health patients, required medical care for chronic medical
conditions, such as diabetes, hypertension, cardiac conditions, or
outpatient psychiatry.  They were seen in monthly clinics on an
outpatient basis by physicians and physician assistants.  The medical
staff also served an adjacent BOP camp housing 250 inmates.

Copr. (C) West 1996 No claim to orig. U.S. govt. works

The Joint Commission on Accreditation of Healthcare Organizations rates the Butner medical referral center as a 180-bed forensic inpatient hospital.

In July 1993, Butner's medical referral center had 91 authorized health care positions, including 9 psychiatrists, 4 medical physicians, 1 optometrist, 2 forensic fellows, [FN15] 8 physician assistants, 15 nurses, 2 dentists, 2 pharmacists, 5 psychologists, 1 quality assurance coordinator, 5 medical records staff, 17 clerical staff, and 20 other health care staff.  Nine positions were vacant, including a medical physician, 2 psychiatrists, a psychologist, 2 nurses, a dental assistant, a physician assistant, and a vocational rehabilitator.

The Associate Warden for Health Services at Butner is responsible for all health care staff plus other staff who work in units housing psychiatric patients.  This arrangement differs from other BOP organizational structures, where psychologists, unit and case managers, and counselors report through chains of command other than health services.  The Associate Warden believes that this integration of psychiatric medicine, physical medicine, and unit management helps ensure commonality of purpose, reduces communication problems, and improves patient progress.

Butner uses a team approach to patient care.  Each patient is assigned to a psychiatrist and a psychologist who write progress notes daily for seclusion patients, weekly for assessment and short-term patients and monthly for long-term and management cases.  In addition, each seclusion patient meets weekly with the treatment services teams, consisting of psychiatrists, psychologists, a nurse, the recreation therapist, a social worker, and case managers.

Generally, the doctors and psychologists work the 7:30 a.m. to 4:00 p.m. shift, although at least one doctor usually works to about 9:00 p.m. In addition, at least one physician works Saturday and Sunday day shifts.


   FN15  For several years, Butner has employed psychiatrists and psychologists in their last year of residency as "fellows" in their specialty.  This program helps augment its staff, advertise the center in a positive manner, and remit permanent staff.  As of July 1993, Butner had 2 forensic fellows working in the center and counted as part of their authorized positions.

Further, one psychiatrist is always on call.  At a minimum, one physician assistant and one nurse cover the four mental health buildings on the midnight to 8:00 a.m. shift.

                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

Appendix III
Lexington Medical Referral Center


Mission of Referral
Center

The medical referral center at Lexington, Kentucky, provides
primary medical and surgical care; chronic and hospice medical care;
and acute, diagnostic, and chronic psychiatric care exclusively to
female inmates.  Care is provided for seriously ill patients, and most
surgeries and all births take place in community hospitals.

The federal correctional institution at Lexington, Kentucky,
consisting of several two- and three-story buildings surrounded by a
wire fence, was designated as a medical referral center in 1990.  The
buildings were built around 1934 and are currently in need of repair
and renovation.  One building contains most of the medical facilities,
including the inpatient medical and psychiatric units, outpatient
clinics, laboratory, pharmacy, dental clinic, and operating suite.

The Lexington correctional institution houses 1,954 female
inmates.  The center has a 22-bed acute care unit with an average
census of 15.  This unit also has a recovery and stabilization room,
and 24-hour nursing and physician assistant coverage.  A physician is
on call after hours.  Patients requiring chronic care are housed in
two extended care units, one with 176 beds and the other with 316
beds.  Neither unit has nursing coverage.  The mental health unit
consists of 34 acute care inpatient beds and a 60-bed transitional
unit for mental health patients.  The transitional unit does not have
nursing coverage.  In addition, the center has 34 obstetric beds.

BOP assigns all inmates with complicated pregnancies to Lexington
for prenatal care.  These patients are transferred to the University
of Kentucky hospital once labor begins to ensure that babies are not
born within a prison.  Lexington also transfers other patients to
community hospitals for medical and surgical care that Lexington is
not staffed to provide.

The Joint Commission on Accreditation of Healthcare Organizations
rates Lexington as a 56-bed medical, surgical, and psychiatric
hospital.

In July 1993, Lexington was authorized 126 health care staff,
including 8 physicians (one of which is a clinical director), 4
psychiatrists, a surgeon, 43 nurses, 12 physician assistants, 4
dentists, 4 pharmacists, 3 psychologists, 10 medical records staff,
and 37 other clinical staff.  At that time, 32 positions were vacant,
including 3 medical physicians (one is the clinical director and the
                         Copr. (C) West 1996 No claim to orig. U.S. govt. works

other two are the obstetrics and gynecology physicians), 1
psychiatrist, 14 nurses, 1 physician assistant, and 13 other health
care staff.  The following specialists were working at Lexington
during this time: 1 family practitioner, 2 general practitioners, 2
internists, 1 surgeon, and 3 psychiatrists.

