USDC FLSD 245B (Rev. 3/01) - Judgment in a Criminal Case                                                    Page 1 of 6

# United States District Court

## Southern District of Florida

### FT. LAUDERDALE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| | (For Offenses Committed On or After November 1, 1987) |
| **v.** | **Case Number: 00-6309-CR-DIMITROULEAS(s)(s)** |
| **DAVID MORGENSTERN** | |

| | |
|---|---|
| Counsel For Defendant: | Brian McComb |
| Counsel For The United States: | Diana L.W. Fernandez |
| | J. Brian McCormick |
| Court Reporter: | Robert Rycoff |

The defendant pleaded guilty to Count 14(s)(s) of the Indictment.  Accordingly, the defendant is adjudged guilty of such count(s) which involves the following offense(s):

| TITLE/SECTION NUMBER | NATURE OF OFFENSE | DATE OFFENSE CONCLUDED | COUNT |
|---|---|---|---|
| 18 U.S.C.  § 1956(h) | Money Laundering Conspiracy | October 24, 2000 | 14(s)(s) |

The defendant is sentenced as provided in the following pages of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

Remaining Counts are dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.  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
Defendant's Date of Birth: October 28, 1948
Def't's U.S. Marshal No.:  10453-074

Defendant's Mailing Address:
7534 Estrella Circle
Boca Raton, Florida 33433

Date of Imposition of Sentence:
April 18, 2003


WILLIAM P. DIMITROULEAS
United States District Judge

April 22, 2003



USDC FLSD 245B (Rev. 3/01) - Judgment in a Criminal Case

DEFENDANT: DAVID MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **120 Months** as to Count 14(s)(s). The sentence imposed in Case Number 02-60100-CR-DIMITROULEAS (**60 MONTHS**) is to run consecutive to the sentence imposed in this case, for a **total term of 180 Months.**

The defendant is remanded to the custody of the United States Marshal.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By:_____
Deputy U.S. Marshal

USDC FLSD 245B (Rev. 3/01) - Judgment in a Criminal Case

DEFENDANT: DAVID MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term **3 years**, to run concurrent with the 3 year term imposed in case number 02-60100-CR-DIMITROULEAS.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.
The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter.

**The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.**

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

**The defendant shall also comply with the additional conditions on the attached page.**

## STANDARD CONDITIONS OF SUPERVISION

1.  The defendant shall not leave the judicial district without the permission of the court or probation officer;
2.  The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
3.  The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4.  The defendant shall support his or her dependents and meet other family responsibilities;
5.  The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6.  The defendant shall notify the probation officer **at least ten (10) days prior** to any change in residence or employment;
7.  The defendant shall refrain from the excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8.  The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9.  The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10. The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
11. The defendant shall notify the probation officer within **seventy-two (72) hours** of being arrested or questioned by a law enforcement officer;
12. The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13. As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

USDC FLSD 245B (Rev. 3/01) - Judgment in a Criminal Case

DEFENDANT: DAVID MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant shall also comply with the following additional conditions of supervised release:

The defendant shall provide complete access to financial information, including disclosure of all business and personal finances, to the U.S. Probation Officer.

The defendant shall maintain full-time, legitimate employment and not be unemployed for a term of more than 30 days, unless excused by the U.S. Probation Officer. Further, the defendant shall provide documentation, including but not limited to, pay stubs, contractual agreements, W-2 Wage and Earnings Statements, and any other documents requested by the U.S. Probation Office.

The defendant shall not be engaged in any business that offers securities, investments, or business opportunities to the public. The defendant is further prohibited from engaging in telemarketing, direct mail or national advertising campaigns for business purposes without the permission of the U.S. Probation Officer.

The defendant shall obtain prior written approval from the U.S. Probation Officer before entering into any self-employment.

