# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

August 02, 2005

Clarence Maddox
Clerk, U.S. District Court
301 N MIAMI AVE STE 150
MIAMI FL 33128-7788



**Appeal Number: 03-12820-AA**
Case Style: USA v. Joseph Silvestri
District Court Number: 00-06309 CR-PAS

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

The district court clerk is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, <u>but not a copy of the court's decision</u>, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (03-2004)

# United States Court of Appeals
## For the Eleventh Circuit

No. 03-12820

District Court Docket No.
00-06309-CR-PAS

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

May 23, 2005

THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

   Plaintiff-Appellee,

versus

JOSEPH SILVESTRI,

   Defendant-Appellant.



------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
------------------------------------------------

## J U D G M E N T

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

Entered:  May 23, 2005
For the Court:  Thomas K. Kahn, Clerk
By:  Gilman, Nancy

ISSUED AS MANDATE
AUG 0 2 2005
U.S. COURT OF APPEALS
ATLANTA, GA.

U.S. v. SILVESTRI                                    2350

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph SILVESTRI, Defendant–Appellant.**

No. 03–12820.

United States Court of Appeals,
Eleventh Circuit.

May 23, 2005.

**Background:** Defendant was convicted in the United States District Court for the Southern District of Florida, No. 00-06309-CR-PAS, Patricia A. Seitz, J., of money laundering and conspiracy to launder proceeds of mail and wire fraud, arising from defendant's participation in Ponzi scheme. Defendant appealed.

**Holdings:** The Court of Appeals, Marcus, Circuit Judge, held that:

(1) evidence was sufficient to establish intent element of conspiracy charge;

(2) act of depositing victims' checks in bank accounts controlled by scheme participants satisfied "transaction in criminally derived property" element of money laundering charge;

(3) defendant's ignorance of use of one particular bank for deposits did not preclude his liability as to transactions involving that bank; and

(4) defendant had invited, and thus had "transaction in criminally derived property" element of offense; waived appeal from, any error in District Court's omitting certain elements from jury instructions.

Affirmed.

**1. Criminal Law ⟜1139**

Sufficiency of evidence supporting federal criminal conviction is question of law, which Court of Appeals reviews *de novo*.

**2. Criminal Law ⟜1144.13(3, 5)**

On appellate challenge to sufficiency of evidence following federal criminal conviction, Court of Appeals examines evidence in light most favorable to government, drawing all reasonable inferences and making all credibility choices in government's favor.

**3. Criminal Law ⟜1137(2)**

On appeal in federal criminal case, party may not challenge as error trial court's ruling, or other trial proceeding, invited by that party.

**4. Conspiracy ⟜28(3)**

Conviction for conspiracy to launder money required proof that: (1) agreement existed between two or more persons to commit crime, and (2) defendant knowingly and voluntarily joined or participated in conspiracy. 18 U.S.C.A. § 1956(h).

**5. Conspiracy ⟜47(2)**

Existence-of-agreement element of conspiracy may be proven by circumstantial evidence, including inferences from conduct of alleged participants, or from circumstantial evidence of scheme.

**6. Conspiracy ⟜47(3.1)**

Evidence was sufficient to establish intent element of conviction for conspiring to launder money from mail and wire fraud, in prosecution arising from elaborate Ponzi scheme in which investors/victims mailed checks to "trust" which pretended to make high-yield investments while telling victims

Synopsis, Headnotes and Key Number Classification
COPYRIGHT © 2005 by West, a Thomson business

The Synopsis, Headnotes and Key Number Classification constitute no part of the opinion of the court.

2351                          **U.S. v. SILVESTRI**

that their investments were guaranteed by "surety bonds" issued by second company, which were in fact worthless; defendant, who took percentage of scheme's payments to bond issuer, initially had been contacted by issuer's president because issuer lacked assets, defendant by his own account served as liaison between issuer and trust, president testified that on multiple occasions he had informed defendant that issuer did not have assets to back bonds but was told that everything would be fine, defendant had assisted with drawing up sample bond and phony financial statements for issuer, and victim and issuer's lawyer both had informed defendant that they suspected Ponzi scheme. 18 U.S.C.A. §§ 1341, 1343, 1956(a)(1)(A)(i), (a)(1)(B)(i), (h), 1957.

### 7. United States ⚖34

In money laundering prosecution arising from Ponzi scheme in which investors/victims mailed checks to "trust" which pretended to make high-yield investments with money, act of depositing checks in bank accounts controlled by scheme participants satisfied "transaction in criminally derived property" element of offense; funds did not have to be withdrawn from those accounts in order for prosecutable "transaction" to occur, on theory that deposits constituted only creation or acquisition of proceeds, since underlying mail fraud had already occurred and checks themselves thus were proceeds. 18 U.S.C.A. §§ 1341, 1957(a), (c)(5), (f)(1-2).

### 8. Conspiracy ⚖41

Conspirators are liable for all acts and foreseeable consequences of conspiracy.

### 9. Conspiracy ⚖41

Each party to continuing conspiracy may be vicariously liable for substantive criminal offenses committed by coconspirator during

course and in furtherance of conspiracy, notwithstanding party's non-participation in offenses or lack of knowledge thereof.

### 10. Conspiracy ⚖40.1

In money laundering conspiracy prosecution arising from Ponzi scheme in which investors/victims mailed checks to "trust" which pretended to make high-yield investments with money, but instead deposited checks into bank accounts controlled by scheme participants, coconspirator's ignorance of use of one particular bank for such deposits did not preclude his liability as to transactions involving that bank; evidence strongly indicated that coconspirator knew that considerably less than total amount of misappropriated money had been deposited into bank that coconspirator was inarguably aware of, permitting inference that he knew that other banks must be involved. 18 U.S.C.A. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), (h), 1957.

### 11. Criminal Law ⚖1137(3)

In money laundering conspiracy prosecution, defendant invited, and thus waived right to appeal from, any error in district court's omitting from jury instructions "specified unlawful activity" involved and what object of conspiracy was; defense counsel told district court that instructions read by court "covered the bases" and that further elaboration on elements of conspiracy charge was not necessary and was not being requested. 18 U.S.C.A. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), (h), 1957.

### 12. Criminal Law ⚖1030(1)

In order for federal appellate court to correct plain error: (1) there must be error; (2) error must be plain or obvious; (3) error must affect substantial rights in that it was prejudicial and not harmless; and (4) mistake

U.S. v. SILVESTRI                                                    2352

must seriously affect fairness, integrity or public reputation of judicial proceedings.

**13. Criminal Law ⊱1178**

Federal defendant waived *Booker* argument on appeal by failing to raise issue in his initial brief to Court of Appeals.

———————

Appeal from the United States District Court for the Southern District of Florida.

Before BLACK and MARCUS, Circuit Judges, and SMITH*, District Judge.

MARCUS, Circuit Judge:

Joseph Silvestri appeals his conviction after a jury trial for conspiring to launder the proceeds of mail and wire fraud in violation of 18 U.S.C. § 1956(h), and for 30 substantive counts of laundering the proceeds of mail and wire fraud in violation of 18 U.S.C. §§ 1957 and 2. All of the charges arose from Silvestri's involvement in a fraudulent investment program based in South Carolina. Silvestri broadly challenges the sufficiency of the evidence on the conspiracy and substantive money laundering counts, and claims that the jury instructions on the conspiracy charge caused prejudicial error. After thorough review, we are satisfied that the evidence was sufficient to sustain the jury's verdict beyond a reasonable doubt on all counts, and that the trial court did not commit reversible error in

its instructions to the jury. Accordingly, we affirm.

I.

On August 14, 2001, a grand jury in the Southern District of Florida charged Silvestri in a second superseding indictment with conspiracy to commit acts of money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i) and 1957, all in violation of 18 U.S.C. § 1956(h) (Count 14).[1] Paragraphs 2 and 3 of Count 14 explained that the purposes and objects of the conspiracy were: (a) to conduct financial transactions involving the proceeds of mail and wire fraud, a specified unlawful activity—specifically, to cash checks obtained from a South Carolina-based investment fraud—with the intent to promote the specified unlawful activity; and (b) to engage in monetary transactions in property worth more than $10,000, criminally derived from the same South Carolina fraud. In addition, Silvestri was charged in 30 substantive counts with money laundering, in violation of 18 U.S.C. §§ 1957 and 2 (Counts 16–45).[2] Silvestri pled not guilty and proceeded to trial, alone.

Construing the evidence in a light most favorable to the jury's verdict, as we must at this stage in the proceedings, the essential facts in this complex fraud case are these.

———————

\* Honorable Fern M. Smith, United States District Judge for the Northern District of California, sitting by designation.

1. The unlawful activities whose proceeds were concealed or promoted were mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. Also charged with conspiracy in the indictment were John Mamone, Joseph Russo, Fred Morgenstern, David Morgenstern, Michael Buccinna, David Bell,

Mark Weiss, and Doreen Russo. The indictment further charged Silvestri with a violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 *et seq.* That charge was dismissed before trial, and is not relevant to this appeal.

2. Mamone, Russo, the Morgensterns, Buccinna and Weiss were also charged in the same substantive counts.

### U.S. Guarantee Corporation in Arizona and Nevada

The story began sometime in 1997, when Alvin Tang,[3] a one-time real estate sales associate and sometime "bouncer" for a bar, and Charles Smith, an attorney from California, began working together to pursue various investment opportunities. Eventually, they formed U.S. Guarantee Corporation in Nevada, with offices in Scottsdale, Arizona, where Tang worked. R7 at 96–100.[4] U.S. Guarantee failed to produce the income Smith had hoped for, however, and by the end of 1997, Smith ceased doing business with Tang and disassociated himself from U.S. Guarantee, leaving Tang as head of the corporation. Smith took from the corporation the only items of value, some "Ginny Mae" mortgages. Joe Kalisch, another partner of Tang's, also pulled out of U.S. Guarantee, taking with him the $40,000 he had invested. Thus, Tang was left with a small clerical staff, a corporation essentially without assets, and a growing number of debts. Tang observed at trial that, "[w]e didn't have any money, and there were people that were owed money and we were rock bottom, struggling, you know." *Id.* at 104.

To help bolster U.S. Guarantee's moribund position, Tang sought to originate some mortgages, but the business was inconsequential. Tang testified that, before leaving U.S. Guarantee in 1997, Charles Smith, U.S. Guarantee's erstwhile primary shareholder, had recommended that Tang contact the defendant, Joseph Silvestri, who could help to develop new investment opportunities for the company. Smith told Tang that "if there was a significant transaction that [Tang] had in the area [of] insurance bonding or reinsurance, that [Silvestri] would be the man to see, but it would have to be something that would be very, very special." *Id.* at 10. In late 1997, Tang spoke to Silvestri concerning a certain "railroad bond," one of U.S. Guarantee's few remaining assets that Tang hoped to use as loan collateral; Silvestri suggested that the bond was "worthless." *Id.* at 10–11. From that point, the two remained in contact, as Tang sought Silvestri's advice concerning further business opportunities. None proved productive until 1999.