Physicians generally work from 7:30 a.m. to 4:00 p.m., although a
physician is on call 24 hours a day.  A physician assistant acts as
the duty officer each day, responding to calls 24 hours a day
throughout the facility.

The facility uses psychology interns from the University of
Kentucky and Public Health Service nursing students who are in their
last year of nursing school.  The latter are used as nurses' aides.

All health care staff report to the Associate Warden for Clinical
Programs; Lexington does not have an Associate Warden for Mental
Health Services.  Staff who provide non-medical inmate services, such
as unit managers, case managers, and counselors, report to the
Associate Warden for Programs, although they meet regularly with
health staff to discuss inmates' progress.


Appendix IV
Springfield Medical Referral Center


Mission of Referral Center

The U.S. Medical Center for Federal Prisoners in Springfield,
Missouri, is one of the Bureau of Prisons' six referral centers that
treat male medical, surgical, and mental health patients.

Location and Condition of Facility

The Springfield Medical Referral Center is an administrative
facility, meaning it is equipped to house inmates of all security
levels.  It was built about 1933.  inmates live in six connected
buildings, each of two or three stories.  The medical facilities are
concentrated in four of the six buildings.  The acute and chronic care
medical and surgical patients are housed in units that resemble
typical hospital rooms, except that several rooms in each unit have
locked doors.  These locked cells are used for patients who are (1)
dangerous to staff or other inmates, (2) participating in the federal
witness protection program, or (3) waiting for their custody status to
be determined.  The mental health patients are housed in units that
resemble typical prison cell blocks with one-man cells.  Springfield
also has a unit that can contain up to 37 inmates in individual locked
cells for disciplinary or protective reasons.

Copr. (C) West 1996 No claim to orig. U.S. govt. works

Number of Inmates and Patients Served

Springfield serves approximately 1, 120 inmates, including 439 patients who require medical or surgical care and 294 who need psychiatric care.  The medical and surgical care is provided to about 46 acute care patients, 54 patients receiving renal dialysis, and 393 other chronic or recovering patients.  The mental health population includes 177 treatment patients and 117 forensic inmates who are being evaluated for their mental ability to stand trial.

Number and type of  Medical Beds

The Joint Commission on Accreditation of Healthcare Organizations rates Springfield as a 46-bed acute care and 177-bed mental health hospital.

Number and type of Staff Positions Authorized and Filled

In July 1993, Springfield had 279 authorized health care positions, including 5 psychiatrists, 15 medical/surgical physicians, an optometrist, 12 physician assistants, 127 nurses, 9 pharmacists, 12 psychologists, 6 quality assurance staff, 10 medical records staff, and 82 other health care staff.  At that time, 18 positions were vacant, including 3 medical physicians, a surgeon, a psychiatrist, a physician assistant, 10 nurses, I medical records staff, and 1 other health care staff.  The following specialists were working at Springfield: 3 general practitioners, 4 psychiatrists, 2 internists, 2 neurologists, 1 psychiatrist, 1 anesthesiologist, 1 orthopedic surgeon, and 1 chief of health programs.

Physicians and physician assistants are available 24 hours a day. However, physicians generally work from 7:30 a.m. to 4:00 p.m. During the evening and night shifts and on weekends, one physician, one psychiatrist, and one psychologist are on call.  Physician assistants are available in the facility 16 hours a day.  Nurses are responsible for medical care between 10:00 p.m. and 6:00 a.m. Nursing services is provided 24 hours a day.

The Associate Warden for Medical Services supervises most of Springfield's health care staff, including nurses and technicians. The Clinical Director is responsible for the internal medicine physicians, psychiatrists, surgeons, dentists, physician assistants, the quality assurance coordinator, utilization manager, and infection-control practitioners.  The Associate Warden for Mental Health Services is responsible for the psychologists and social workers who work with the mental health patients.

Appendix V
Comments From the  Director,  Federal Bureau of Prisons

Copr. (C) West 1996 No claim to orig. U.S. govt. works

David P. Baine
Director, Federal Health Care
Delivery Issues
Human Resources Division
U.S. General Accounting Office
Washington, D.C.  20548

Dear Mr. Baine:

The following information is being provided in response to your
request to the Attorney General, dated November 9, 1993, for comments
on the General Accounting Office (GAO) draft report entitled, "Bureau
of Prisons Health Care: Inmates' Access to Health Care Is Limited by
Lack of Clinical Staff."  The GAO evaluated the adequacy of the
Federal Bureau of Prisons (BOP) medical services and the
effectiveness of its quality assurance program.  This review afforded
the BOP the opportunity of having another external evaluation of its
delivery of healthcare services to a incarcerated inmate population.
many of these inmate patients frequently begin their incarceration in
the BOP with significant physical and psychiatric diseases, many times
as a result of unhealthy behaviors such as drug abuse, alcoholism,
high-risk sexual behavior and violence.  Specifically, GAO reviewed
the following four issues:

-whether inmates with special medical needs are receiving  the
care they need;

-whether BOP has quality assurance programs to  detect problems
with healthcare and take corrective action to prevent similar
problems;

-whether BOP physicians and other healthcare providers are
qualified to perform the services they are  assigned;

-whether BOP is considering the most cost-effective alternatives
to meet the rising needs of inmates for  medical services.