USDC FLSD 245B (Rev. 3/01) - Judgment in a Criminal Case

Page 5 of 6

DEFENDANT: DAVID MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in the Schedule of Payments.

| Total Assessment | Total Fine | Total Restitution |
|---|---|---|
| $100.00 | None | $13,375,927.36 |

It is further ordered that the defendant shall pay restitution in the amount of $13,375,927,36. During the period of incarceration, payment shall be made as follows: (1) if the defendant earns wages in a Federal Prison Industries (UNICOR) job, then the defendant must pay 50% of wages earned toward the financial obligations imposed by this Judgment in a Criminal Case; (2) if the defendant does not work in a UNICOR job, then the defendant must pay $25.00 per quarter toward the financial obligations imposed in this order. These payments do not preclude the government from using other assets or income of the defendant to satisfy the restitution obligations.

Upon release of incarceration, the defendant shall pay restitution at the rate of 10% of monthly gross earnings, until such time as the court may alter that payment schedule in the interests of justice. The U.S. Bureau of Prisons, U.S. Probation Office and U.S. Attorney's Office shall monitor the payment of restitution and report to the court any material change in the defendant's ability to pay.

The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(I), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| Bettie B. Ashmore<br>Court Appointed<br>Receiver<br>District of SC<br>Case No. 00-CV-236<br>Price, Paschal &<br>Ashmore<br>644 East Washington St.<br>Greenville, SC 29601 | | $13,375,927.36 | |

*Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

USDC FLSD 245B (Rev. 3/01) - Judgment in a Criminal Case                                                    Page 6 of 6

DEFENDANT: DAVID MORGENSTERN
CASE NUMBER: 00-6309-CR-DIMITROULEAS(s)(s)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

     A. Lump sum payment of **$100.00** due immediately.

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

**The assessment/fine/restitution is payable to the U.S. COURTS and is to be addressed to:**

     **U.S. CLERK'S OFFICE**
     **ATTN: FINANCIAL SECTION**
     **301 N. MIAMI AVENUE, ROOM 150**
     **MIAMI, FLORIDA 33128**

**The assessment/fine/restitution is payable immediately. The U.S. Bureau of Prisons, U.S. Probation Office and the U.S. Attorney's Office are responsible for the enforcement of this order.**

     Joint and Several

Defendant Name, Case Number, and Joint and Several Amount:

00-6309-CR-DIMITROULEAS(s)(s) with co-conspirators in this case, John Mamone and Fred Morgenstern.

     The defendant shall forfeit the defendant's interest in the following property to the United States:

     **$31,273,273.58**

     Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

The payment folder contained a list of all cashier's checks issued as fees to the defendant, either in the defendant's own name, Risk Management, or ACC Capital. (Tang, 5/30/02 at 30; Turner, 5/29/02 at 57-60). The total amount paid by U.S. Guarantee to the defendant up until December 17, 1999, was $1,551,481. (Tang, 3/28/02 at 131; Turner, 3/29/02 at 104).[8]

There were also three additional checks issued to the defendant on January 7, 2000, which were not included on the list contained in Government's Exhibit 4F, although copies of the cashier's checks were in the folder. (Tang, 3/28/02 at 131-32; Turner, 3/29/02 at 104).

The defendant's participation in these charges was not limited to his recruitment of U.S. Guarantee. The defendant used his influence to assist Womack and Fred Morgenstern (Gold Coast Check Cashing) in opening bank accounts at Admiralty Bank in South Florida, which were then used to launder the Alliance Trust/Chemical Trust funds. (See generally Peggy Preston, 5/29-30/02; Bruce Mahon, 5/30/02; William Burke, 3/30/02).

In early 1999, the defendant called Bruce Mahon, the Chairman of Admiralty Bank, and someone he had known twenty years earlier in New Jersey. (Mahon, 5/30/02 at 98, 100, 101-02). The defendant said that he was now selling insurance or financial guarantee

---

[8]    The defendant failed to file an income tax return for 1999 during which time he received these monies. (Wise, 5/31/02 at 151).

policies and mentioned a company in South Carolina, whose president was Virgil Womack. The defendant explained that Womack was selling these investment packages to seniors and that insurance bonds were being issued to guarantee the investment. The defendant said that he was even going to invest in it to test it out. The defendant further stated that the rate of return on the investment was between 5% and 20%. (Mahon, 5/30/02 at 102-03).