### Alliance Trust in South Carolina

Sometime in July 1999, Virgil Womack, an (apparently close) acquaintance of the defendant Joseph Silvestri, operated a company based in Seneca, South Carolina known initially as Alliance Trust, and later renamed Chemical Trust. Alliance Trust was engaged in the marketing and sale of allegedly high-yield, low-risk investment opportunities. The company employed a number of sales agents, who enticed investors to put their money into Alliance Trust, with promises of annual returns ranging from 9.5% to 20%. R7 at 14, 15, 35, 72; R10 at 188; R15 at 56. The agents described Alliance Trust to investors as a sort of "private investment club" that investors could join after paying a fee. When investors asked how Alliance Trust would employ their capital in order to generate such high returns, the agents said that the company was either making "overseas investments," buying specially discounted U.S. Treasury notes, or purchasing "distressed" properties. R15 at 55, 63, 66. No such investments were ever made. R11 at 31, 32; R12 at 72, 115–17, 119–20.

### Alliance Trust and U.S. Guarantee Begin to Work Together

In March 1999, Silvestri proposed to Tang that U.S. Guarantee could undertake a

---

3. Tang entered a plea of guilty to conspiracy to commit fraud, agreed to cooperate with the government, and was sentenced to 30 months' imprisonment.

4. All citations to the trial transcript will be in the following format: R[Volume #] at [page number]. For example, this citation is to Volume 7 of the record at pages 96–100.

course of action that would entail "no risk" to the company. Tang testified that although Silvestri knew U.S. Guarantee was "starving," Silvestri nonetheless suggested that it could issue bonds. R8 at 28–29. Silvestri visited with Tang in Arizona on April 6, 1999. The defendant specifically said that U.S. Guarantee could issue "construction" bonds to a South Carolina firm headed by a friend, Virgil Womack, who had been the owner and head of a construction company. Later, Silvestri changed the proposal and said, instead, that U.S. Guarantee could issue "surety bonds," purporting to secure individual investments made in Womack's organization, Alliance Trust. According to Tang, "Alliance was just a name that was created by Silvestri." *Id.* at 40–46.

On that visit to Scottsdale, Arizona in early April 1999, Silvestri ate dinner with Tang and Kenneth Turner, another U.S. Guarantee executive who testified at trial.[5] Notably, during this meeting Silvestri described himself to Turner as a "liaison between U.S. Guarantee and Alliance." Silvestri said that U.S. Guarantee was "going to guarantee the investment." R9 at 44, 47. U.S. Guarantee's involvement with the Alliance Trust scheme began at approximately that time.

To make the security guarantee facially credible, U.S. Guarantee prepared and distributed bogus brochures and financial statements. The financial statements were attached to the brochures, and each financial statement included a phony balance sheet listing assets, liabilities, and net shareholders' equity. As the materials were created, Silvestri critiqued and marked up drafts, advising Tang what items to include or omit. U.S. Guarantee's brochure described the company, its corporate purpose, and certain

individuals affiliated with the company (including Barry Goldwater, Jr.). R8 at 50–67.

Tang testified about two successive and wholly fictitious versions of the financial statement. The first was dated March 15, 1999 (although it continued to be revised and edited in April and May). Its balance sheet listed U.S. Guarantee's total assets at $1.7 billion. Among the assets listed were $167 million in certificates of deposit, $100.1 million in real estate, and $1.51 billion in certain "partnerships." R8 at 56–59; Gov. Ex. 4A. Tang said that the company at the time had essentially *no* assets, or at most "a few thousand dollars in the bank." *Id.* at 62.

The *second* financial statement was dated July 13, 1999. The balance sheet in that statement said that the company had $2.4 billion in assets and $2.4 billion in "total net liabilities and net equity ... coming to a grand total of $2.4 billion dollars for U.S. Guarantee." R8 at 80. Among the assets listed were $167 million in certificates of deposit, $1.46 billion in real estate, and $786 million in partnerships. Gov. Ex. 4F. In reality, Tang testified, U.S. Guarantee had "maybe $10,000" in assets at that point. *Id.* at 73–77, 81; Gov. Ex. 4D.

Tang further testified that Silvestri encouraged him to create the financial statements in order to help the Alliance Trust sales agents promote the investment program. According to Tang, he and Silvestri had "two or three discussions" concerning the preparation of the statements. R8 at 59–60. Tang described the conversations in this way:

Q: Was there any discussion about—with Mr. Silvestri—about what should actually

---

5. Turner entered a plea of guilty to a conspiracy charge, and faced a possible sentence of up to five years' imprisonment. R9 at 23.

go in these documents, the Profile and the balance sheet?

A: Certainly there was a critique. And in looking at what we submitted to what was finally—to what was perfected at the end.

Q: When you say "a critique," how did this take place? How did the critique take place?

A: We would submit it, and he would look at it, and there were some things that, you know, that, you know, Joe was not happy with.

Q: And what did he say to you when you say he wasn't happy with something?

A: That specifically there were some things that should not be in there, and, you know, that there were things that should be in there and there were things that should not be in there.

*Id.*

Tang also faxed drafts of the financial statements to Silvestri's Florida address, and Silvestri "marked up" and returned those documents. R8 at 60–61. Among other things, Silvestri suggested that certain "railroad bonds" should be removed from the assets column, and that an item titled "Assets Held In Trust For Indemnification On Corporate Guarantee" be added to the assets column. *Id.* at 77. Tang was not able to explain what that item referred to. Tang incorporated Silvestri's suggested changes in order to create a "perfected form" of the document. *Id.* at 61. Tang also said that, during the summer of 1999, while the financial statements were being developed and amended, he and Silvestri had "constant conversation[s] of our worrywart and our nagging, you know, that we did not have the ability to, you know, to cover them [the surety bonds]," but that "Joe ... would give us, you know, would comfort us saying that the

investment was secure and that the investors would not be hurt, and, you know, and the non-depletion account and non-depletion, you know, and said all the words." *Id.* at 81.

In order to assure investors that the Alliance Trust program was indeed a low-risk investment, the sales agents explained that each investment was secured by U.S. Guarantee. At early stages in the venture, sales agents promoting Alliance Trust would call U.S. Guarantee for additional information to provide investors. Indeed, Turner initially referred these calls to Silvestri. R9 at 47. As time passed, that arrangement "got to be too much" for Silvestri, who then suggested that U.S. Guarantee field the calls directly. *Id.* Silvestri specifically instructed Turner to tell Alliance sales agents that "the investment was very safe, that the money was put into banks, ... that U.S. Guarantee was backing [it] up," and that "the money could be gotten within seven days." *Id.* at 47, 64. Meanwhile, Turner and Silvestri held a number of discussions regarding whether various U.S. Guarantee assets could be used as loan collateral. Silvestri concluded, however, that "he wasn't able to do anything with any of them." *Id.* at 82–83.

When an investor sent a check to Alliance Trust, he or she would be given a *laminated* U.S. Guarantee bond, which purported to guarantee the investor's capital against loss. R15 at 68. The agents also provided investors with one of the financial statements issued by U.S. Guarantee, which, again, indicated that U.S. Guarantee had extensive assets. In reality, the entire program was a sham. U.S. Guarantee, portrayed as a financially stable bulwark against investment risk, in fact had virtually no assets. In addition to telling investors that prominent individuals were associated with U.S. Guarantee, sales agents said that part of the company's mis-

**U.S. v. SILVESTRI**                                           **2356**

sion was to provide housing for indigents. *Id.* at 57–58; R8 at 53–54; Gov. Ex. 4A. For its services, U.S. Guarantee received a fee of between 7% and 10% of the amount of each investment; Silvestri received 40% of U.S. Guarantee's share.  R8 at 30, 32.

### How the Scheme Worked

Special Agent Ronald Wise of the Internal Revenue Service testified at trial that a "Ponzi scheme" is "a scheme where investors are not really paid a return on their investments.  They are, in fact, paid what's alleged to be a return, but it's money actually taken from the next level or tier of investments." R12 at 116.[6]  By all appearances, Alliance / Chemical Trust took on the form of a "Ponzi scheme."   The earliest investors in the scheme received some payments that were financed by using the principal invested by others who joined the scheme later.  Meanwhile, millions of dollars were skimmed off for personal use by the members of the scheme (including Silvestri).  While all of the investors believed that their investment principal was guaranteed, in reality all the funds were being used either to make small payments to the initial "tiers" of investors, or for the personal use of the scheme's masterminds.  The principal, which the scheme's organizers had promised was guaranteed and earning interest, was actually being dispersed as soon as it was taken in by the enterprise.  *Id.* at 116–17.

Investors first made out and mailed checks to Alliance Trust (later, Chemical Trust). Some of the checks were deposited into ac-

counts held in the name of "Prestige Accounting Services," and the funds from these accounts were used to make "interest" payments to earlier investors.  The funds from other investor checks were wired to U.S. Guarantee as payment for its services.  The remainder of the checks were sent to Gold Coast Check Cashing, a Florida business owned and controlled by co-conspirators David and Fred Morgenstern, also acquaintances of Silvestri.  R9 at 218–22; R12 at 57–62, 76–78, 81–82, 113–16, 120–24.

Peggy Preston, who had prior experience working for banks, was employed by Fred Morgenstern in his various business ventures.  She was aware that Fred previously had been convicted of bank fraud.  R9 at 212. Fred purchased Check Cashing Unlimited in the summer of 1999, and Preston managed six check cashing stores for him.  Fred told her that his brother, David Morgenstern, had introduced him to a new client whose checks would be deposited regularly at the check cashing stores.  The new client was Virgil Womack, and his South Carolina investment company was Alliance/Chemical Trust.  *Id.* at 218–22.

From the summer of 1999 through the end of that year, Fred Morgenstern deposited some of these checks into accounts he controlled at a Florida branch of Citibank, and others into an account maintained at a Florida branch of First Union Bank.  R9 at 221, 223, 234; R11 at 27.  When First Union later closed the account in August 1999 (for rea-

---

6.  "The term 'Ponzi scheme' is derived from Charles Ponzi, a famous Boston swindler.  With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days.  Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due."  *United States v. Masten,* 170 F.3d 790, 797, n. 9 (7th Cir.1999)

(quotations and citations omitted).  "Generically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors."  *In re Bonham,* 229 F.3d 750, 759, n. 1 (9th Cir.2000).  *See also Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924).

2357                                    U.S. v. SILVESTRI

sons discussed below), Silvestri helped Wom-
ack and the Morgensterns set up several new
accounts at a Florida branch of Admiralty
Bank, with whose chairman Silvestri had a
prior relationship. R10 at 100–108. The
Morgensterns deposited the First Union
funds and additional investor checks into
those accounts in September 1999. *Id.* at
11–15. The Morgensterns also deposited in-
vestor checks into offshore accounts at
Americas International Banking Corp., Ltd.
(AIBC), based in the Bahamas, where the
Morgensterns and Silvestri had opened sev-
eral additional accounts. R9 at 237; R11 at
25–26.