The GAO toured and reviewed three of seven Medical Referral
Centers (MRC) of the Bureau.  The Bureau MRCs provide inpatient,
outpatient, psychiatric, chronic, and tertiary care to approximately
78,000 inmates housed in 71 correctional facilities throughout the
United States.  All seven of the Bureau MRCs are fully accredited by
the Joint Commission on Accreditation of Healthcare Organizations
(JCAHO).  The GAO visited the Federal Medical Center (FMC) at
Lexington, Kentucky; the Federal Correctional Institution (FCI) at
Butner, North Carolina; and the Medical Center for Federal Prisoners
(MCFP) at Springfield, Missouri.

BOP found the draft report to be informative and  comprehensive.
                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

However, BOP strongly disagrees with the general finding of GAO that
it currently does not have the capacity to provide appropriate medical
and psychiatric care to the inmate population.  GAO bases its
determination on its belief that the BOP has been unable to recruit
and retain qualified healthcare staff.  Within the context of resource
limitations, the BOP continuously and carefully balances the resources
it allocates to each of its programs to achieve its overall,
coordinated mission of care and custody.  While in an ideal setting
more staff and more resources to provide healthcare is desirable, BOP
believes that it is providing quality care consistent with community
standards with the resources available.  It requests that GAO modify
its draft report consistent with the facts provided below.

Findings Re Meeting Special Medical Needs  of  Inmates

The GAO draft report identified that inmates with special needs,
including women, psychiatric patients, and patients with chronic
illnesses are not receiving all of the healthcare they need at the
three MRCE visited.

GAO stated that female patients at FUC Lexington are not
receiving timely pelvic examinations and PAP tests upon incarceration.

By policy, BOP requires pelvic examinations and PAP tests on
admission.  However, as noted in the GAO Report, during the period of
the GAO review, these tests were not being done in a timely manner due
to a lack of staff.  The staff vacancies were in the professions of
physician gynecologists and physician assistants, as well as nurses.
BOP agrees with this finding for the period of the GAO review.

The BOP has had staff shortages at FMC Lexington, and during
these periods of shortages the number of procedures being performed
fell behind.  However, the Bureau recently assigned an additional 20
positions to FMC Lexington, and as of September 31, 1993, only 18 of
120 healthcare positions at FMC Lexington were vacant.  In spite of
Federal salary limits, BOP is still able to maintain a quality staff
who care about the inmates and their problems.  It is difficult to
find potential applicants who are willing to work for less
compensation, and respect the human and medical rights of the inmate
population.  Additionally, the BOP has difficulty recruiting all
range, of professional medical staff due to its inability to compete
with salary ranges offered by community based organizations.  For
example, the average starting salary offered in the community to
physician assistants is 4D to 60 percent higher than in the BOP.

GAO  stated  that many psychiatric patients at the XCFP
Springfield and scheduled individual and group therapies.  Lack of
adequate PNC Lexington XRCs are not receiving regularly psychiatrist
and psychiatric nursing positions was identified as the cause of this
deficiency.

Copr. (C) West 1996 No claim to orig. U.S. govt. works

GAO's statement is not entirely correct.  The GAO used an 'ideal' inmate psychiatric practitioner ratio of 25 to 1 proposed by the Chief Psychiatrist, BOP.  However, they applied this ratio based only on the psychiatrist positions without regard for the acuity level or the type of illness involved.

The BOP employs an extensive team approach to treating mental health patients, involving not only psychiatrists, but psychiatric nurses, social workers, medical nurses, psychologists, correctional counselors, case managers, correctional staff, and chaplains.  While this team approach is consistent with the community mental health model, the GAO correctly noted an insufficient number of psychiatrists at the MCFP Springfield and FMC Lexington MRCE.  The BOP continues to actively recruit for these positions.

GAO stated that some inmates with chronic conditions are not receiving follow-up care.  The GAO interprets follow-up care as monitoring by a nurse in a chronic care unit.

The BOP policy on chronic care monitoring is specific and appropriate.  All chronic care patients are identified upon incarceration or upon development of a chronic disease.  Once identified, inmates are regularly scheduled in chronic care clinics which are held at least four times per year.  Additionally, inmates have access to healthcare professionals on a daily basis through sick call visits and as needed on an emergency basis 24 hours a day.

BOP believes it exceeds the community standard.  Chronic care patients in the community are treated at their physicians' offices or through hospital-based outpatient facilities while continuing to live in their homes.  Patients in the community report to their physician provider as needed for treatment of chronic illnesses.  Twenty-four hour nursing staff coverage to monitor chronic care patients is neither a community standard nor cost effective.

As noted above, BOP policy requires those inmates identified as having chronic care conditions to be evaluated by a physician at least four times a year.  BOP agrees with the GAO finding that not all chronic care patients at FMC Lexington and MCFP Springfield were monitored according to policy.  BOP continually tracks institution data and staff to ensure chronic care patients are monitored at least four times a year.  Due to staffing constraints, BOP is not always able fully to comply with the policy.  However, these patients have the capability and responsibility to request follow-up care as needed, consistent with the community standard.