In June of 1999, the defendant himself opened an account at Admiralty Bank. (Mahon, 5/30/02 at 104-05; Government's Exhibit 18). Mahon also had several conversations with the defendant at the time, in which the defendant told him that Womack would be opening several accounts at Admiralty Bank, depositing between 4 to 5 million dollars. Those accounts were opened in July 1999. (Mahon, 5/30/02 at 107-08); Government Exhibits 14A and 15A).

Not only did the defendant assist Womack in opening accounts to launder the fraud monies, but he also assisted Fred Morgenstern, who was negotiating millions of dollars of Alliance and Chemical Trust checks which were being forwarded by Womack to South Florida. Fred Morgenstern was having these checks negotiated through his own check cashing store, Gold Coast Check Cashing, as well as other check cashing stores and through a number of bank accounts. (Preston, 5/29/02 at 218-220; Government Exhibits 7A and 7B). Gold Coast Check Cashing began to have problems with its bank, First Union, when the bank contacted makers of some of the Chemical Trust checks, elderly people, who said that they were making an

8

investment and did not know why their checks were being processed at a check cashing store. (Preston, 5/30/02 at 10-11). Preston told Fred Morgenstern about the problem, who said they needed to find another bank. (Preston, 5/30/02 at 11). In August or September 1999, Fred Morgenstern told Preston that he had found another bank and on September 22, 1999, Preston, Fred Morgenstern, and Jason Crossen went to Admiralty Bank. They were met at the bank by the defendant. (Preston, 5/30/02 at 11-12, 15).

When the three of them arrived, the defendant was already there speaking with a bank employee. Fred Morgenstern had brought with him a number of Chemical Trust checks that had been marked void in the Bahamas, which Fred Morgenstern had then altered by whiting out the void. (Preston, 5/30/02 at 8-9, 13). The defendant, Fred Morgenstern, and the bank employee went into a separate room, but Preston could still see them; when they came back out, Fred Morgenstern told Preston, in the presence of the defendant, that the bank would not accept the whited out checks. The account for Gold Coast Check Cashing was then opened with Chemical Trust funds, in the form of cash, that Preston had brought with her on Fred Morgenstern's instructions. (Preston, 5/30/02 at 13-15, 21-22, 81; Government's Exhibit 16A).

As the fraud and money laundering of the ill-gotten gains continued, problems began to arise with both the issuance of the bonds by U.S. Guarantee and the laundering of the monies through Admiralty Bank. The defendant tried to take care of both of these

in order to keep both the fraud and the money laundering schemes going.

In September of 1999, the Arizona Corporation Commission issued a subpoena for the records of U.S. Guarantee. Tang called the defendant and informed him of the subpoena. (Tang, 5/28/02 at 100-01; Turner, 3/29/02 at 92). The defendant told Tang that the commission was just a busy body organization and that the worst they could do was to issue a cease and desist order. (Tang, 5/28/02 at 102-03).

U.S. Guarantee hired an attorney to talk to the commission and the defendant flew into Arizona to talk to them. (Tang, 5/28/02 at 111-12; Turner, 5/29/02 at 94-95). The defendant had a meeting with U.S. Guarantee's attorney, which Turner attended. The defendant described the Chemical Trust investment to the attorney and confirmed that it was a prime note deal. The attorney responded that those do not exist and that it sounded like a Ponzi scheme. The defendant said that he had been in these investments before and had made money. After the meeting, the defendant told Turner that the attorney didn't know what she was talking about. (Turner, 5/39/02 at 95-97). Tang as well asked the defendant if Chemical Trust was a Ponzi scheme; the defendant said that it was not, that the Arizona commission simply didn't understand. (Tang, 5/28/02 at 16).

About one week after these events, Tang received a telephone call from the defendant and David Morgenstern. (Tang, 5/28/02 at

10

103-04, 5/29/02 at 17-18). During this call the defendant described David Morgenstern as a long time friend[9] and a powerful banker who was handling the investment. Both the defendant and David Morgenstern assured Tang that everything was fine. (Tang, 5/28/02 at 103-04). Thereafter, U.S. Guarantee continued to issue the bonds for Chemical Trust. (Tang, 5/28/02 at 110-11).