Considerable evidence presented at trial
detailed Silvestri's role in the Alliance/Chem-
ical Trust Program. Tang testified that he
and Silvestri spoke repeatedly about the fact

that U.S. Guarantee did not have the assets
to cover the surety bonds. Silvestri continu-
ally assured Tang that the investments would
go into a "non-depletion account," and that
the funds would never be at risk since the
"capital was always stable." R8 at 62–64, 68.
As time went on, and the volume and number
of bonds requested and issued became "very
uncomfortable," Tang had what he termed
"never ending" discussions with Silvestri.
*Id.* at 82. He said to Silvestri, "Hey, Joe,
you know that we don't have a pot to piss in.
I mean, you know that," and that U.S. Guar-
antee's financial statement as issued was
"worthless." *Id.* at 83, 246. According to
Tang, Silvestri would respond that "every-
thing was pretty okay and the investment
was making money, and ... everybody was
going to be fine."[7] *Id.* at 82–83.

---

7. Among other things, Tang testified on direct
examination in this way:

  Q: Did you ever [have] any discussions with
    Mr. Silvestri during this time period about
    the fact that U.S. Guarantee did not have
    the assets to back these bonds?

  A: Yes.

  Q: Could you describe for us as best you can
    those conversations with Mr. Silvestri,
    particularly in this time frame—and then
    we will move on to later—but from March,
    April into May?

  A: Probably the most common conversation
    that I would have with Joe was the—was
    this conversation. And the conversation
    that Joe and I would have would be that,
    you know, the investment, where the funds
    would go. And Joe would tell me that the
    investments would go into a non-depletion
    account and the funds were never at risk,
    and the capital was, you know, always—
    the capital was always stable, and the capi-
    tal was never—again, never at risk. And,
    you know, the investors were never going
    to be hurt, and, you know, different terms,
    you know, but there was—

  R8    at 62–63.

At another point on direct examination, Tang
said:

  Q: Did you ever discuss with Mr. Silvestri
    during this time frame, summer into fall of

1999, about the volume and the number of
bonds that were now being requested and
then subsequently issued?

  A: The volume was very uncomfortable, and,
    yes, we—yes, I did discuss it with him.
    You know, the discussions were never end-
    ing, and—but, you know, his—you know,
    he constantly just gave us the comfort and
    security that everything was going to be
    okay. And so certainly in—out of every
    three conversations that we had, I mean,
    two of them were just, you know, confirm-
    ing that everything is okay and the invest-
    ment was fine, and, you know, there was
    no question, that everything was going to
    be—everything was pretty okay and the
    investment was making money, and, you
    know, everything was going to be fine.

  Q: Did you ever discuss with Mr. Silvestri
    during the course of these same conversa-
    tions, the summer of '99 into the fall
    of '99, the fact that U.S. Guarantee quite
    simply did not have the assets to back the
    bonds?

  A: There were several times that I said that,
    yes, that, you know—I mean, pardon the
    expression—that, "Hey, Joe, you know
    that we don't have a pot to piss in. I
    mean, you know that."

As the program got underway, and the investors began submitting checks to Alliance Trust, Silvestri or Clifton Wilkinson, Womack's brother-in-law, directed U.S. Guarantee how many bonds to write, to whom, and in what amounts. R8 at 30, 38, 39. In return for the bonds, Alliance Trust wired money to U.S. Guarantee's accounts at Western Security Bank and Arizona Bank, both located in Phoenix, Arizona. In turn, each week Turner obtained cashier's checks for Silvestri and sent them to him or to Risk Management (a company Silvestri controlled) by overnight delivery. R9 at 88–94. The fees that U.S. Guarantee actually received for its role in the "program" totaled $3,916,376. Silvestri's share came to approximately $1.5 million. R8 at 131.

With the investor checks thus deposited, Silvestri, Womack, and the Morgensterns began to transfer funds from one bank to another, either through wire transfers or by having cashier's checks sent from bank to bank. Thus, the Morgensterns transferred

money from the Admiralty and Citibank accounts, in Florida, to the AIBC accounts, in the Bahamas, and to a Morgenstern-controlled account at Barclays Bank, located in London, England. From the accounts at each of the four banks (Admiralty, Citibank, AIBC and Barclays), the various parties withdrew money for their own uses. Ultimately, all of the investors' capital, other than what was used to pay "interest" to other investors and to pay U.S. Guarantee and Silvestri, was diverted into accounts held by Womack, and the Morgensterns, for their personal use.

### How the Funds were Transferred

The movement of funds was complex and involved multiple banking institutions. First, investors sent checks to Alliance Trust or Chemical Trust in Seneca, South Carolina. R9 at 218–22. Womack then endorsed the checks on behalf of Alliance or Chemical, and forwarded the checks (via DHL packages) to Fred Morgenstern's Gold Coast Check Cash-

---

Q:  And what response would Mr. Silvestri have to you when you said something like that?

A:  "You don't worry—you don't have to worry about it. This is a non-depletion account and, you know, the trades are going fine, you know, which is how the money was being made, and, you know, the investment is going well, and, you know, and . . . nobody is at risk and this is going to be fine."

*Id.* at 82–83.

On cross-examination, Tang gave the following answer to counsel's questions:

Q:  You never told him: We don't really have these things. This is all a fraud? Did you?

A:  Sure we did.

Q:  Oh, you did? And when was that? When was that?

A:  From the—

Q:  I didn't hear you tell the prosecutor. When was it?

A:  Joe knew that the agreements we had with—Joe knew the agreement we had.

*Id.* at 195–96.

Finally, on redirect examination, Tang said:

Q:  So what discussions did you have concerning—I am sorry—that furthered this fraud, what conversations with the defendant?

A:  After bonds had already been issued, I had told Mr. Silvestri that, you know, that our financial statement was worthless.

Q:  And can you tell us which bonds you are discussing at this point because we had a series of bonds in 1999?

A:  We had this discussion at various points from, you know, whether we are talking about, you know, May, June or, you know, even after the Arizona corporation commission incident, so—

Q:  And what was Mr. Silvestri's response about the financial situation of U.S. Guarantee?

A:  Being that the investment was fine and in place, that, you know, that it didn't matter.

Q:  What didn't matter?

A:  That we were worthless.

*Id.* at 246.

2359    U.S. v. SILVESTRI

ing store in Margate, Florida. *Id.;* R15 at 4–11. Gold Coast, in turn, deposited the checks into three different banks: *Admiralty Bank* in West Palm Beach, Florida, R12 at 59–73; *Citibank* in Ft. Lauderdale, Florida, R9 at 223; or *AIBC* in Nassau, Bahamas, R11 at 9–19, 25–26.

At Admiralty Bank, the checks were deposited into three different accounts: Gold Coast Check Cashing, with Peggy Preston and Jason Crossen listed as signatories, R12 at 73; Alliance Trust, with Womack listed as signatory, *id.* at 59; and Chemical Trust, also designating Womack as signatory. *Id.* at 59, 60, 73. At Citibank, the checks were deposited into various additional accounts listed in the name of Americas Resource Corp., with Fred Morgenstern listed as signatory. *Id.* at 82–83, 85. At AIBC, the checks were deposited into the Americas Fidelity Assurance Corp., Ltd. account. David Morgenstern had power of attorney over that account. R11 at 9, 13, 14, 19.

From the Alliance Trust account at Admiralty Bank, Womack wired some $2.8 million to David Morgenstern's AIBC account. R11 at 23–24. From the Alliance Trust and Chemical Trust accounts at Admiralty Bank, collectively, Womack transferred $1.5 million to another Admiralty account in the name of Prestige Accounting Services, R12 at 113; those funds were used to make the "interest" payments to earlier rounds of investors in the Alliance Trust program. *Id.* at 114–16. Womack also transferred $3.1 million from the Alliance Trust and Chemical Trust accounts to U.S. Guarantee's accounts at Western Security Bank and Arizona Bank. *Id.* at 120. This money was used to pay U.S. Guarantee's "fee" as the "underwriter" of the investments; a portion of it was sent

on to Silvestri's own account at AIBC in the Bahamas, as his share of the fee. *Id.* at 121, 129–30. Womack transferred still another $425,000 to Nelson Jarnagin, an attorney for Chemical Trust.[8] *Id.* at 143. Finally, Womack transferred $6.25 million from the Chemical Trust account into the Falcon Trust account maintained at Barclays Bank in London, England, with David Morgenstern as signatory. *Id.* at 112.

From Fred Morgenstern's Citibank account, $10.3 million was transferred into the Falcon Trust account at Barclays Bank. In addition, $6.25 million was transferred into David Morgenstern's AIBC account, $850,000 into a Prestige Accounting Services account at Pointe Bank in Florida, and an additional $417,000 into an escrow account for Steven Sadow (an attorney for Womack's wife) at Suntrust Bank in Atlanta, Georgia. R12 at 93, 96, 97, 100–12.

From David Morgenstern's AIBC account, $2.1 million was transferred into still another account, in the name of Americas Capital Management, also at AIBC in Nassau. R11 at 46. Another $2.8 million was transferred into an account maintained at a Swiss bank in the name of Slattocks Investment, S.A., $2.9 million was withdrawn to settle litigation related to 5 Star Global, another Ponzi scheme in Wisconsin, and $3.2 million was withdrawn to settle litigation in the UK. A further sum of $541,464 was withdrawn to cover American Express charges, including airfare to and from Nassau for David Morgenstern, Silvestri, Womack, and their respective wives, as well as various Morgenstern family expenses. *Id.* at 36–46.

The counts listed in what was called by the government Category A (Counts 17, 18, 20,

---

8. Womack also gave some $1.4 million in endorsed investors' checks to Jarnagin; $500,000 of the total funds given to Jarnagin were trans-    ferred to Bruce Harvey, an attorney for Womack himself.

21, and 22) each involved deposits of the investors' checks, endorsed by Womack, into the Gold Coast Check Cashing account at Admiralty Bank in Florida. R12 at 68–84. These deposits were made in September and October of 1999. *Id.* The Category B counts (Counts 19, 24–25, 30–32, 34–36, and 39–44) involved deposits of the Womack-endorsed investors' checks into Fred Morgenstern's Citibank account in Florida; they were made from October to December of 1999. *Id.* at 84–93. The Category C counts (Counts 28, 33, 38, and 45) involved the withdrawal of funds from Fred Morgenstern's Citibank account, by checks drawn on the account, signed by Fred Morgenstern, and made payable to "Americas International Bank Corporation, Ltd." (AIBC). *Id.* at 93–96. These checks were drawn and sent from November to December of 1999. The Category D counts (Counts 23, 26, 27, 29, and 37) involved wire transfers of funds from Fred Morgenstern's Citibank account to David Morgenstern's account at Barclays Bank in England. R12 at 96–100. The funds were wired from October through December of 1999. The Category E count (Count 16) involved a single wire transfer, occurring on August 8, 1999, from Womack's Alliance Trust account at Admiralty Bank to David Morgenstern's account at AIBC. *Id.* at 100–101.