The GAO states that there in insufficient nursing staff at  the MRCM.

                    Copr. (C) West 1996 No claim to orig. U.S. govt. works

BOP concurs with this finding.  Each MRC utilizes a different classification system in evaluating its nursing requirements.  As a result, the MRCs are utilizing differing parameters in determining their needs.  In addition to the recruitment difficulties already noted, the Bureau needs to reevaluate its nurse staffing practices throughout BOP.  By doing so, nurse utilization can be coordinated and more effectively managed.  The first step of the Bureau in addressing this issue will be to develop or acquire a standard patient care classification system for all NRCE.  This will result in a staffing system based upon inmate healthcare needs and not institution staffing patterns.

GAO stated that the three IMCs varied in their  approach  to infection control.  Also provides no explanation or clarification of that assertion.

The BOP has always had an infection control policy in place for the NRCS.  This policy is comprehensive and continually updated in conjunction with the recommendations made by the Centers for Disease Control and Prevention (CDC).  As each institution has different missions and inmate populations, the implementation of the CDC guidelines and recommendations will also differ from institution to institution according to local needs.  GAO did not identify any deficiencies in the overall infection control program of the Bureau or in the implementation of these policies by the MRCs.

Findings Re Quality Assurance

GAO stated that of the throe KRCs only PCI Butner has a quality assurance program in place that is addressing quality assurance problems.  At MCPP Springfield, GAO states neither the physicians nor other healthcare providers are accepting responsibility for the problems identified by their quality assurance personnel.  GAO states the reason for this lack of involvement on the part of healthcare staff in understaffing.  GAO cited two inmate deaths, one at KCFP Springfield, the other at FMC Lexington, that allegedly resulted from understaffing.

MCFP Springfield and FMC Lexington, as well as FCI Butner, have comprehensive quality assurance programs in place.  The JCAHO evaluated the effectiveness of these programs in February and March 1993 and found them to be in substantial compliance with JCAHO standards.  However, JCAHO did identify some deficiencies at MCFP Springfield and FMC Lexington in medical staff monitoring of certifying intpatient care components such an radiology and surgery. Both institutions have submitted corrective plans of action in response to these deficiencies.  Lastly, both institutions received full JCAHO accreditation.

Additionally, in May 1992, prior to the GAO review, a consulting

Copr. (C) West 1996 No claim to orig. U.S. govt. works

team visited MCFP Springfield, at the invitation of the Warden, to provide direction for restructuring the quality assurance program at that institution.  MCFP Springfield redesigned its quality assurance program and utilized the expertise of the consulting team to refine the program.

Bureau procedure for disseminating external review findings is to transmit to the Regional Director a written notice of any deficiencies.  At the same time, a transmittal is sent to the Warden at the MRC for appropriate consultation with the Region.  The Regional Directors are responsible for ensuring appropriate corrective action has been taken.  GAO has appropriately noted the occasional deficiencies of this system.  Therefore, DOP is restructuring its quality assurance notification and review (follow-up) process.

The MCFP Springfield case involving the death of a psychiatric inmate with medical problems was evaluated by an external medical consultant, prior to the GAO review.  The GAO concurred with the findings of the consultant of SOP, that this case was incorrectly medically managed.  MCFP Springfield recognized the quality assurance problems with this case and instituted corrective actions to prevent further occurrences.  Specifically, MCFP Springfield counseled and monitored the physician in question, increased the level of staffing, and implemented a system of medical and psychiatric duty officers.

The FMC Lexington case involved an inmate with chronic medical problems.  This case was identified by the BOP and was reviewed by the Bureau's external reviewer prior to the GAO study.  The external reviewer indicated an inappropriate level of care was provided. However, there was no method to verify whether the unavailability of resources affected the longevity of this patient.  As result of this case and other cases, staffing reevaluations took place which ultimately led to the addition of 20 medical positions at the FMC.

Findings Re Qualifications of Health Care Providers

GAO recognized that all physicians employed at the three NRCs have appropriate credentials and are educationally qualified to perform the work they are assigned.  GAO also found that SOP personnel had verified all physicians, credentials.

GAO stated that many physician assistants in the SOP lack generally required education and certification, and are not receiving additional supervision from physicians.

The Office of Personnel Management (OPM) has set minimum hiring standard for physician assistants. while the BOP can exceed the minimum hiring standards, the BOP must consider all applicants who meet the minimum training and experience standards set forth by OPM. To do otherwise, the BOP would risk legal action from non-selected

Copr. (C) West 1996 No claim to orig. U.S. govt. works

applicants.

BOP recognizes and supports the need to meet the community standard with regard to physician assistants.  Competition for graduates of accredited physician assistant programs is very high, with approximately six potential openings nationally in the private an well an the public sector for every graduate.  Due to the salary differentials noted previously, the BOP has had to explore a tentative recruiting and retention strategies to meet the physician assistant community standard.