Womack's accounts at Admiralty Bank, which the defendant had helped open, also began to have problems. The bank became concerned because the Alliance and Chemical Trust checks were being sent everywhere, including wires to the Bahamas, and there began to be problems in clearing the checks and with the endorsements or lack of endorsements on the checks. (Mahon, 5/30/02 at 114-15; Burke, 5/30/02 at 154).[10] At about the same time, Admiralty Bank received a subpoena from South Carolina for all records concerning Womack, Alliance Trust and Chemical Trust. (Burke, 5/30/02 at 165). Burke happened by coincidence to run into the defendant at the bank when he was meeting with Mahon; Burke asked the defendant about Chemical Trust. The defendant said that Chemical Trust sold investments at a high rate of return to investors. The defendant further explained that Chemical Trust was purchasing investments such as World War II era bonds in Germany or France, which would

---

[9]    In fact, the defendant had known David Morgenstern since 1995 (Preston, 5/30/02 at 12).

[10]    William Burke was Chief Operating Officer at Admiralty Bank (Burke, 5/30/02 at 149).

produce the high rate of return. The defendant also stated that the investments were being guaranteed by U.S. Guarantee with a surety bond, showing Burke a sample of one. (Burke, 5/30/02 at 167-74). Burke, as head of operations, had two telephone conversations with Womack concerning the problems that were arising with his accounts. In the first conversation, Burke told Womack that the bank now wanted to hold the funds while the checks cleared; Womack seemed to be amenable to the idea. Womack also explained that concerning the checks that didn't have endorsements, it had just been a clerical error that he would rectify. (Burke, 5/30/02 at 157-58). Within days or a week, Burke spoke with Womack again and told Womack that the bank wanted to hold $800,000 against all the Chemical Trust checks that were processed through the bank; this was not acceptable to Womack. (Burke, 5/30/02 at 158-59).

Mahon also called the defendant concerning the problems with the Womack accounts, which he recalled was just 3 to 4 weeks after the accounts had been opened. Mahon told the defendant about the problems with the accounts and concerns that some of the checks had been manipulated with. The defendant called Mahon back and told him that the problems with checks being deposited into the Gold Coast Checking Account apparently had just been a mistake. (Mahon, 5/30/02 at 117-19). Finally, in September or October of 1999, Admiralty Bank decided that it was best to close the Womack accounts. The bank was concerned that it might be a pyramid scheme or might involve money laundering, particularly because of the

12

large amounts of monies that were being transferred offshore. (Mahon, 5/30/02 at 119-121). As Mahon had stated to the defendant earlier, he believed that the rate of return on the investments was just too high, that one could not make 25% return on invested money. (Mahon, 5/30/02 at 145-46).

Gold Coast Check Cashing had problems with their account at Admiralty Bank as well. When Preston told Fred Morgenstern about the problem, he told her to get the defendant involved; she did not recall whether she actually spoke to him. (Preston, 5/30/02 at 35-36). The final result was that the account for Gold Coast Check Cashing at Admiralty Bank was closed (Preston, 5/30/02 at 34-37).

There was also testimony elicited at trial which demonstrated that the defendant had direct contact with victims of the Chemical Trust fraud. Dennis Dostert had invested in Chemical Trust through an agent beginning in August of 1999. (Dostert, 6/4/02 at 63-65; Government Exhibits 77A-M). In total, he invested $192,000. (Dostert, 6/4/02 at 79). By October 1999, Dostert became concerned about his investment and called the 800 number of Chemical Trust, asking if Chemical Trust was a Ponzi scheme; Dostert was told that he should call the defendant and was given the defendant's number in Florida. On November 14, 1999, Dostert reached the defendant by telephone and discussed Chemical Trust. (Dostert, 6/4/02 at 82-89; Government Exhibits 77N & 77O).