### *Official Scrutiny of U.S. Guarantee by the Corporation Commission of Arizona*

During the latter part of 1999, Tang informed Silvestri that he had received a subpoena for U.S. Guarantee's records from the Corporation Commission of Arizona. R8 at 100–101. Silvestri assured Tang the Commission was "a busybody organization," and that the worst that could happen would be the issuance of a cease and desist order, in which case U.S. Guarantee would simply stop doing business. *Id.* at 102. A week later,

Silvestri called Tang and introduced him to David Morgenstern, whom Silvestri described as "a powerful banker." *Id.* at 103. Morgenstern also reassured Tang that everything would be fine. *Id.* at 104. Tang hired an Arizona lawyer for the company, who subsequently advised him and U.S. Guarantee vice president Kenneth Turner that Alliance/Chemical Trust's investment program "sounded like" a Ponzi scheme. *Id.* at 112; R9 at 95–97. Silvestri assured Tang and the attorney, however, that the program was not a Ponzi scheme. R9 at 96–97. Tang continued to issue the bonds guaranteeing investor principal, even though he knew U.S. Guarantee had no financial ability to underwrite any lost investment.

### *FBI and IRS Scrutiny of Alliance/Chemical in South Carolina*

The massive fraud was later uncovered by the Federal Bureau of Investigation, which executed search warrants on Womack's various South Carolina offices on January 7, 2000. FBI agents seized numerous documents related to the Alliance Trust program. FBI agents arrested Womack and seized computers and business records of Alliance Trust/Chemical Trust in South Carolina, at Morgenstern's Gold Coast Check Cashing in Florida, and at U.S. Guarantee. Tang worriedly asked Silvestri for guidance. Again, Silvestri reassured Tang, opined that there was no problem, and urged Tang to just "hang in there." R12 at 21–22, 25, 27–30; R8 at 122–23.

Internal Revenue Service Special Agent Wise, who reviewed many of these documents, testified extensively at trial about the details of this complex series of financial transactions and the specific transfers underlying the charges for which Silvestri was indicted and ultimately convicted. More spe-

2361                                    U.S. v. SILVESTRI

cifically, Wise outlined the transactions on which the substantive money laundering counts in the indictment were based.[9] R12 at 68–101. In addition, Wise testified that Silvestri had never filed a personal income tax return for 1999.

Henry Marvin Harrison, who was appointed by the United States District Court for the District of South Carolina to assist a court-appointed receiver in an investigation and civil action initiated to recover the investors' funds, also analyzed the seized records and testified at Silvestri's trial. Harrison identified a chart that summarized "major transfers of victims' investor funds" and "use of" those funds with regard to the Morgensterns' AIBC account in the Bahamas. Included in these transfers were the transactions already described, upon which a number of the charges were based. Harrison also testified about the further disposition of the investors' funds, including their use for personal expenses. R11 at 26–64.

*Testimony of the Victims*

The government also elicited extensive testimony from several victimized investors. One of them was Dennis Dostert, a retired public school teacher who ultimately lost more than half of the funds he had invested in Chemical Trust. Dostert said that he had learned about the investment program from a man who addressed his prayer group, and who explained that investors would receive returns on their income of between 15% and 20%. R15 at 54–56. Dostert noted that he read balance sheets for U.S. Guarantee, which, he was told, would be issuing surety bonds that guaranteed his investments in Chemical Trust. Dostert added that he was assured U.S. Guarantee was a reputable and reliable operation, and that after he paid $99 to join the "private investment club," he could realize a profit of 20% annually on any investment. Dostert actually invested a total of $192,000. *Id.* at 55–56, 66, 68. He ultimately lost more than half the funds he put into Chemical Trust, and recovered only 44% of the total, and then only with the assistance of the court-appointed receiver. *Id.* at 79, 101.

Sometime in late 1999, Dostert became very concerned about the legitimacy of the investment program, and spoke with a representative of Chemical Trust (the renamed

---

9. The details of these transactions are as follows. In *Category A:* Counts 17, 18, 20, 21, and 22 refer to deposits of Chemical Trust checks into a Gold Coast account, # 300139047, at Admiralty Bank, dated, respectively, September 29; October 5, 12, 12, and 12, 1999, and totaling, respectively, $261,914.21, $577,296.94, $449,578.26, $262,259.16, and $250,940.77. In *Category B:* Counts 19, 24, 25, 30, 31, 32, 34, 35, 36, 39, 40, 41, 42, 43, and 44 refer to deposits of Chemical Trust checks into the Morgensterns' "Americas Resource" account, # 3200395518, at Citibank, dated, respectively, October 12, 22, and 28, November 15, 16, and 17; and December 1, 7, 15, 21, 21, 22, 23, 28, and 29, 1999 and totaling, respectively, $297,000.00, $266,602.02, $233,294.52, $402,137.00, $292,244.32, $350,000.00, $374,180.24, $1,250,174.70, $258,654.13, $651,567.00, $598,990.00, $827,689.00, $300,358.99, $622,159.55, and $297,019.68. In *Category C:* Counts 28, 33, 38 and 45 refer to withdrawals of funds by checks drawn on the Americas Resource Citibank account, dated, respectively, November 5 and 18, and December 20 and 31, 1999, each in the amount of $500,000. In *Category D:* Counts 23, 26, 27, 29 and 37 refer to wire transfers from the Citibank account to the Morgensterns' account at Barclays in London, # 63772677, dated, respectively, October 20; November 3, 4 and 15; and December 17, 1999, and totaling, respectively, $425,000.00, $550,000.00, $1,000,000.00, $1,000,000.00, and $500,000.00. In *Category E:* Count 16 refers to a wire transfer from the Alliance Trust account, # 30013756, at Admiralty Bank to the Morgensterns' account at Barclays Bank in New York (subsequently rewired to Barclays Bank in the Bahamas), dated August 9, 1999 and totaling $2,800,000.00.

Alliance Trust), who advised him to call "Joe Silvester" [sic]. R15 at 84. Dostert phoned Silvestri to express apprehension about his investments, and explained to Silvestri that a different program in which Dostert had previously invested had turned out to be a Ponzi scheme. Silvestri replied that Chemical Trust was "not a Ponzi Scheme[,] that they actually did make investments and that *he, as underwriter, had made investments for Chemical Trust.*" (emphasis added). *Id.* at 89–90.

When Dostert asked how the program was able to pay such high returns, Silvestri claimed that it was investing in Deutsche Bank, a German bank, which, Silvestri said, was yielding 5% a month on investments of over $1 million dollars. R15 at 90. After Dostert explained that he needed the funds he had invested to support his mother in a senior home, Silvestri told him that Chemical Trust was "a sound investment," assured him that U.S. Guarantee was a reliable company, and added "[y]ou know, the banks don't really pay enough, do they?" *Id.* at 90, 92. Silvestri also advised him that U.S. Guarantee "had a real good deal for [Dostert] coming up[,]" but told Dostert that he [Silvestri] could not divulge the details. *Id.* at 92. In fact, there was no such lucrative deal in the works, and Silvestri's assurances were false.

Another victim of the fraud was Fran Roscoe, a retiree living on social security who invested $327,601—her life savings—into the Chemical Trust scheme. Before Roscoe made any investments, a sales agent told her that she would earn a 10% return. The agent assured Roscoe that her funds were guaranteed by U.S. Guarantee, a company the agent said had $6 billion in assets. The agent promised Roscoe that U.S. Guarantee "approve[d] all investments," and assured "the integrity of each investment," so that "[t]here was no risk involved." R10 at 188–

91. Like Dostert, Roscoe eventually lost more than half of her investment, and recovered only 44% of her funds with the assistance of the receiver.

Roscoe and Dostert were just two of the many victims of the scheme. Yet another retiree to be swindled was Phyllis Goldberg, a 67–year–old woman who, with her husband, invested almost $40,000 in Chemical Trust. Like the other victims, Goldberg was promised a guaranteed high rate of return on her investment, and was told that all investments were backed by bonds guaranteed by U.S. Guarantee. R7 at 80, 83. Similarly, 79–year–old Abbot Kissen invested $260,000 in Chemical Trust, eventually losing more than half of his investment. Like the other victims, Kissen made his investment only after being assured his principal was entirely safe and fully backed by surety bonds issued by U.S. Guarantee. *Id.* at 5, 12, 16–18, 22. Sharon Bohlen, a 62–year–old woman, also lost a substantial portion of the funds she had invested in the fraudulent scheme. *Id.* at 46. Dostert, Roscoe, Goldberg, Kissen, and Bohlen represent only a small portion of the numerous victims of the fraud, but their accounts are typical of the many elderly investors defrauded. Indeed, IRS Special Agent Wise testified that he had reviewed the files of some 1,200 individual investors, seized at Womack's office in Seneca, South Carolina. R12 at 51.

*Silvestri's Further Involvement*

The government elicited still more testimony concerning Silvestri's role in the subsequent transfer of the Alliance Trust investors' funds into the personal accounts of Womack, the Morgensterns, and Silvestri himself. Peggy Preston testified that in August 1999, First Union Bank—one of the banks in which the Morgensterns had initial-

ly deposited the investors' checks—began to raise questions about the Morgensterns' Gold Coast account. The bank was particularly concerned with the volume of checks made out to Chemical Trust, and the notable fact that several of them had portions whited out. In fact, First Union employees contacted some of the investors who had written the checks in question, and discovered that the investors were elderly people who believed they were making legitimate investments. Suspicious of wrongdoing, First Union closed the account and terminated its relationship with the Morgensterns. R10 at 9–11.

Soon thereafter, Fred Morgenstern advised Preston that "we need to find ... another bank[.]" R10 at 11. On September 23, 1999, Preston, Crossen, Fred Morgenstern and Silvestri met at Admiralty Bank in Florida to open a new account. Id. at 11–15. Silvestri had contacted an old acquaintance, Bruce Mahon, who was the chairman of Admiralty Bank. Although Silvestri and Mahon had not spoken in years, Silvestri was able to convince Mahon to open an account for Chemical Trust. Silvestri told Mahon that he was selling insurance bonds used to guarantee the principal of investments that Womack sold. Id. at 100–108. Eventually, Fred Morgenstern opened several other accounts at Admiralty Bank, with signatories including "Gold Coast Checking," "The Adbank Companies," and "First Capital Acceptance Corp." Id. at 16–20.

Mahon testified that within a month of opening the first Admiralty Bank account, the bank became concerned about the accounts because a large amount of money was being wired from the account to banks in foreign jurisdictions, including the Bahamas and the United Kingdom. Some of the transfers struck Mahon as improper, and the backs of some of the deposited checks appeared to have been tampered with. Mahon called Silvestri, who told him the checks had been mistakenly deposited at the wrong bank. R10 at 118–19. William Burke, Admiralty Bank's chief operating officer, also spoke with Silvestri about the Chemical Trust-related accounts. When Burke inquired as to the nature of the investments that the group was selling, Silvestri referred to certain World War II-era bonds, which Silvestri claimed Chemical Trust was purchasing in Europe. Id. at 169–72. Not surprisingly, these explanations failed to reassure Mahon and Burke, and Admiralty Bank, like First Union earlier, decided to close the various accounts. Id. at 119–20.