First BOP petitioned for, and acquired, a delegation of authority under Title 38 [FN1] to permit it in the future to hire certified physician assistants based upon a more competitive salary rate. Second, for the past two years the BOP has been exploring academic relationships with accredited Physician Assistant Training Programs and the American Academy of Physician Assistants throughout the United States to provide additional training and upward mobility for qualified candidates.  Recognizing the need to meet the community standard for certification of physician assistants, BOP would provide the opportunity (based on available funding) for a limited number of qualified staff, including foreign medical school graduates currently practicing physician assistants in the BOP, to attend one of the existing accredited national training programs with the end goal of certification.  Finally, the BOP offers an extensive and comprehensive continuing professional medical education program for all of its medical staff.

The GAO statement regarding the lack of adequate supervision from physicians for many physician assistants requires further review by the BOP.  The Program Review Division, BOP, has reviewed these MRCN ever two years.  Program review guidelines are in place that monitor physician supervision of physician assistants.  BOP policy requires a physician to randomly or specifically review 10 medical records completed by physician assistants on a daily basis.  The Program Review Division reports have confirmed that this in being done at the three MRCs with the exception of less than 100 percent compliance at MCFP Springfield.  This inconsistency has been corrected.

Based upon the GAO interviews with physicians and physician a assistants, BOP is going to review and reevaluate its program review guidelines and discuss the physician monitoring of physician assistants with both the physicians and the physician assistants at the MRCS.


   FN1  The Veterans Administration authority to  hire  medical professionals, 38 U.S.C. 57401, et seq., allows for higher salaries and less competitive hiring procedures.
                         Copr. (C) West 1996 No claim to orig. U.S. govt. works

Findings Re Cost Effective Alternatives for Inmate Care

GAO stated that the DOP is planning a major hospital acquisition
program without fully reasoning Its needs.  Additionally, GAO notes
the DOP is considering the construction of six large acute, tertiary
care hospitals and/or acquiring several military facilities.

Under current population projections, the BOP is planning four
new MPCO at this time.  They include the PM at Butner, NC; Ft. Devens,
MN; Carswell APB, TX; and a facility in the Western Region.  Two of
these facilities (Ft.  Devens and Carswell APB) are acquisitions of
former military hospitals.  These proposed acquisitions are detailed
in the BOP Long Range Medical Facilities Plan.  The acquisition of
surplus military hospitals is seen as an extremely cost effective
means of obtaining facilities and as a way to lessen the impact on the
community of closing the military facility.

The BOP has a comprehensive and evolving on-line medical data
collection system on its nationwide SEMY information system.  The
Sensitive Medical Data system uses the ICD-9-CM [FN2] system to encode
all medical encounters of inmates, including specific identification
of any tertiary care obtained.  One data system module of SENTRY, DGN,
monitors patients at the MRCs in accordance with JCARO definitions of
beds.  DGN uses JCAHO bed categories to determine the type of patient
bed utilization at each of the NRCE.  The medical Duty Status
describes the medical duty status of each inmate and identifies
inmates covered under the Americans with Disabilities Act.  In the
near future, additional ICD-9-Cm procedure codes will be added.  This
information system, which in now less than two years old, allows BOP
to follow morbidity trends.  The system in growing in sophistication
and will give the Bureau the capability to determine its health care
needs.

The GAO states there La a lack of any data which would support a
strategic medical plan.  As a result of this, GAO recommends, as an
alternative to hospital construction or acquisition, acquiring medical
services through private contractors.


   FN2  International Classification of Disease, 9th Revision, Clinical
Modification (IM-9-CM).  The ICD-9-CM, a classification system used in health
care facilities, is primarily a universal classification system for grouping
illnesses.  Its secondary purpose is for use in hospital disease indexing.


As noted above, the Bureau has a comprehensive data collection
and utilization segment system to plan for future medical and facility
needs.  In addition, the BOP has for several years had a Long Range
                     Copr. (C) West 1996 No claim to orig. U.S. govt. works

Medical Facilities Plan.  This plan identifies current resources, future growth, and resources needed to meet that growth.

In May 1990, an independent study, Privatize  Federal  Prison Hospitals?  A Feasibility study, requested by the Office of Management and Budget, was conducted by Abt Associates of Cambridge, MA.  The Abt study generally concluded that privatization of the MRCs was not feasible from both management and cost-effectiveness perspectives. The BOP has tried contracting out its health care programs at two facilities, the Federal Prison Camp, Duluth, Minnesota; and the Metropolitan Correctional Center, Chicago, Illinois.  Both programs were terminated because of contract management problems and excessive costs.

The BOP is again testing site contract services.  As part of its effort to deliver efficient and effective health care services, BOP recently awarded a comprehensive physician services contract at PCI Fort Worth, a MRC for chronic care patients.  The contract provides for a complete array of specialty physician services to be provided on site by health care providers from the University of North Texas, Health Science Center at Fort Worth within the context of a Bureau directed healthcare delivery system at that institution.