The defendant told Dostert that he was an underwriter for Chemical Trust, that it was not a Ponzi scheme, and that

13

investments were actually being made.  The defendant explained that as an underwriter he actually made investments for Chemical Trust. Defendant stated that he had worked for Chemical Trust for five years and also said that Deutsch Bank in Germany was paying 5% return on investments over one million dollars.  (Dostert, 6/4/02 at 89-93).

Dostert told the defendant that his investment was very important to him because his mother-in-law was in assisted living and that was what the money was needed for; Dostert also mentioned that he was considering investing additional monies.  The defendant assured Dostert that Chemical Trust would be a sound investment. Dostert also asked about the bonding company, U.S. Guarantee, inquiring if it was reliable and if it would be a good idea for Dostert to visit the offices in Arizona.   The defendant told Dostert that he thought it was a good idea to see U.S. Guarantee. The defendant explained that when he had been first hired by U.S. Guarantee, he had gone to their offices and was impressed with their operation.  Finally, the defendant told Dostert that Chemical Trust had a "real good deal" coming up, but that he was not at liberty to give Dostert the details.  The defendant assured Dostert that he would be learning about it soon.  (Dostert, 6/4/02 at 89-93).

By December, Dostert learned that there were problems and made a formal request for the return of his investment from Chemical Trust; Dostert never received any of his monies back from Chemical

Trust through his efforts. Dostert finally received a portion of his investment back from the receiver in South Carolina. (Dostert, 6/4/02 at 96-101)

The specific amounts of monies that were being generated by the South Carolina fraud, and then laundered through South Florida, the Bahamas and elsewhere, as well as the monies that went directly to the defendant was described to by Senior Special Agent Ronald Wise. (5/31/02 at 46-184) and Marvin Harrison (5/31/02 at 2-62; 6/4/02 at 8-69). Special Agent Wise and Mr. Harrison also testified concerning the personal use of much of this money by the defendant and his coconspirators.

S/A Wise is a supervisory agent with the Internal Revenue Service, assigned to the West Palm Beach Office. He was primarily responsible for the financial aspects of the investigation. (Wise, 5/31/02 at 47, 49). S/A Wise analyzed all the evidence, tracing deposits into accounts as they came from investors throughout the country to Womack and Alliance or Chemical Trust, through a number of bank accounts in South Florida and into the Bahamas. S/A Wise also traced some of the funds as they were wired or transferred between accounts. (Wise, 5/31/02 at 49-50). S/A Wise reviewed 1,200 files of investors of Alliance and Chemical Trust, which included the documents related to each of their investments, along with background information. (Wise, 5/31/02 at 51-52; Government's

Exhibit 58).[11]  Finally, S/A Wise analyzed the Preston documents, which included the daily transmittal sheets that accompanied the Alliance/Chemical Trust checks and was able to match them to deposits in various South Florida accounts for the most part. (Wise, 5/31/02 at 53-54).

S/A Wise helped prepare a chart which delineated the totals for deposits of victim investor checks into Florida and Bahamas accounts and he testified concerning the documents underlying the chart. (Government's Exhibit 70).  Approximately $17.1 million dollars were deposited into accounts at Admiralty Bank (Alliance Trust, Chemical Trust, and Gold Coast Check Cashing); approximately $20.9 million dollars was deposited into Citibank accounts in Fort Lauderdale; and, from various South Florida accounts, $3.4 million was transferred to AIBC bank in the Bahamas.  (Wise, 5/31/02 at 56-62, 82-84, 91).

S/A Wise also participated in the creation of Government's Exhibit 71, a summary of the individual transactions charged in each of the substantive counts, along with references to the individual exhibit numbers which relate to each transaction. (Wise, 5/31/02 at 63-65, 68-82, 84-91).

---

[11]   A number of these victims from different parts of the country testified concerning their investments in Alliance and Chemical Trusts, using their retirement funds or life savings, the documents they received, as well as the loss of their monies. (Kissen, 5/23/02 at 2-29; Bohlen, 5/23/02 at 30-54; Goldberg, 5/23/02 at 54-94; Roscoe, 5/30/02 at 182-206; Stonesifer, 5/30/02 at 207-20; and, Dostert, 6/4/02 at 52-122).