Mahon testified that he and other bank administrators were worried that the bank could be implicated in a "pyramid scheme" and in "money laundering." R10 at 120. Burke testified that prior to closing the accounts, an "agitated" Silvestri called Burke and complained that "[i]f this ... is the way ... you treat referrals or companies that I refer ... to the bank, then how can I continue to refer business to Admiralty Bank[?]" Id. at 180–81.

*The Tapes*

The government also introduced the tape recordings and transcripts of eight telephone calls between Silvestri and Fred Morgenstern that occurred between January 8 and January 19, 2000, which the FBI had intercepted pursuant to a court-ordered Title III wiretap on Morgenstern's cellular telephone. R15 at 11–20. On January 8, after the FBI raids, Silvestri spoke to Fred Morgenstern. Morgenstern told Silvestri, "I'm not saying that they ... got anything in our office that's particularly compelling. You know probably copies of checks and some checks that hadn't been deposited." Gov. Ex. 52C at 1–2; R15 at 22. In another conversation after the raid, Silvestri asked Morgenstern, "[t]he

U.S. v. SILVESTRI    2364

400,000 that you tried to move, do you know how it went?" Gov. Ex. 52D at 1; R15 at 23. In still another conversation, Silvestri told Morgenstern that checks were still being sent to U.S. Guarantee:

SILVESTRI: Ah. . . . I told you that U.S. Guarantee is getting envelopes with money in it, right?

MORGENSTERN: Yeah.

SILVESTRI: With checks. We're sending 'm back. They've got about five so far. (Laughs). They got two the other day.

MORGENSTERN: Yeah.

SILVESTRI: Can't even turn this thing off. The faucet's open, it won't quit pouring.

Gov. Ex. 52J at 6–7; R15 at 48. Silvestri also told Morgenstern the "excellent news" that the Arizona Commission had dropped its action against U.S. Guarantee, having merely issued a cease-and-desist letter. Gov. Ex. 52J at 1–2.

On January 19, 2000, Silvestri advised Fred Morgenstern that "the receiver's telling people . . . they think they know where there's basically 20 [million] and all the rest is lost. And . . . they also claimed they've sent out 1,200 letters, which is almost the amount of the ah, investors . . . and the letters ah, start out 'Dear victim.' " Gov. Ex. 52K at 1–2; R15 at 49. In part, the following conversation ensued:

SILVESTRI: Okay. Ah, the letters start out dear victim, and I don't know what else to say, but that's wonderful. (Chuckles).

MORGENSTERN: They start out dear victim?

SILVESTRI: Dear victim.

MORGENSTERN: (Laughs). Well that's certainly subtle.

SILVESTRI: But I . . . think . . . that maybe . . . the good news is that they claim they've found 20 [million] but all the rest is lost.

MORGENSTERN: Well if they ah.

SILVESTRI: So if they haven't contacted the right people then they're never gonna find it anyhow, are they? So ah.

MORGENSTERN: No.

Ex. 52K at 1–2; R15 at 49.

*Jury Instructions*

The district court instructed the jury on the general elements applicable to Count 14, the charge of conspiracy to launder money. It explained:

In this case, with regard to the alleged conspiracy, the Indictment charges that the defendant knowingly and willfully conspired to: 1, conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, that is the cashing of checks obtained from the South Carolina-base[d] investment fraud, which involved the proceeds of specified unlawful activity, specifically mail fraud and wire fraud, *with intent to promote the carrying on of the specific unlawful activities;* and, secondly, engage and attempt to engage in monetary transactions affecting interstate and foreign commerce in criminally derived property that was of a value of greater than $10,000, which was derived from specified unlawful activity, that is mail fraud and wire fraud, which property was obtained from a South Carolina-based investment fraud.

It is charged, in other words, that the defendant conspired with others to commit two separate, substantive crimes or offenses.

2365                          U.S. v. SILVESTRI

In such a case, while you may find that the defendant conspired to commit both substantive offenses, it is not necessary for the Government to prove that the defendant conspired to commit both of the substantive offenses.

2d Supp. Ex. at 97 (emphasis added).

The district court further instructed the jury:

The term "specified unlawful activity" means either a violation of ... 18 [U.S.C.] [§] 1341, which is mail fraud, or a violation of 18 [U.S.C.] [§] 1343, which is wire fraud as described in the indictment.

Section 1341 makes it a federal crime or offense for anyone to use the United States mails in carrying out a scheme to defraud.

Section 1343 makes it a federal crime or offense for anyone to use an interstate wire communications facility in carrying out a scheme to defraud.

I further instruct that the Government must prove beyond a reasonable doubt that the proceeds involved in each count of the indictment are proceeds either from mail fraud or wire fraud as the "specified unlawful activity." However, the government need not prove that the defendant was directly involved in the commission of either the mail or wire fraud crimes that constitute the specified unlawful activity charged in the counts of the Indictment. Instead, the government must prove beyond a reasonable doubt that the defendant was aware that the "monetary transactions" charged in each count in the indictment were from "criminally derived property" .... However, should you conclude beyond a reasonable doubt that the defendant was involved either in the mail or wire fraud activities identified in the Indictment, then you may

consider this finding in evaluating whether the defendant had knowledge that the proceeds involved in the monetary transaction charged in the indictment were from a criminal offense.

*Id.* at 101–102.

After the district court finished instructing the jury, it asked the parties for exceptions or objections. This colloquy ensued:

THE COURT: Any exception or objections to the content or manner in which the instructions were given?

[AUSA] FERNANDEZ: ... I believe in looking at the instructions as a whole, *what the jury also needs to be charged on is the elements of 1956,* which is the ... first object of the conspiracy. What we have charged and included ... is a[§] 1957—but in looking back at the instructions I just don't see the elements of [§ 19]56 given. I think it is necessary.

THE COURT: Mr. Sharpstein?

[Defense counsel] SHARPSTEIN: *I mean, you have already instructed the jury. I don't know the substantive difference there. You have told them—I thought it covered the bases.*

MS. FERNANDEZ: I thought it did, too, until I went back and looked, and then I realized that what it does talk about is the two objects and so forth. And you read the objects and it gives—

MR. SHARPSTEIN: It's self-explained. *You know, cashing the checks and/or, you know, passing the money. And you have explained the monetary transaction, financial institutions, all of the same elements.*

* * *

THE COURT (to Ms. Fernandez): Mr. Sharpstein is **not** asking for it. If he is

**U.S. v. SILVESTRI**                                    **2366**

waiving it, then why do we need to go back and do it?

\* \* \*

THE COURT (to Mr. Sharpstein): What's your position on my reading § 1956 ... ?

MR. SHARPSTEIN: *I just said it. I don't think it's necessary.*

THE COURT: How about this as an option? What's your position on my reading it but not sending it back in a written form?

MR. SHARPSTEIN: *I will leave it to the court's discretion. I am just saying that I am not requesting it.*

2d Supp. Ex. at 108–10 (emphasis added). Following Sharpstein's advice, the district court decided not to further instruct the jury as to the first object of the conspiracy alleged in Count 14.

### The Verdict and Sentence

The jury found Silvestri guilty on all counts, specifying as part of its verdict that Silvestri was guilty of both of the purposes and objects of the conspiracy set forth in Count 14. On May 23, 2003, Silvestri was sentenced to 122 months of imprisonment, followed by 2 years of supervised release, ordered to pay a special assessment of $3,100, and to forfeit money and property derived from the fraud. This appeal ensued. Currently 73 years old, Silvestri remains incarcerated pending the outcome of the appeal.

### II.

#### A.

[1, 2] The sufficiency of evidence supporting a criminal conviction is a question of law, which we review *de novo. United States v. Diaz,* 248 F.3d 1065, 1084 (11th Cir.2001).

We review the sufficiency of the evidence to determine whether a reasonable jury could have concluded that the evidence established Silvestri's guilt beyond a reasonable doubt. *Id.* Stated another way, we will not disturb a guilty verdict unless, given the evidence in the record, "no trier of fact could have found guilt beyond a reasonable doubt." *United States v. Lyons,* 53 F.3d 1198, 1202 (11th Cir.1995). At this stage in the proceedings, we examine the evidence in the light most favorable to the government, drawing all reasonable inferences and making all credibility choices in the government's favor. *Id.* at 1200.

[3] As for the challenged jury instructions, "[i]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." *United States v. Ross,* 131 F.3d 970, 988 (11th Cir.1997) (internal citation and quotation marks omitted). "The doctrine of invited error is implicated when a party induces or invites the district court into making an error." *United States v. Stone,* 139 F.3d 822, 838 (11th Cir.1998). "Where invited error exists, it precludes a court from invoking the plain error rule and reversing." *Ford ex rel. Estate of Ford v. Garcia,* 289 F.3d 1283, 1294 (11th Cir.2002), *cert. denied,* 537 U.S. 1147, 123 S.Ct. 868, 154 L.Ed.2d 849 (2003) (internal citation and quotation marks omitted). *See also United States v. Jernigan,* 341 F.3d 1273, 1289–90 (11th Cir.2003) (finding that defendant whose counsel had affirmatively stipulated to the playing of a tape-recorded statement had invited any error resulting from the jury's hearing the tape, and thus that the error was not reversible).

Silvestri first argues that the evidence was insufficient to convict; and, second, that the omission from the jury instructions of the

2367                     U.S. v. SILVESTRI

elements of two components of the conspiracy charged—the mail and wire fraud constituting the "specified unlawful activity" and the object of promotional money-laundering—constituted prejudicial error. After thorough review of the record and the parties' briefs and oral arguments, we are persuaded that the evidence was sufficient to sustain the jury on all counts, and we decline to review the jury instructions because Silvestri invited any claimed error.

### B.

Silvestri says that the evidence was insufficient to support his conviction for conspiring to launder money because the government failed to establish that he knew the funds from the Alliance/Chemical Trust program were proceeds of illegal fraud. More specifically, he claims that the government failed to prove either that he knew (1) U.S. Guarantee had insufficient assets to back up the bonds it had issued to guarantee the investors' capital; or (2) Alliance/Chemical Trust was not legitimately investing the investors' funds. We are unpersuaded.

[4, 5] "To support a conviction of conspiracy, the government must prove [1] that an agreement existed between two or more persons to commit a crime and [2] that the defendants knowingly and voluntarily joined or participated in the conspiracy." *United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983). *See also Whitfield v. United States,* — U.S. —, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) (holding that conviction under 18 U.S.C. § 1956(h) for conspiracy to commit money laundering does not require proof of an overt act in furtherance of the conspiracy). The existence of an agreement may be proven by circumstantial evidence, including "inferences from the conduct of the alleged participants or from circumstantial

evidence of a scheme." *United States v. Tamargo,* 672 F.2d 887, 889 (11th Cir.1982) (citation and marks omitted). Indeed, the government may establish knowledge of an illegal agreement by showing that the defendant "knew the essential object of the conspiracy." *United States v. Russell,* 703 F.2d 1243, 1250 (11th Cir.1983). It is *not* necessary for the government's evidence to be inconsistent with *every* reasonable hypothesis except that of guilt in order to be sufficient. *Lyons,* 53 F.3d at 1202. Moreover, in reviewing the prosecution's case, we draw no distinction between circumstantial and direct evidence. *United States v. Navarro-Ordas,* 770 F.2d 959, 966 (11th Cir.1985).