As part of the commitment of BOP to proactive strategic planning, it has regularly reevaluated its healthcare needs for the inmate population for the future and the resources that will be required to meet this challenge.  As the medical needs of BOP inmates chan 9, BOP determines what inpatient and outpatient medical requirements will be necessary to provide the inmate population with a community standard of medical care.  Consistent with this standard, the BOP recruits, trains, and contracts for the needed medical staff.

GAO Recommendations

BOP is taking the following actions on the recommendations contained in this report:

Recommendation:  Revise SOP hiring standards for physician assistants to conform to current community standards of training and certification.

- With the implementation of Title 38 BOP will be able to revise its hiring standards for physician assistants to conform with current community standards of training and certification.

Recommendation:  Reemphasize to the wardens of medical referral centers the importance of taking corrective action on identified quality assurance problems.

-The restructured quality assurance programs of BOP are

                              Copr. (C) West 1996 No claim to orig. U.S. govt. works

addressing the need to reemphasize to MRC staff the importance of
taking corrective action on identified quality as its main problems.
BOP will continue to closely monitor its quality assurance programs.

Recommendation: Prepare a needs assessment of the medical
services its inmate population requires and determine what medical
services it can efficiently and effectively provide in-house.

-BOP has developed a comprehensive data collection and
utilization management system to plan for future medical and facility
needs.

Recommendation:  Determine the most cost effective approaches to
providing appropriate health care to current and future inmate
populations.
-The Bureau has had for-several years a Long Range Medical
Facilities Plan.

Thank you for the opportunity to review the draft report.  These
comments are intended to share additional information with you on our
health care programs and to provide you with an alternative
perspective and response to the findings contained therein.  Should
you have any questions, please do not hesitate to contact me.


Kathleen M. Hawk
Director

Appendix VI
Major Contributors to This Report

James A. Carlan, Assistant Director (202) 512-7120
Mary Ann Curran, Evaluator-in-Charge
Lawrence L. Moore, Evaluator


 GAO/HEHS 94-36, 1994 WL 833229 (F.D.C.H.)
END OF DOCUMENT

                        Copr.  (C) West 1996 No claim to orig. U.S. govt. works

## Jeanne Baker

**From:**     "Robert D Dee" <Deer@GAO.GOV>
**To:**       <Jbakeresq@theoffice.net>
**Sent:**     Wednesday, November 13, 2002 10:45 AM
**Attach:**   1994GAOR.DOC
**Subject:**  1994 GAO REPORT

November 13, 2002

Ms. Jeanne Baker
Attorney at Law, P.A.
2937 SW 27th Avenue
suite 202
Miami, FL 33133


Dear Ms. Baker

You recently requested information regarding a  February 10, 1994
General Accounting Office report, number GAO-HEHS-94-36 entitled Bureau
of Prisons Health Care: Inmates' Access to Health Care Is Limited by
Lack of Clinical Staff.  Specifically, you asked about the Bureau of
Prisons' responses to the four recommendations contained in the report.
The attached information is taken from a GAO data base and would be
current as of October 1996 when we determined that the Bureau of Prisons
had implemeted corrective actions in response to each recommendation.
We would not have information relative to addtional Bureau of Prisons
actions taken subsequently.

If you need additional information, or if I can be of further
assistance, please let me know.

Sincerely,

Robert Dee
Senior Analyst

1

11/14/2002

GAO Report HEHS-94-36
*Bureau of Prisons Health Care*: Inmates' Access to Health Care Is Limited by Lack of
Clinical Staff
Issued February 10, 1994

<u>Recommendations and Agency Response</u>

| GAO Recommendation | Bureau of Prison (BOP) Response |
| --- | --- |
| The Attorney General should require the Director, BOP, to prepare a needs assessment of the medical services its inmate population requires and determine what medical services it can efficiently and effectively provide in-house. | BOP uses a system called the "Sensitive Medical Data Database" to prepare ongoing needs assessments of the inmate population. The system has been in process for approximately 2 years and has assisted BOP in determining what medical services its inmate population requires. |
| The Attorney General should require the Director, BOP, to determine the most cost-effective approaches to providing appropriate health care to current and future inmate populations. | BOP has taken or is actively pursuing several steps to improve the cost-effectiveness of care provided to inmates. Although it has not completed its pilot study on whether emergency medical technicians can replace physician assistants, BOP has hired registered and licensed practical nurses in positions previously staffed by physician assistants. The cost for these nurses is less than that for physician assistants. Additionally, BOP completed its pilot study of preferred provider organizations and found that they apparently provide lower costs than the use of private physicians in the community. BOP continues to study ways to control costs, such as implementing telemedicine in three locations, using managed care where feasible, and pursuing an agreement with the Defense Personnel Supply Command whereby BOP can purchase volume medical supplies at discounted prices. |