Government's 72, described by S/A Wise, depicted the transfer of victim funds from Americas Resource accounts (Fred Morgenstern) at Citibank to four other accounts: $6.25 million dollars to AIBC; $850,000 to Prestige Accounting; $10.3 million to Falcon Trust in London; and $417,000 to an attorney representing Charlotte Womack (wife of Virgil Womack). (Wise, 5/31/02 at 92-106, 109-10).

Government's Exhibit 73 is a chart which reflected transfers of victim investor funds from a number of Admiralty Bank accounts. S/A Wise testified about the specific transfers which resulted in the totals contained on the chart: $2.8 million dollars to AIBC, Bahamas; $6.2 million dollars to Falcon Trust, London; $1.5 million dollars to Prestige Accounting; $425,000 dollars to a Georgia attorney representing Chemical Trust (Nelson Jarnagin); and, $3.1 million dollars to U.S. Guarantee, from which $1.5 million dollars was transferred to the defendant. (Wise, 5/31/02 at 110-44).

Marvin Harrison is an investigator who worked for the receiver in South Carolina (Harrison, 5/31/02 at 3-4). Prior to testifying, he had reviewed records recovered through search warrants, records from the Bahamas bank (AIBC), including accounts of the defendant's, as well as other accounts, including domestic bank accounts. (Harrison, 5/31/02 at 6-12).

Harrison testified concerning the overseas accounts and transfers of Alliance/Chemical Trust investor funds through a number of accounts. At AIBC in the Bahamas, Harrison in particular identified two accounts for the defendant into which investor funds

17

were transferred - Risk Management and Joe Silvestri. (Harrison, 5/31/02 at 10). Harrison utilized a chart, Government's Exhibit 75, as he testified concerning major transfers of victim investor funds to the Bahamas and further use of those funds. (Harrison, 5/31/02 at 13-29, 31-46).

Harrison also identified and described a number of specific deposits and transfers involving the defendant's accounts in the Bahamas. (Harrison, 5/31/02 at 47-62). As part of his testimony, Harrison discussed copies of four cashier's checks made out to the defendant as well as the counterpart deposit of these checks into the defendant's account in the Bahamas. (Harrison, 6/4/02 at 12-17; Government's Exhibits 7H, 9HHH).

Based on Harrison's analysis, he identified a total of $538,066.75 dollars of Chemical Trust funds which were deposited in defendant's accounts in the Bahamas. (Harrison, 6/4/02 at 17/18).

In all of Harrison's analysis of the records, he found no indication that the defendant or his coconspirators ever invested any of the Alliance/Chemical Trust funds. (Harrison, 6/4/02 at 20, 36).

The final chart and events which Harrison testified about concerned the transfer of investor funds to Bruce Harvey, who was the attorney who represented Virgil Womack after his arrest on January 7, 2000. (Harrison, 6/4/02 at 22-32).

The tape recordings of intercepted conversations between the defendant and Fred Morgenstern which took place in January 2000 and

which were played for the jury confirmed many of the events that the witnesses had testified to, as well as the defendant's relationship with the coconspirators, his involvement in both the fraud and the money laundering, his receipt of monies, his knowledge of Womack's activities, his actions after the arrest of Virgil and Charlotte Womack and others, including attempts to transfer fraud monies to pay for their attorneys and for their bonds, attempts to cover up the money laundering, and discussions about the 17 to 18 million that had been transferred to Falcon Trust in London.  (Government Exhibits 52A, 52C-52K).

<u>CONCLUSION</u>

WHEREFORE, the government respectfully requests that this Honorable Court specifically consider these portions of the trial transcript, as well all the trial exhibits, along with arguments raised at the sentencing, in considering the defendant's objections to the PSI.