[6] Silvestri primarily challenges the government's evidence as to the second requirement—that he knew of and voluntarily joined in the conspiracy. Notably, he does not dispute that the program involving Alliance/Chemical Trust and U.S. Guarantee was an elaborate scheme designed to defraud many investors of their money, and it is undeniable that the monies received were never used to make legitimate investments. Nor does he dispute that U.S. Guarantee never had assets remotely sufficient to back Alliance/Chemical Trust as promised, and that the investors' money instead was shuffled to foreign bank accounts and paid out to several entities and persons, including: Alliance/Chemical Trust, run by Womack; U.S. Guarantee, run by Tang; Gold Coast Check Cashing, run by the Morgensterns; and Silvestri himself. Finally, Silvestri does not dispute that if the evidence established that he knew *either* that U.S. Guarantee was writing bonds without assets *or* that Womack was not actually investing the investors' funds—or, more generally, that the proceeds in any transaction he participated in were

U.S. v. SILVESTRI                                    2368

illegal—it was reasonable for the jury to find him guilty beyond a reasonable doubt.

Silvestri was convicted of *conspiring* to violate 18 U.S.C. §§ 1956(a)(1)(A)(i) and (B)(i) and 1957, as proscribed by 18 U.S.C. § 1956(h).[10] In Count 14, the indictment charged that the purposes and objects of the conspiracy were to engage in financial transactions affecting interstate and foreign commerce by cashing checks obtained from a South Carolina-based investment fraud involving the proceeds of a specified unlawful activity,[11] with intent to promote the carrying on of the specified unlawful activity, knowing the transactions were designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, and further knowing that the property involved represented said proceeds. It was also alleged that the criminally derived proceeds involved property of a value greater than $10,000.[12]

If the jury found that Silvestri knew that one element of the scheme was fraudulent, it could reasonably consider that knowledge, under all the facts presented, as evidence that he knew other aspects of the scheme were similarly fraudulent. Thus, if there is sufficient evidence Silvestri knew that U.S. Guarantee was basically a worthless company, without sufficient assets to ensure the investors' "capital investments," that evidence could buttress a finding that Silvestri knew the funds were not being legitimately invested, and vice-versa. The mutually reinforcing nature of this evidence may support a

finding that the knowledge element was satisfied.

Based on our thorough review of this record, we are satisfied that the government presented sufficient evidence from which a jury could find (as it did), beyond a reasonable doubt, that Silvestri knew both that U.S. Guarantee had no assets to back its surety bonds and that the Alliance/Chemical Trust program was a fraudulent scheme. When Tang first contacted Silvestri in late 1997, he did so precisely because his company had no assets and was in dire need of a way out. Indeed, Silvestri advised Tang that several items Tang hoped to utilize as collateral were "worthless." Moreover, Tang advised Silvestri that the company was broke.

At one point in his testimony, Tang unambiguously said that he had discussed with the defendant "the fact that U.S. Guarantee did not have the assets to back" the bonds it had issued. R8 at 63. Indeed, Tang said that in the summer and fall of 1999, he was "'uncomfortable' about the volume and the number of bonds ... being requested and then subsequently issued," and he discussed this too with Silvestri. *Id.* at 82–83. On direct examination, Tang testified that during the summer of 1999 and into the fall of that year, he told Silvestri that U.S. Guarantee did not have the assets to back the bonds. "There were several times," in Tang's words, that he said, "Hey, Joe, you know that we don't have a pot to piss in. I mean, you know that." *Id.* at 83. Silvestri, however, reassured Tang that there was nothing to worry about because the "investment is going well, and, you

---

10. Title 18 U.S.C. § 1956(h) provides that "[a]ny person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

11. The specified unlawful activities listed were mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

12. Silvestri does not challenge the proof of the interstate nature of the transactions, nor that the scheme involved proceeds of the specified unlawful activity greater than $10,000.

2369                    **U.S. v. SILVESTRI**

know, ... nobody is at risk and this is going to be fine." *Id.* At still another point, on cross-examination, when directly asked by defense counsel: "You never told him: 'We don't really have these things. This is all a fraud.'? Did you?" Tang said "Sure we did." *Id.* at 195. He further responded, on cross-examination, that Silvestri knew "that we didn't have any money ...," although he said he didn't use those particular words. *Id.* at 197. Finally, on redirect examination, Tang said that "[a]fter [the] bonds had already ... issued, I ... told Mr. Silvestri that, you know, that our financial statement was worthless." *Id.* at 246.

Additionally, Silvestri, by his own account, served as "liaison between U.S. Guarantee and Alliance." Notably, he assisted in drawing up the sample surety bond and the phony financial statements for U.S. Guarantee; he took calls from Alliance/Chemical Trust sales agents regarding questions about U.S. Guarantee; he instructed Turner on responding to similar calls; and he directed U.S. Guarantee how many bonds should be issued and to whom they should be sent. As the scheme progressed, Silvestri continued to receive clear notice of the precariousness of U.S. Guarantee's actual financial position. Nonetheless, Silvestri repeatedly dismissed these concerns, assuring Tang that U.S. Guarantee would never have to make good on its bond obligations because of the security and success of the Allied/Chemical Trust investments.

Silvestri suggests, however, that Tang's testimony was inconsistent in many respects, and emphasizes that Tang did not testify that he told Silvestri "we don't have any money." While Tang may not have used those exact words, the record reflects that he told Silvestri U.S. Guarantee was in dire financial straits, and that it did not have the assets to guarantee the investments. Whether his tes-

timony was wholly consistent or altogether credible was a question for the jury, which, quite apparently, accepted Tang's account of the communications as accurate. Plainly, the jury was free to choose among reasonable interpretations of the testimony. *See Lyons,* 53 F.3d at 1202; *United States v. Calderon,* 127 F.3d 1314, 1325 (11th Cir.1997), *United States v. Brown,* 186 F.3d 661, 666, n. 8 (5th Cir.1999); *United States v. Guerrero,* 169 F.3d 933, 939 (5th Cir.1999).

The trial record further indicates that Silvestri had plenty of reason to know that the investors' funds were being misappropriated. Both victim Dostert and U.S. Guarantee's lawyer directly advised him of their concern that the program might be a Ponzi scheme; in fact, the lawyer related the Arizona Commission's conclusion that the program was indeed such a scheme, and stated that she agreed. Both Dostert and Burke, of Admiralty Bank, questioned Silvestri as to how the program was able to offer its unusually high rates of return. Moreover, Mahon expressed to Silvestri his concern regarding irregularities in certain transactions involving the investors' funds. Silvestri gave dubious and shifting responses to each of these inquiries, telling Dostert and Burke, respectively, that the money was invested either in Deutsche Bank or in certain World War II-era bonds, advising Mahon that the checks at issue had been deposited at the wrong bank, and telling Tang simply that U.S. Guarantee's lawyer "didn't know what she was talking about."

In *United States v. Simon,* 839 F.2d 1461 (11th Cir.1988), the defendants, who had been employed as salespersons in a "boiler room operation" that sold fraudulent oil and gas leases, were convicted of conspiracy to commit mail and wire fraud. We affirmed the conviction, noting that the investment

terms the defendants conveyed to the investors included the promise of "unbelievable" risk-free returns, that several investors had expressed their concern that the investments might be a fraud, and that the defendants knew that a government investigation into a related sales program had been launched. *Id.* at 1470. Given these clear indicia of impropriety, we found that the defendants' continued participation in the operation amounted at least to "a reckless indifference to the truth, which supplies the criminal intent necessary" for a conspiracy conviction. *Id.* While there certainly was reckless indifference on Silvestri's part, it is not necessary to rely on that theory, because here the jury had sufficient evidence to find direct knowledge.

Furthermore, the wiretapped phone conversations strongly suggest that Silvestri was not surprised or dismayed by the failure of the fund or by the FBI investigation, which would have been a normal response for someone who had just discovered that the fund he had been touting to so many investors for so long was a scam. Rather, he indicated an intent to elude the FBI until the stolen money could be transferred to accounts the government could not reach.

Finally, Silvestri personally played a significant role in the transfer of the investors' funds to various bank accounts. Mahon testified that Silvestri was an "integral participant" in establishing accounts for Womack and the Morgensterns at Admiralty Bank, where many of the investors' checks were deposited. In fact, it was Silvestri who used his prior relationship with Mahon to open up the accounts at that bank. Indeed, Silvestri took the lead in attempting to dissuade Mahon and Burke from closing the accounts, and protested vigorously when the bank nevertheless closed the accounts. Additionally, Silvestri himself was the signatory on at least one of the Bahamian bank accounts (at AIBC).

Silvestri argues, nevertheless, that there was no evidence he knew that the problems with Womack's various accounts were anything but "mistakes" in depositing checks to the wrong accounts and that no one ever "told" Silvestri that Admiralty's checks and wires were being sent everywhere. But, the jury could have inferred (and no doubt did infer) that Silvestri clearly knew that the various bank account activities were involved in laundering the funds Allied/Chemical Trust received from the investors.

Quite simply, the evidence, taken in a light most favorable to the government, indicates that Silvestri was involved in every major facet of the fraud, including the marketing of the investment program, the issuance of the surety bonds from U.S. Guarantee, and the transfer of funds to various accounts at multiple banks. The evidence was sufficient to establish beyond a reasonable doubt that the conspirators (including Silvestri) created an elaborate scheme to bilk investors out of many millions of dollars. Indeed, Silvestri appears to have been a major orchestrator of the fraud, the one person in the entire scheme who had contact with *all* the major players.

Although the government only had to establish Silvestri's knowledge of *either* the insufficiency of U.S. Guarantee's assets *or* of Alliance/Chemical Trust's illegitimate use of investor funds in order to show that he knew the proceeds of the program were illegal, the record, viewed in a light most favorable to the jury's verdict, indicates that Silvestri well knew of both aspects of the fraud. In short, the evidence was sufficient to sustain the jury's verdict on the conspiracy charge.

## C.

Silvestri also argues that the evidence was insufficient to support his substantive money laundering convictions. Again, Silvestri was indicted for and convicted of 30 counts of money laundering, all arising from check deposits into, withdrawals from, and wire transfers among various bank accounts. The evidence of the underlying transactions was organized by transaction-type (deposit, withdrawal or wire transfer) and the bank at which each transaction took place. Thus, for example, Category A transactions consisted of five deposits of investor funds into the Gold Coast Check Cashing account at Admiralty Bank and totaled approximately $1.8 million (corresponding to Counts 17–18, 20–22). Category B transactions consisted of fifteen check deposits into an account at Citibank controlled by Fred Morgenstern, and totaled over $7 million (corresponding to Counts 19, 24–25, 30–32, 34–36, 39–44). Category C transactions consisted of four withdrawals of funds, each in the amount of $500,000, from the Citibank account (corresponding to Counts 28, 33, 38, 45). Category D transactions consisted of five wire transfers from the Citibank account to an account at Barclays Bank in England, controlled by the Morgensterns, totaling about $3.5 million (corresponding to Counts 23, 26–27, 29, 37). Finally, Category E consisted of one wire transfer, in the amount of $2.8 million, from a Womack account at Admiralty Bank to a Morgenstern account at AIBC in the Bahamas (Count 16).