| The Attorney General should require the Director, BOP, to revise BOP hiring standards for physician assistants to conform to current community standards of training and certification. | BOP reexamined its hiring standard for physician assistants under its Title 38 authority and determined that Title 38 would be too costly to implement. Instead, BOP restructured its staffing of medical centers and now emphasizes the hiring of nurse practitioners who meet community standards, over physician assistants who lack certification. Also, BOP entered into an agreement with the Department of Defense to provide training for its physician assistants who do not meet the community standard of certification. This will permit BOP's physician assistants to apply for certification testing. |
|---|---|
| The Attorney General should require the Director, BOP, to reemphasize to the wardens of medical referral centers the importance of taking corrective action on identified quality assurance problems. | BOP has taken several actions to improve the quality of its health care program. Specifically, the Director of BOP: (1) sent a memorandum dated February 23, 1994, to all wardens emphasizing the importance of continuous quality improvements; (2) directed six regional offices to nominate a number of institutions for JCAHO survey training; (3) added a section entitled "Quality Assessment and Improvement Program" to its health services manual; and (4) provides minutes of governing body meetings to all institutions citing quality of health care issues discussed. |

United States General Accounting Office

# GAO

Annual Report to the Chairmen and
Ranking Minority Members, House and
Senate Committees on Appropriations

January 1996

# STATUS OF OPEN RECOMMENDATIONS

## Improving Operations of Federal Departments and Agencies





**GAO**

United States
General Accounting Office
Washington, D.C. 20548

Comptroller General
of the United States

B-205879

January 16, 1996

The Honorable Mark O. Hatfield
Chairman, Committee on Appropriations
United States Senate

The Honorable Robert C. Byrd
Ranking Minority Member
Committee on Appropriations
United States Senate

The Honorable Robert L. Livingston
Chairman, Committee on Appropriations
House of Representative

The Honorable David R. Obey
Ranking Minority Member
Committee on Appropriations
House of Representatives

This is our annual report on the status of open recommendations resulting from the General
Accounting Office's (GAO) audits, evaluations, and other review work in federal departments
and agencies. To encourage prompt, responsive actions on our recommendations, we
systematically followup on them and annually report on their status.

We are sending copies of this report to the Office of Management and Budget and federal
departments and agencies so that they may respond to inquiries about these issues during
appropriations and oversight hearings. We are also sending copies to Chairs and Ranking
Minority Members of all House and Senate committees and subcommittees to better inform
them of GAO's open recommendations.

*Charles A. Bowsher*

Charles A. Bowsher
Comptroller General
of the United States

PAGE 1

05/06/96

HEHS-94-36

========================================================================

TITLE:    Bureau of Prisons Health Care: Inmates' Access to Health Care Is

Limited by Lack of Clinical Staff

ACCESSION NUMBER: 151025        RPTNO: HEHS-94-36

BNUMBER: B-249967        DOCUMENT DATE: 02/10/94

DOCUMENT TYPE: Letter Report

JOB CODE:

101414

ABSTRACT:

Federal prisoners with special needs, including women, psychiatric

patients, and those with chronic illnesses, have not been receiving all of

the health care they need at medical referral centers run by the Bureau of

Prisons (BOP). A lack of doctors and nurses is a major problem. Some of

BOP's medical referral centers that GAO visited failed to correct

identified quality-of-care problems. Although the doctors at each of the

centers GAO visited were qualified, many physician assistants did not meet

the training and certification requirements of the medical community

outside of BOP. To reduce its reliance on community hospitals and other

outside health care facilities, BOP is considering building six large

hospitals and acquiring several military facilities. But BOP has yet to

develop the data needed to determine the kind of medical services needed by

inmates and the type of services it can effectively and efficiently

deliver. Without such information, BOP can only guess at the numbers and

types of staff it would need to run these hospitals. BOP should consider

drawing on the experience of states with problems in providing inmates with

adequate medical care. These states have successfully contracted out some or all of their inmate medical care.

BACKGROUND:

Pursuant to a congressional request, GAO reviewed the Federal Bureau of Prisons' (BOP) medical delivery system, focusing on whether: (1) inmates with special medical needs are receiving the care they need; (2) BOP quality assurance programs adequately detect quality-of-care problems; (3) BOP physicians are qualified to perform medical services; and (4) cost-effective alternatives exist to meet inmates' medical service needs.

FINDINGS:

GAO found that: (1) at the three medical referral centers reviewed, inmates with special needs and patients with chronic illnesses did not receive the health care they needed because of the lack of physicians and clinical staff; (2) some patients' conditions did not improve and others deteriorated because physicians could not adequately supervise their assistants and nurses could not adequately provide individual and group counseling to psychiatric patients; (3) although the three centers have quality assurance programs that are intended to identify health care problems, two centers have failed to correct identified quality assurance problems; (4) although physicians at each of the centers are qualified to perform medical services, many physician assistants have failed to meet training and certification requirements; (5) BOP is considering constructing six large acute tertiary care hospitals and acquiring several military facilities to reduce costs and its reliance on community hospitals; (6) BOP does not have sufficient information to determine the number and types of staff needed to operate the new facilities, inmate medical services needs, and the type of services it can effectively provide; and (7) BOP needs to determine its basic requirements and the costs and benefits of other alternatives for meeting its needs before proceeding with the construction or acquisition of facilities.