Respectfully submitted,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY


By: _____
DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY
Court I.D. #A5500017
500 East Broward Boulevard
Suite 700
Fort Lauderdale, FL 33394
Telephone: (954) 356-7392
Fax:       (954) 356-7230

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by mail to the following on April 21, 2003:

Jeanne Baker, Esquire
2937 S.W. 27th Avenue
Suite 202
Miami, Florida 33133

_Diana W. Fernandez_
DIANA L.W. FERNANDEZ
ASSISTANT UNITED STATES ATTORNEY

21

## Curriculum Vitae

**MICHAEL B. NELSON, D.O.**
Chief Physician, Health Services Division
Federal Bureau of Prisons
320 First Street NW
Washington, DC 20534
(202) 307-2867 ext. 107

**DATE OF BIRTH:** October 26, 1957
**BIRTHPLACE:** Denver, Colorado

## EMPLOYMENT HISTORY

Chief of Health Programs Branch, Health Services Division, Federal Bureau of Prisons, June 2000 to present. In addition to duties as Chief Physician, my responsibilities include assuring that currently established programs meet appropriate standards as well as initiating and establishing policies and programs which enhance the delivery of health care provided by all clinical disciplines.

The Chief of Health Programs is the supervisor of the Chief Professional Officers in the following clinical disciplines: Dentistry, Pharmacy, Nursing, Physician Assistants / Midlevel Providers, Infection Control Program, Rehabilitation Services, Social Work, Medical Designations and Transportation, and Health Information Management. Formulates long-range objectives, plans and programs for these disciplines in consultation with the Chief Professional Officers, integrating them with the overall mission and objectives of the Bureau of Prisons.

Chief Physician, Federal Bureau of Prisons, September 1999 to present. Responsibilities include: Clinical oversight and mentoring of approximately 100 institution Clinical Directors; development and implementation of orientation and training program for new BOP physicians and Clinical Directors; development and implementation of clinical practice guidelines for chronic illnesses and infectious diseases; direct oversight of hepatitis C treatment of all BOP inmates; approval/disapproval authority for non-formulary medications Bureau-wide; direct oversight of requests for emergency transfer of BOP inmates to a Federal Medical Center; chair of BOP Organ Transplant Committee.

Health Services Administrator/Clinical Director, January 1999 to August 30, 1999, Federal Correctional Institution, Sheridan, Oregon. Appointed to joint position by Warden and Associate Warden to establish consistency in leadership and supervision in the department. In addition to overseeing all aspects of clinical care as the Clinical Director, responsibilities

included: cost center manager, performance evaluations on all Health Services staff, leave granting authority, recruitment, continuing education, Drug Free Workplace administration, utilization review, and Contracting Officer's Technical Representative.

Clinical Director, FCI Sheridan, May 1989 to January 1999. Responsibilities included provision, supervision and coordination of health care to approximately 1850 inmates.

Primary care physician, Family Practice Clinic, Corvallis, Oregon, July 1988 until May, 1989. Outpatient and inpatient general practice care. Left practice to re-enter Federal service.

Staff physician, United States Penitentiary, Lompoc, California, July 1986 until June 1988. Responsibilities were to coordinate regular follow-up care of chronically ill inmates, supervise Physician Assistant care, and coordinate specialty consultant visits and referrals. Assigned to USP Lompoc by the National Health Service Corps, as a scholarship obligee.

**EDUCATIONAL BACKGROUND**

B.S. in Zoology from Colorado State University, May 1980.

D.O. from Kirksville College of Osteopathic Medicine, June 1984.

Rotating Internship, Riverside Hospital, Wichita, Kansas, July 1984-June 1985.

Residency in Internal Medicine, (Osteopathic, equivalent to PGY-2), Riverside Hospital, Wichita, Kansas, July 1985-June 1986. Left residency to complete NHSC scholarship obligation.

Board Certified in Family Practice, 1995.

**PROFESSIONAL ASSOCIATIONS**

American Association of Physician Specialists

American Academy of Family Practice

Federal Physicians Association

Oregon Medical Association

**HONORS AND AWARDS**

Phi Beta Kappa, Colorado State University, 1980.

Sigma Sigma Phi, National Osteopathic Honor Fraternity, 1983.

Intern of the Year, Riverside Hospital, 1985.

Honor Graduate, Federal Law Enforcement Training Center, 1986.