Silvestri contends, nevertheless, that the evidence was insufficient to support his money-laundering convictions under 18 U.S.C. § 1957 for the Category A and Category B check-deposit transactions because the deposits only *created* illegal proceeds, and thus could not have been transactions *in* preexisting illegal proceeds. He also argues that the government's evidence was insufficient as to the Category B, C, or D transactions because the government did not show that he associated with or furthered any of those transactions. Finally, he argues that the government failed to establish liability under *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), because the proof did not show that the transactions were in furtherance of, within the scope of, or reasonably foreseeable as a necessary or natural consequence of an unlawful agreement. We remain unpersuaded.[13]

### 1.

[7] As for the Category A and B counts, Silvestri says that the government's evidence showed only the acquisition *of* the proceeds from the specified unlawful activity (here, mail and wire fraud), and not a transaction *in* the unlawful proceeds. According to Silvestri, there is no § 1957 violation based solely on check deposits because the depositor (or his aider/abettor) does not have possession of the illegal funds until the funds are withdrawn. We disagree with this reading of § 1957, and conclude that on the facts of this case Silvestri was properly convicted based on the deposit of the checks obtained through mail fraud.

Section 1957 sanctions anyone who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity[.]" 18 U.S.C. § 1957(a). The term "monetary transaction" is defined by the statute as "the deposit, withdrawal,

---

13. We also are unpersuaded by Silvestri's additional argument that as to the substantive counts the government failed to establish "unlawful intent.    As discussed in Part II.B, *supra*, we are satisfied that there was sufficient evidence to establish his knowledge of the fraud.

transfer, or exchange, in or affecting inter-state or foreign commerce, of funds or a monetary instrument ... by, through, or to a financial institution[.]" *Id.* at § 1957(f)(1). The term "monetary instruments" means "(i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery[.]" *Id.* at § 1956(c)(5). The term "criminally derived property" means "any property constituting, or derived from, proceeds obtained from a criminal offense ...." *Id.* at § 1957(f)(2).

While the term "proceeds" is not defined by the statute, "we read the statute using the normal meanings of its words." *Consol. Bank, N.A., Hialeah, Fla. v. United States Dep't of Treasury,* 118 F.3d 1461, 1463 (11th Cir.1997). "Courts must assume that Congress intended the ordinary meaning of the words it used...." *Id.* (internal citation and quotation marks omitted). Moreover, "absent a clearly expressed legislative intent to the contrary, that language is generally dispositive." *Id.* (internal citation and quotation marks omitted). "[T]o determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *United States v. McNab,* 331 F.3d 1228, 1237 (11th Cir.2003), *cert. denied,* 540 U.S. 1177, 124 S.Ct. 1406, 158 L.Ed.2d 77 (2004) (alteration in original) (internal citation and quotation marks omitted). The term "proceeds" simply represents "what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue; the total amount brought in." Webster's Third New International Dictionary 1807 (3d ed.1961). Proceeds does not mean only cash or money. BLACK'S LAW DICTIONARY 1084 (5th ed.1979) (citing *Phelps*

*v. Harris,* 101 U.S. 370, 380, 25 L.Ed. 855 (1879) ("Proceeds are not necessarily money. This is also a word of great generality. Taking the words in their ordinary sense, a general power to dispose of land or real estate and to take in return therefor such proceeds as one thinks best, will include the power of disposing of them in exchange for other lands.")).

In addition, Black's Law Dictionary explains that money, checks, and the like are generally called "cash proceeds," while all other proceeds are "non-cash proceeds." BLACK'S LAW DICTIONARY 1084. *See also United States v. Akintobi,* 159 F.3d 401, 403–04 (9th Cir.1998) (checks stolen from the mail or obtained by fraud were "proceeds" for purposes of money laundering statute, even though checks ultimately proved worthless because accounts backing them up were either empty or closed); *United States v. Haun,* 90 F.3d 1096, 1101 (6th Cir.1996) (checks defendant received from the fraudulent sales of the automobiles fall within the common understanding of "proceeds," and thus constitute "proceeds" for money laundering purposes).

Silvestri claims that the act of placing the investors' money into bank accounts for personal use constituted an act *creating* "proceeds," rather than a transaction *in* proceeds. He argues that before the checks were deposited, the "proceeds" were not in possession or "obtained." *See United States v. Gregg,* 179 F.3d 1312, 1315 (11th Cir.1999) (stating that conviction under § 1957 requires proof that "before [the transaction occurred], ... proceeds ... were 'obtained from a criminal offense.' ") However, using the ordinary meaning of the word "proceeds," the checks themselves constituted proceeds of this criminal activity. There is nothing in § 1957 that requires that the proceeds be in the form of cash or that the

2373                    **U.S. v. SILVESTRI**

checks must be contained in a bank account before being considered "proceeds."

Indeed, common usage of the term "proceeds" suggests a broader definition of the word encompassing checks. Section 1957 even specifically includes within its definition of "monetary transactions" the deposit of monetary instruments such as checks into bank accounts, indicating that possession of unprocessed checks would be considered as possession of proceeds. In *United States v. Williamson*, 339 F.3d 1295 (11th Cir.2003), *cert. denied by McKee v. United States*, 540 U.S. 1184, 124 S.Ct. 1427, 158 L.Ed.2d 88 (2004), we held that "the depositing and cashing of *checks that represented the proceeds of the mail fraud* [which constituted the specified unlawful activity] promoted not only the Appellants' prior unlawful activity, but also their ongoing and future unlawful activity. Such evidence is sufficient to sustain a conviction for promotional money laundering." *Id.* at 1302 (emphasis added).

To support his narrower definition of "proceeds," Silvestri cites to our decisions in *Gregg* and *United States v. Nolan*, 223 F.3d 1311 (11th Cir.2000), both of which are distinguishable from this case. In *Gregg* and *Nolan*, we held that the specified unlawful activity was a completed crime only when money was deposited into a bank account. *See Gregg*, 179 F.3d at 1316; *Nolan*, 223 F.3d at 1315–16. More specifically, the Court stated that because "[m]oney laundering is an offense to be punished separately from an underlying criminal offense," the "primary issue in a money laundering charge involves 'determining when the predicate crime becomes a "completed offense" after which money laundering can occur.'" 223 F.3d at

1315 (quoting *United States v. Christo*, 129 F.3d 578, 579–80 (11th Cir.1997)). Thus, in *Nolan*, where the underlying criminal offense was the theft of money from the government by diverting money from an account held by a government contractor into a personal account under the defendant's control, the theft offense was completed only when the defendant ordered the deposit of a duplicate payment into his account "with the intent to use the money for his own purposes." *Nolan*, 223 F.3d at 1316 (quoting *Gregg*, 179 F.3d at 1315). Likewise, in *Gregg*, the underlying *bank fraud offense* was completed as soon as the defendant fraudulently obtained the deposit of an insurance check into his bank account. 179 F.3d at 1315–16; *see also* 18 U.S.C. § 1344.

In this case, by contrast, the completion of the underlying criminal offense occurred *before* the Morgensterns deposited the checks. Mail fraud, under 18 U.S.C. § 1341, is completed when someone "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," "for the purpose of executing such scheme or artifice or attempting so to do," places in any post office or mail depository anything to be delivered by the Postal Service, or deposits or causes to be deposited anything to be sent or delivered by any private or commercial interstate carrier, or receives anything through the mails. *Id.* at § 1341.[14] This Court has said that the crime of mail fraud was completed when the defendant delivered a letter containing false, material representations via Fed Ex. *See United States v. Gray*, 367 F.3d 1263, 1269 (11th Cir.2004). Indeed, in

---

14. In 1994, Congress expanded the provisions of § 1341 to include any "matter or thing whatever to be sent or delivered by any private or commercial interstate carrier." *See United States v. Ma-*

*rek*, 238 F.3d 310, 318 (5th Cir.2001). Deliveries by DHL are covered under the expanded definition. *United States v. Chua*, 16 Fed.Appx. 737 (9th Cir.2001).

U.S. v. SILVESTRI · 2374

*Gray*, we noted that the deposit of mail is sufficient, and that there is no requirement that the mail actually be received. *See id.* at 1270.

The specified unlawful activity in this case was completed as soon as the investor checks were sent through the mails, from Alliance/Chemical Trust in South Carolina to the Morgensterns and/or Silvestri in Florida, for the purpose of executing the fraudulent scheme. The subsequent deposit of the checks, as proceeds of the specified unlawful activity of mail fraud, satisfied the requirements of the money-laundering counts. *See Williamson*, 339 F.3d at 1302 (holding that "the depositing and cashing of *checks that represented the proceeds of the mail fraud* promoted not only the Appellants' prior unlawful activity, but also their ongoing and future unlawful activity. Such evidence is sufficient to sustain a conviction for promotional money laundering." (emphasis added)).[15]

Therefore, we hold that the jury could (as it did) properly find Silvestri guilty of money laundering based on the deposits of investors' checks into various bank accounts, as charged in 20 counts for the A and B transactions.

### 2.

Silvestri makes a variety of additional arguments as to the sufficiency of the evidence on the substantive money-laundering counts contained in categories B, C, and D. Silvestri asserts that he could not properly be

convicted on any of those counts.[16] Again, we remain unpersuaded.

[8, 9] "Basic to criminal law principles is the concept that the commission of a substantive offense and a conspiracy to commit it are separate and distinct offenses." *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir.1996) (internal citation and quotation marks omitted). "Under well established Eleventh Circuit precedent conspirators are liable for *all of the acts and foreseeable consequences of the conspiracy*." *United States v. Alas*, 196 F.3d 1250, 1251 (11th Cir.1999) (emphasis added). "Each party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, *notwithstanding the party's non-participation in the offenses or lack of knowledge thereof*." *Mothersill*, 87 F.3d at 1218 (emphasis added); *see also Pinkerton*, 328 U.S. at 647, 66 S.Ct. at 1184 (holding that "all members are responsible" in a conspiracy for the foreseeable acts of a co-conspirator); *United States v. Hansen*, 262 F.3d 1217, 1246–47 (11th Cir.2001). "Liability will not lie, however, if the substantive crime 'did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" *Mothersill*, 87 F.3d at 1218 (quoting *Pinkerton*, 328 U.S. at 647–48, 66 S.Ct. at 1184). "Hence, the court need not assess the individual culpability of a particular conspira-

---

**15.** Likewise, in *United States v. Mankarious*, 151 F.3d 694, 704–06 (7th Cir.1998), our sister circuit distinguished proceeds obtained through bank fraud, and often through wire fraud, from mail fraud, citing *United States v. Sampson*, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962) and *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), distinguishing the

Eleventh Circuit's *United States v. Christo* (involving bank fraud proceeds) and the Tenth Circuit's *United States v. Johnson*, 971 F.2d 562 (10th Cir.1992) (involving wire fraud proceeds).