PAGE 2

05/06/96

HEHS-94-36

OPEN RECOMMENDATIONS TO AGENCIES

RECOMMENDATION: The Attorney General should require the Director, BOP, to
determine the most cost-effective approaches to providing appropriate
health care to current and future inmate populations.

STATUS: Action in process.

STATUS COMMENTS: BOP has taken several steps to improve the cost-
effectiveness of care provided to inmates. For example, it: (1) has
initiated a pilot study using emergency medical technicians rather than
physician assistants at selected low-security institutions; (2) is
seeking legislative authority to require private-sector providers to
bill at Medicare rates; (3) has hired personnel to review hospital bills
before payment; (4) has initiated a pilot study using preferred provider
organizations; and (5) has signed an interagency support agreement with
the U.S. Penitentiary, Leavenworth, Kansas, and the Munson Army
Community Hospital in Ft. Leavenworth to provide inpatient, outpatient,
and ambulatory surgery services to inmates.

STATUS CHANGE DATE: 11/30/95

TARGET:

Department of Justice

RECOMMENDATION: The Attorney General should require the Director, BOP, to
revise BOP hiring standards for physician assistants to conform to current
community standards of training and certification.

STATUS: Action in process.

STATUS COMMENTS: BOP is reexamining its hiring standard for physician

assistants under both its Title 5 and its Title 38 authority.

STATUS CHANGE DATE: 11/30/95

TARGET:

  Department of Justice


  ASSISTANT DIRECTOR: Isaacson, Sandra K.

  EVALUATOR-IN-CHARGE: Curran, Mary A.

  CYCLE NUMBER: 4

  CYCLE DATE: 04/96

  RESPONSE DATE: 10/24/95

**April Kassover, Ph.D.**

Licensed Psychologist
515 NorthBridge Center
Pavilion Suite 300
West Palm Beach, FL 33401
561-650-2233

Name  Delores Silvestri                                          dob; 8 / 23/ 31

Dot;   1 / 28/ 03                                                dor; 8 / 24 / 03

Psychological Consultation

Ms Silvestri was referred for a forensic related issue and was referred by a colleage since I spent 12 ½ years as a court psychologist in Palm Beach County Courthouse and now am doing further assignments in my private practice over the last 9 months.

Behavioral Observations

 Ms Silvestri was brought to the office with her daughter Shannon Materio.  Initially they were seen together and then later the mother was seen privately.  The daughter provided a history of a federal conviction with her father 20 yrs ago requiring 18 months incarceration, and then more recently in 2000,  Mr Silvestri was convicted on 23 counts relating to financial transactions.

Since then the father's health has deteriorated and he recently underwent cardiac bypass surgery.  Because of this, his family fears that he will be sent to a prison with special medical facilities which will be far away from Miami. The family currently only gets to visit for 2 hrs on Sat morning so they have to leave WPB hours earlier.  Once he is out of state this will be even more distressing since they  will no longer be able to see him each weekend. The family is concerned about the failing health and age (71) of both parents. The family has spent their life's savings on attorneys fees. Ms Silvestri now lives on her $500 social security check and the family will have to sell her home.  She has high blood pressure, cholesterol and hormone problems all requiring medications which she cannot afford.

Ms Silvestri is undergoing a major depressive disorder since her husband's conviction. She raised 5 children and nephews and nieces.  Now she is alone.  She feels suicidal. There are ideations (thoughts, intent and plan) of overdosing pills.  (i.e. "I will save them up" for higher potency).  There are bouts of uncontrollable crying.  Her hands shake with tremors.  She is angry with the system.  She feels her children would be better off without her since she feels like she is a burden.  Her daughter has 3 children and works full time with her husband. Ms Silvestri did not eat for months after the trial.  She has lost 9 lbs. and looked a bit gaunt. Ms Silvestri has at times has been abusing alcohol to minimize her distress.  She often feels nausea in the morning when she goes to brush her teeth and wants to "regurgitate".  She gets dizzy spells.  Her doctor gave her 4 anxiety/"nerve" pills of Zanax they believe.

Further psychiatric medications, unfortunately, cannot be prescribed safely since she could be at heightened vulnerability for a suicide attempt. Supportive counseling would also be recommended but they have no insurance to cover this. Ms Silvestri states she lives for her 9 yr old grandson "PJ" but she feels by ago 10 he'd get over her suicide attempt if she were to do so. Ms Silvestri is at heightened risk for a successful suicide due to the ideation, plan and intent, depression, anxiety, anger, desire for retaliation, low self esteem and age (there is little to hope for since she realizes her husband may die in jail). Ms Silvestri evidenced no antisocial behaviors so should not pose any threat to society. Subsequently due to the severity of symptoms any legal mitigating facts to minimize her husband's sentence could in essence save her life.

DIAGONSTIC IMPRESSION:      MAJOR  DEPRESSION,  SINGLE  EPISODE, MODERATELY SEVERE.

Please do not hesitate to contact me if I can be of any further assistance.

_____

April Kassover, P h D
Lic PY 4158