Award for Exceptional Service as CPR Instructor, U.S.P. Lompoc, 1988.

Award for Exceptional Service to U.S.P. Lompoc, June 28, 1988.

BOP Leadership Forum, February 1991, in recognition of my interest in and commitment to a career in administration within the Bureau of Prisons.

Certificate of Appreciation from Health Services Division, December 13, 1991.

Certificate of Appreciation, CPR Instructor, FCI Sheridan, 1989-1992.

Certificate of Appreciation for Employee Development, FCI Sheridan, 1992.

Special Act Award, December 1, 1995, for Life-Saving Emergency Medical Care of an Inmate on November 25, 1995.

Certificate of Appreciation, "Outstanding Performance of Duty in the JCAHO Accreditation Process of the Bureau of Prisons," August 1, 1996.

Special Act Award, FCI Sheridan, for Exceptional Performance in Preparation for Program Review, August 16, 1996.

Certificate of Appreciation, "Outstanding Performance of Duty in Health Care to the Bureau of Prisons," September 13, 1996.

Assistant Director's Award for Health Services (BOP Clinical Director of the Year), Federal Bureau of Prisons, June 1997.

HEHS-94-36, Title: Bureau of Prisons Health Care: Inmates' Access to Health Care Is Limited by Lack of Clinical Staff, Issue Date: 10-FEB-94
Director: Baine, David P, Asst Director: Isaacson, Sandra K

| Recommendation | Agency | Status | Date Closed | Status Comments |
|---|---|---|---|---|
| The Attorney General should require the Director, BOP, to prepare a needs assessment of the medical services its inmate population requires and determine what medical services it can efficiently and effectively provide in-house. | Department of Justice | Closed - Implemented | 27-Oct-95 | BOP uses a system called the "Sensitive Medical Data Database" to prepare ongoing needs assessments of the inmate population. The system has been in process for approximately 2 years and has assisted BOP in determining what medical services its inmate population requires. |
| The Attorney General should require the Director, BOP, to determine the most cost-effective approaches to providing appropriate health care to current and future inmate populations. | Department of Justice | Closed - Implemented | 05-Oct-96 | BOP has taken or is actively pursuing several steps to improve the cost-effectiveness of care provided to inmates. Although it has not completed its pilot study on whether emergency medical technicians can replace physician assistants, BOP has hired registered and licensed practical nurses in positions previously staffed by physician assistants. The cost for these nurses is less than that for physician assistants. Additionally, BOP completed its pilot study of preferred provider organizations and found that they apparently provide lower costs than the use of private physicians in the community. BOP continues to study ways to control costs, such as implementing telemedicine in three locations, using managed care where feasible, and pursuing an agreement with the Defense Personnel Supply Command whereby BOP can purchase volume medical supplies at discounted prices. |
| The Attorney General should require the Director, BOP, to revise BOP hiring standards for physician assistants to conform to current community standards of training and certification. | Department of Justice | Closed - Implemented | 05-Oct-96 | BOP reexamined its hiring standard for physician assistants under its Title 38 authority and determined that Title 38 would be too costly to implement. Instead, BOP restructured its staffing of medical centers and now emphasizes the hiring of nurse practitioners who meet community standards, over physician assistants who lack certification. Also, BOP entered into an agreement with the Department of Defense to provide training for its physician assistants who do not meet the community standard of certification. This will permit BOP's physician assistants to apply for certification testing. |
| The Attorney General should require the Director, BOP, to reemphasize to the wardens of medical referral centers the importance of taking corrective action on identified quality assurance problems. | Department of Justice | Closed - Implemented | 27-Oct-95 | BOP has taken several actions to improve the quality of its health care program. Specifically, the Director of BOP: (1) sent a memorandum dated February 23, 1994, to all wardens emphasizing the importance of continuous quality improvements; (2) directed six regional offices to nominate a number of institutions for JCAHO survey training; (3) added a section entitled "Quality Assessment and Improvement Program" to its health services manual; and (4) provides minutes of governing body meetings to all institutions citing quality of health care issues discussed. |