**16.** Silvestri raises still other sub-arguments as to each of the categories that we need not address separately. They are subsumed within our discussion of *Pinkerton* liability.

tor provided that the 'substantive crime was a reasonably foreseeable consequence of the conspiracy.'" *Id.* (quoting *United States v. Alvarez*, 755 F.2d 830, 849–50 (11th Cir. 1985)).

In fact, the *Pinkerton* doctrine has been applied to money laundering conspiracy cases; a defendant who joins a money laundering conspiracy may be found substantively liable for money laundering offenses committed by co-conspirators. *See United States v. Tokars*, 95 F.3d 1520, 1539 (11th Cir.1996); *United States v. Mathison*, 157 F.3d 511, 551 (8th Cir.1998).

[10] Silvestri argues that there was no evidence that he was specifically aware of the use of Citibank in the money-laundering scheme, and that therefore the counts related to Citibank transactions (Categories B, C and D) are insupportable. Such specific knowledge, however, is not required in order to establish *Pinkerton* liability. The government needed to demonstrate only that it was reasonably foreseeable that a co-conspirator would use banks other than Admiralty (of whose use Silvestri was plainly and fully aware) to transfer the investment funds.

Among other things, the arrangement among Silvestri, U.S. Guarantee, and Alliance/Chemical Trust called for U.S. Guarantee to receive between 7% and 10% of the funds invested in the program, *and* for Silvestri to receive forty percent of that share. Under the most generous measure, Silvestri was thus to receive 4% of the total invested funds. The government presented evidence that Silvestri ultimately received more than $1.5 million under the arrangement, thus permitting a reasonable jury to infer that the total invested funds were at least $37.5 million. Moreover, in the telephone call intercepted on January 19, 2000, while discussing the receiver's efforts to locate and recover

the investors' funds, Silvestri told Fred Morgenstern that "the good news is that they claim they've found 20 [million] but all the rest is lost." The evidence strongly indicates that Silvestri knew between $20 million and $37.5 million in investor funds had been misappropriated through the fraudulent scheme. However, Special Agent Wise testified that a total of only $17.1 million was ultimately deposited into Admiralty Bank, and Silvestri himself told Mahon, at the opening of the initial Admiralty Bank account, that a mere $4 million to $5 million would be deposited. This too amply supports the reasonable inference that Silvestri knew that millions of dollars in investors' funds were being deposited somewhere other than in Admiralty. *See Mathison*, 157 F.3d at 550–51 (Evidence was sufficient to support money laundering under vicarious liability where government showed that defendant was closely associated with investment group, was instrumental in its organization, accepted a sizable amount of money from it, and encouraged victims to invest in it.).

Moreover, IRS Special Agent Wise testified that Silvestri himself, upon receiving his commission checks from U.S. Guarantee, deposited them into "various bank accounts all around South Florida and throughout other parts of the country, as well as in Nassau, the Bahamas." Admiralty Bank was only one of several banks that Wise identified as receiving deposits from Silvestri himself. According to Wise, Silvestri used his Admiralty account merely as a "conduit account," through which Silvestri's funds would pass on their way to other banks.

Indeed, it was Silvestri himself who introduced Fred Morgenstern and Womack to Admiralty Bank, where they established several accounts and deposited millions of dollars. The defendant personally knew the

U.S. v. SILVESTRI    2376

Chairman of Admiralty and vouched for Womack as well as for the guaranteed investment program. And it was Silvestri who accompanied Peggy Preston to Admiralty Bank on the very day Gold Coast Check Cashing opened its account. Moreover, Silvestri sought to reassure the bank's officials that the accounts were not problem accounts in the hope of maintaining the accounts as long as possible. We also observe that the accounts maintained at Admiralty Bank provided an important vehicle for transferring millions of dollars, invested by the many victims, offshore to the Bahamas and AIBC. Once offshore, these funds were transferred again to bank accounts in England and Switzerland. Finally, it is worthy of note that Silvestri himself opened his own account at AIBC where fraud proceeds were deposited.

On this record, it was more than reasonable to conclude that Silvestri expected, or should have expected, co-conspirators such as the Morgensterns to similarly employ a wide array of banks in their money laundering scheme. In short, we are fully satisfied that a reasonable jury could have found, beyond a reasonable doubt, that the use of the Citibank accounts was altogether foreseeable, and thus convicted Silvestri on the counts related to those accounts as well.

D.

[11]  Finally, Silvestri argues that the district court erred in omitting from its jury instructions on the conspiracy charge definitions of (1) the specified unlawful activity of mail and wire fraud and (2) the conspiracy object of promotional money laundering.

Because any such omissions, even if amounting to error, were invited by Silvestri, we reject this argument.

It is well established in this Circuit that to invite error is to preclude review of that error on appeal. *See Ford,* 289 F.3d at 1294. When a party responds to a court's proposed jury instructions with the words "the instruction is acceptable to us," such action constitutes invited error. *Id.* (quoting *United States v. Fulford,* 267 F.3d 1241, 1247 (11th Cir.2001)). These words serve to waive a party's right to challenge the accepted instruction on appeal. *Id. See also Jernigan,* 341 F.3d at 1290 (finding that a party invited error involving introduction of a recording into evidence when his counsel responded to the court's question "Is everybody agreeable to that?" by responding "Yes, your honor.").

[12]  Silvestri affirmatively waived his right to challenge the instruction when his counsel told the district court that the jury instructions "covered the bases." Silvestri not only failed to raise the issue on his own accord, but when the government requested further elaboration on the elements of the § 1956 charge for money laundering, Silvestri's counsel responded by saying he didn't think it was "necessary," that the money-laundering count was "self-explained" and that he was not requesting further instruction. Indeed, his words expressly accepted the language of the jury instructions, thereby inviting any claimed error. On this record, we conclude that Silvestri waived his right to challenge the jury instructions.[17]

17.  Even if he did not invite error, Silvestri certainly did not object. Thus, the standard is at least that of plain error, an extremely high standard of review that Silvestri does not meet. *See United States v. Hansley,* 54 F.3d 709, 715 (11th Cir.1995). For the court to correct plain error:

(1) there must be error; (2) the error must be plain or obvious; (3) the error must affect substantial rights in that it was prejudicial and not harmless; and (4) the mistake must seriously affect the fairness, integrity, or public reputation of judicial proceedings. *United States v. Chis-*

[13] Because there was sufficient evidence to find Silvestri guilty beyond a reasonable doubt on all counts, and because

Silvestri invited any alleged errors in the jury instructions, we AFFIRM the district court's entry of judgment pursuant to jury verdict.[18]

---

*holm,* 73 F.3d 304, 307 (11th Cir.1996). The plain error standard is a "high standard of egregious error." *Hansley,* 54 F.3d at 715.

The district court instructed the jury that violations of 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) constituted the specified unlawful activity for purposes of the money laundering charges. It further explained that § 1341 "makes it a crime or offense for anyone to use the United States mails in carrying out a scheme to defraud," and that § 1343 "makes it a federal crime or offense for anyone to use an interstate wire communications facility in carrying out a scheme to defraud." Although the district court did not define the terms "defraud" or "promote," we are satisfied that these terms are well "within the common understanding of the jury" and therefore need not be defined. *See United States v. Gonzalez,* 940 F.2d 1413, 1427 (11th Cir.1991). The district court's description of the specified unlawful activity was thus sufficient to satisfy the court's duty to charge the jury on the money laundering counts. In short, the jury instructions were not "so clearly erroneous as to result in a substantial likelihood of a grave miscarriage of justice," as required to show plain error. *Id.* (quoting *United States v. Pepe,* 747 F.2d 632, 674, n. 7 (11th Cir.1984))

18. Silvestri also attempts for the first time, in a Notice of Supplemental Authority submitted pursuant to Fed. R.App. P. 28(j), to challenge his sentence under the Supreme Court's recent decision in *United States v. Booker,* --- U.S. ---, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). In *Booker,* the Court held that the Sixth Amendment prohibited a judge from enhancing a defendant's sentence according to the Federal Sentencing Guidelines based on facts not found by the jury, if the judge treated the Guidelines as mandatory in doing so. Silvestri argues that because the district court here applied such enhancements, the case should be remanded for resentencing. Because Silvestri waived this argument by not asserting it in his initial brief to this Court, he is barred from raising it here.

In *Booker,* the Court stated that reviewing courts are expected "to apply ordinary pruden-

tial doctrines," including (but not limited to) "plain error" review for issues not raised at the district court level. 125 S.Ct. at 769. Under the law of this Circuit, an issue not raised in a party's initial appellate brief is considered waived, and the party is prohibited from raising the issue later in the appeal. *See United States v. Njau,* 386 F.3d 1039, 1041–42 (11th Cir.2004) (refusing to consider a claim under *Blakely v. Washington,* 542 U.S. ---, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) (the predecessor case to *Booker* ), first raised in a letter submitted pursuant to Fed. R.App. P. 28(j)); *United States v. Hembree,* 381 F.3d 1109, 1110 (11th Cir.2004) (denying a motion to file a substitute or amended principal brief raising a *Blakely* claim); *United States v. Curtis,* 380 F.3d 1308, 1310–11 (11th Cir.2004), modified on other grounds, 400 F.3d 1334 (11th Cir.2005) (denying a motion to file a supplemental brief raising a *Blakely* claim); *United States v. Levy,* 379 F.3d 1241, 1242–43 (11th Cir.2004) (refusing to consider a *Blakely* claim first raised in a petition for rehearing); *United States v. Padilla-Reyes,* 247 F.3d 1158, 1164 (11th Cir.2001) ("[B]ecause Padilla did not raise this issue in his initial brief to this court, we apply the rule that parties cannot properly raise new issues at supplemental briefing, even if the issues arise based on intervening decisions or new developments cited in supplemental authority."); *United States v. Ardley,* 242 F.3d 989, 990 (11th Cir.2001) (refusing to consider, on remand from the Supreme Court, an issue arising under *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (another *Booker* predecessor), not raised in the initial or reply brief during the original appeal).

Moreover, Fed. R.App. P. 28(j) specifically says that a party must "state the reasons for the supplemental citations, *referring either to the page of the brief or to a point argued orally.*" (emphasis added). We have noted that "[t]his language further underscores that an appellant's supplemental authority must relate to an issue previously raised in a proper fashion, and that an appellant cannot raise a wholly new issue in a supplemental authority letter or brief." *Levy,* 379 F.3d at 1244.

U.S. v. SILVESTRI                                              2378

**AFFIRMED.**

Nothing in *Booker* or in any of our subsequent cases indicates that the traditional waiver rule has been altered or overturned. In this case, Silvestri did not address sentencing at all—let alone the Sixth Amendment or the *Apprendi/Blakely/Booker* line of cases— in his initial brief to this Court. Thus, under controlling case law, Silvestri has waived the argument, and may not raise it on appeal.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

U.S. Court of Appeals, Eleventh Circuit—West, a Thomson business, Saint Paul, Minn.